# EXHIBIT 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

R CONSULTING & SALES, INC., a Nevada corporation,

Plaintiff,

Case No. 3:17-cv-00171-LAB-BLM

vs.

OLD REPUBLIC INSURANCE COMPANY, a Pennsylvania corporation; and DOES 1 through 10,

Defendants.

---

Deposition of PMK - LANCE Z. RICOTTA, taken on behalf of the Defendant at 402 West Broadway, Suite 1550, San Diego, California 92101, beginning at 9:59 a.m. and ending at 4:39 p.m., on February 15, 2018, before ERIN E. CATES, Certified Shorthand Reporter No. 14096.

SAN DIEGO, CALIFORNIA; THURSDAY, FEBRUARY 15, 2018

9:59 a.m.

PMK - LANCE Z. RICOTTA,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. CARPENTER:

Q. Would you state and spell your name for the record, please, sir.

A. Lance Ricotta, L-A-N-C-E R-I-C-O-T-T-A.

Q. You've been deposed before; is that right?

A. Yes.

Q. How many times?

A. A couple.

Q. Do you remember the last time?

A. Maybe a year or two ago.

Q. And what was that case involving in -- did that involve?

A. It was regards to an aircraft lease.

Q. And what was the name of the case?

A. I think it was Kim -- or R Consulting versus Kim.

Q. Kim? K-I-M?

Q. What is your current position with R Consulting & Sales?
A. Aircraft manager.
Q. What's that mean?
A. Basically, I manage the aircraft that they go on their flights. I manage the maintenance. I deal with customers.
Q. And you fly the aircraft too?
A. Some of them I do; some of them I don't.
Q. And sometimes you get other pilots to come and do the flying for you? Is that the way it works?
A. Yes, sir.
Q. Are you a -- by "you," I mean, is R Consulting & Sales a part in any one operation?
A. Yes, sir.
Q. Do they have a 135 certificate?
A. No, sir.
Q. And to make sure I understand the company correctly, the structure of the company is made up of Raquel Michel and yourself and some file clerk? That's basically the company; is that right?
MR. MASON: Objection. The question is vague and ambiguous. Lacks foundation.
THE WITNESS: I'd like to clarify something.
///



BY MR. CARPENTER:

Q. Sure.

A. I don't arrange pilots for customers. I can give them names, phone numbers of qualified people, and they can make their decision on if they hire somebody -- or they bring in their own pilots, which happens quite often. And we let -- we make sure that they're qualified for what they're doing.

(Mr. Metsch enters room.)

BY MR. CARPENTER:

Q. Okay. How long have you worked for R Consulting & Sales?

A. Probably ten years, eight years. Something like that.

Q. So you started working, what, around the 2008 time frame?

A. It would be a guess. It's been a long time.

Q. All right.

MR. MASON: Please don't guess.

BY MR. CARPENTER:

Q. Was the company set up when you first went to work for it or were you part of the establishment of the company? By "the company," I'm talking about R Consulting & Sales.

A. I don't understand.

Q. Did it exist at the time you went to work for it?
A. Yes, sir.
Q. Okay. And I understand that the president of the company and also a member of the board and the only officer of the company is Raquel Michel; is that right?
A. As far as I know, yes, sir.
Q. And you've been in that very same position as the aircraft manager from the time that you joined the company some ten years ago; is that correct?
A. Yes, sir.
Q. Have you done anything else other than what you just described as the job responsibilities of the aircraft manager?
A. For different companies, yes.
Q. No. For -- sorry. Let me -- for R Consulting & Sales, have you done anything other than what you described as the aircraft manager position?
A. It's all I can really think of. I don't know what you're really asking.
Q. All right. Let me --
MR. MASON: The question is vague and ambiguous.
BY MR. CARPENTER:
Q. Let me ask it this way: Are you involved

with writing any checks, paying any bills for R Consulting & Sales?

A. I gather invoices for it and I give them to Raquel or the secretary to be paid.

Q. Okay. So you bring in the invoices, you give them to Raquel or the secretary, and then they take care of paying whatever the bills are; is that the way it works?

A. Yes.

Q. You don't handle bill paying yourself -- I mean, as far as writing a check or sending a wire or anything along that line?

A. No, sir.

Q. All right. And what is the business, if you could describe it to me, of R Consulting & Sales? What is their business?

A. It's an aircraft sales and leasing company.

Q. Sales and leasing company. Anything else?

A. Consulting.

Q. What is the consulting part of it?

A. Managing aircraft for other clients.

Q. How does that work? Can you explain to me managing aircraft for their clients. What does that mean?

A. If somebody needs help with maintenance or

Q. Go fishing?
A. No.
Q. Okay. Let me direct your attention to November 38LR.
MR. MASON: Do you mean "388"?
MR. CARPENTER: 388LR. Thank you.
BY MR. CARPENTER:
Q. You were involved with the purchase of that aircraft, correct?
A. Yes, sir.
Q. What was its N-number before it became N388LR?
A. I don't recall.
Q. Why was the N-number changed?
A. Easy to keep track of.
Q. Was that your idea?
A. Yeah.
Q. And does the "LR" have any significance?
A. I kind of named it after me and Raquel.
Q. "LR" for Lance Ricotta?
A. No. More for Lance and Raquel.
Q. Got it.
Who was the -- who was N388LR purchased from?
A. Wells Fargo.



name. Is that all right with you?
A. Yes, sir.
Q. Okay. So you don't know how many leases there were from the time that -- and I want to just make sure the record is clear and that I have a timeline -- from the time that it was purchased from Wells Fargo until Pablo leased it; is that correct?
A. Yes, sir.
Q. And do you know a Mr. Galvan?
A. Galvan?
Q. Yeah. How do you spell the last name?
A. I don't -- I'm not sure.
Q. I've seen it spelled G-A-L-V-A-N and G-A-L-V-A-N-G. Do you know which one is correct?
A. I don't.
Q. Did he ever lease this airplane?
A. His company did, yes.
Q. And do you recall when that was?
A. I don't recall.
Q. Are you the one that negotiated the lease with Mr. Galvan?
A. Yes, sir.
Q. Did he come to you, or how did this lease come about? Can you explain it to me?
MR. MASON: Just for the record, I think

it's spelled G-A-L-V-A-N. That's how I've seen it in writing. So I don't think there's a "G" on the end, and I don't want to confuse the record here with incorrect spellings, please.

MR. CARPENTER: Yeah. Thank you for clarifying it because, as I said, I've seen it two ways, and I'm not sure which is the correct way. So let's go with "Galvan," okay?

BY MR. CARPENTER:

Q. And you have no recollection of the -- well, strike that.

Do you recall how long the lease was for?

A. I don't recall.

Q. Have you seen a copy of that lease?

MR. MASON: Objection. It's vague as to time.

BY MR. CARPENTER:

Q. At any time?

A. Yes, sir.

Q. Okay. When you got -- when you prepared yourself for this deposition today, and we went through Exhibit 1 with all the stuff that was listed, I gather you didn't come across the Galvan lease?

A. I didn't.

Q. And where would that have been kept in the

company records, if you know?

A. I don't.

Q. You have no idea where it would be kept?

A. No, sir.

Q. Okay. Who would have kept the records?

A. Probably, Raquel.

Q. Raquel?

A. Or the secretary.

Q. Is there, like, a file cabinet where all these former leases are kept?

A. I don't know if she keeps them or not.

Q. How about -- is it the same thing for, like, sales documents? Is there, like, a file system that you can look for a record on a sale of any of the aircraft that R Consulting was selling?

A. I don't know how she keeps her records.

Q. Okay. Any idea where the aircraft was based when Mr. Galvan was leasing it?

A. El Paso.

Q. How do you recall that? I'm just curious. You don't remember the terms of the lease or the dates of the lease or anything, but you remember it was based in El Paso?

A. I remember talking to Atlantic Aviation in El Paso, which is where the airplane was kept.

Q. So I gather Galvan kept the aircraft at Atlantic Aviation. Is that an FBO?

A. Yes, sir.

Q. And do you know who the person was there that was your contact at Atlantic Aviation?

A. I don't recall.

Q. Do you know what Mr. Galvan used the airplane for?

A. For transportation.

Q. What kind of business was he in?

A. He had several businesses that I knew about -- which one was a wine business, another one was milk. I think he had some construction businesses, also.

Q. Did you deliver the airplane to him -- and by "the airplane," we're talking about 388 -- in El Paso?

A. Delivering as in --

Q. Yeah. Did you --

A. -- did I ride with it or fly with it?

Q. Fly it? Did you fly it El Paso?

A. I don't recall if I flew it or if somebody else flew it.

MR. MASON: Belated objection as to time. It's vague as to time.

///

BY MR. CARPENTER:
Q. Okay. So we have this lease, and you said the airplane was based in El Paso. Where was it flown from to El Paso? Ontario?
A. I don't recall. It's been a long time, sir.
Q. Okay. All right. At some point in time, did RC -- I'm sorry -- did R Consulting inform its broker, Avinsurance, that there was a lease with Mr. Galvan and his company?
A. Yes, sir.
Q. Who informed the broker?
A. I don't recall.
Q. How do you know the broker was informed?
A. I think we had him additionally insured on the policy.
Q. Who was the one that asked that they be included as an additional insured?
A. The customer.
Q. So the customer asked R Consulting to add them as an additional insured? Is that the way it worked?
A. Yes, sir.
Q. And who were the communications with between Mr. Galvan's company and R Consulting?
A. I don't understand.

Q. All right. You just agreed with me that they asked to be added as an additional insured, and that either happened, probably, in writing or by e-mail or by phone or in person, somehow, right?
A. Yes, sir.
Q. And that there was a conversation between somebody at Galvan and R Consulting that transmitted that request.
A. Okay.
Q. So I'm trying to figure out who was it that asked for it at Galvan and who did they ask at R Consulting. Do you know?
A. Well, they would have asked me.
Q. And then you would have contacted --
A. But it was probably his assistant.
Q. Okay. Do you remember the assistant's name?
A. I think it was Enrique.
Q. Enrique. Any idea what the last name was?
A. I don't.
Q. And so it was in -- your recollection is that Enrique -- did he speak to you? Did he e-mail you? How did this work?
A. It's been four or five years, sir. I don't recall.
Q. But in any case, you were the one that

contacted Avinsurance and said "Add Galvan to the lease as an additional insured." Is that true?

A. I don't know if I called or if Raquel called. I don't recall either way who did it. Like I said, sir, it's been four or five years.

Q. And who would you have spoken to at Avinsurance? Who was your point of contact back in that period of time?

A. I spoke to several people at Avsurance. Mr. Underwood. I don't know if Mr. Coleman worked at Avsurance at the time. I don't recall how, you know --

Q. Well, let me just ask you a series of questions about Phoenix Aviation Managers. Does that name mean anything do you?

A. No, sir.

Q. So I gather you never had any contact with them at any point in time; is that fair?

A. Yes, sir.

Q. All right. And then Old Republic Aerospace, does that mean anything to you?

A. No, sir.

Q. Again, I gather since it doesn't mean anything to you, you don't recall it or having any contact with them; is that fair?

A. Yes, sir.

Q. And then how about Old Republic Insurance Company? Are you familiar with them?
A. I am now.
Q. Okay. And you are now because they wrote this insurance policy that we're here talking about today; is that right?
A. Yes, because of the suit we're having.
Q. And you understand that Old Republic Insurance Company is the insurance company that wrote and handled this risk and gave you the insurance policy; is that right?
A. I understand that now, yes.
Q. And you didn't have that understanding before this litigation; is that correct?
A. Yes, sir.
MR. MASON: All right. Let's take a break. We've been at this just about an hour. Let's take a five-minute break.
MR. CARPENTER: Before you do that --
BY MR. CARPENTER:
Q. Anytime you need a break for any reason, just let me know. I mean, this is not a marathon.
A. Yes, sir.
Q. I have a lot to get through, and I'm going to try to get through it expeditiously. But any time you

arrive at the terms of the lease, and then you end up with the lease like we see in Exhibit 2. Is that the way it would work?

A. Yes, sir.

MR. MASON: Objection.

BY MR. CARPENTER:

Q. Okay. Do you know when N234LR was purchased initially?

A. I don't.

Q. That's the subject of Exhibit 2, right, that aircraft N-number?

A. Yes, sir.

Q. Okay. Do you know who it was purchased from?

A. I don't.

Q. Who handled the purchase?

A. I would have handled -- or helped handle the purchase, but I don't remember the client's name that it was purchased from.

Q. How long did Info Tech Corporation have possession of N234LR under this lease?

A. Approximately six months.

Q. Do they still have possession of the aircraft?

A. No, sir.

Q. Does R Consulting still own the aircraft?

Q. And they were going to take a ride in the airplane. Who was going to fly it?
A. I don't recall who the pilots were.
Q. Was there ever a lease between The Cosmopolitan and R Consulting?
A. I don't recall if there was a lease or not between them.
Q. Was it -- do you have any understanding of what this flight was supposed to be? Was it like a prepurchased flight, or what was the purpose of the flight?
A. This might have been a demo flight.
Q. You just specifically can't recall?
A. No, sir.
MR. CARPENTER: Okay. I'm going to hand you what's been marked as Exhibit 6 and ask you to take a look at that, please.
(Exhibit 6 was marked for identification.)
BY MR. CARPENTER:
Q. And I apologize for the quality of it, but that's the best we have.
Have you seen that before?
A. Yes, sir.
Q. What is it?
A. It's an aircraft dry lease.



Q. Between?
A. R Consulting and -- trying -- I don't how to pronounce it. It's A-V-I-A-R-R-E-N-D-A-M-I-E-N-T-O-S S.A. de C.V. and Pablo Gonzalez Ulloa.
Q. And I'm going to refer to that -- you just pointed out how difficult that name is -- as "Pablo's company," and you'll understand that to be that long name you just spelled into the record; is that fair?
A. Yes, sir.
Q. And then Pablo, as we mentioned earlier, has got kind of a complicated name. I'll just call him "Pablo" for the purposes of these questions. Is that all right with you?
A. Yes, sir.
Q. This lease that we're looking at, Exhibit 6, is the lease involving the airplane that we're here dealing with -- that's NR388RL, correct?
A. 388 Lima Romeo.
Q. Lima Romeo. Who handled the negotiations on behalf of R Consulting relative to this lease?
A. I did.
Q. Was Raquel involved in the negotiations at all?
MR. MASON: Objection. It calls for speculation.



THE WITNESS: With Pablo or with myself?

BY MR. CARPENTER:

Q. In the negotiations with Pablo.

A. I don't recall that she spoke with Pablo.

Q. And let me direct your attention to paragraph 2 on the first page of the lease, under "Term." And the term of this particular lease, Exhibit 3, was three months; is that right?

A. Yes, sir.

Q. And the start date of the lease was --

MR. MASON: Let me clarify something. You said "Exhibit 3"?

MR. CARPENTER: I'm sorry. Exhibit 6. Correct the record on that. Thank you, again.

BY MR. CARPENTER:

Q. On Exhibit 6, the start date was September the 3rd, 2014?

A. September 4th.

Q. 2014?

A. 2014, yes.

Q. So the three-month lease would have ended, what, December the 4th, 2014; is that right?

MR. MASON: Objection. Calls for a legal conclusion and speculation.

BY MR. CARPENTER:
Q. You can answer.
A. Three months from September 4th would have been December 4th.
Q. Okay. Now, in your negotiations with Pablo, did he ever tell you how he planned on using this aircraft, November 38 Lima Romeo?
A. 388 Lima Romeo?
Q. Yeah.
A. Yes, sir.
Q. What did he tell you in regards to that?
A. For executive transport.
Q. And what did you understand that to mean?
A. Flying people in his company and --
Q. Did you have some -- I'm sorry.
A. -- and his customers.
Q. I didn't mean to cut you off.
And his company -- what was your understanding of what his company did, Pablo's company?
A. They had government contracts with Mexico.
Q. Doing what?
A. Mostly aviation related. Building aircraft for the Mexican military.
Q. Did you have an understanding when you were

aircraft.

Q. Now, the lease doesn't have any constraints or indication of how many hours a month the aircraft was going to be flown --

MR. MASON: Objection. Calls for a legal conclusion.

BY MR. CARPENTER:

Q. -- does it?

MR. MASON: And the document speaks for itself.

BY MR. CARPENTER:

Q. Well, I'll make it easy for you. When you were negotiating the terms of the lease with Pablo, did you talk about how many hours you anticipated that he and his company would be flying the airplane under the terms of the lease?

A. Approximately 35 hours.

Q. And is that number reflected somehow in any writings that you're aware of?

A. I don't know. I'm reading contract over.

MR. MASON: Just give him some time to review the agreement.

MR. CARPENTER: Sure. Absolutely.

(Mr. Metsch exits room.)

THE WITNESS: No, sir.

MR. CARPENTER: All right. Then -- read the question and the answer, back, please.

(Record read.)

BY MR. CARPENTER:

Q. So your answer is in regards to lease itself, Exhibit 6? There's nothing in there that reflects the 35 hours; is that what you're saying?

A. I don't see anything in there that reflects the 35 hours.

Q. But you have an understanding it was only going to be flown for 35 hours, and that came from somewhere. Was that in your discussions with Pablo? Is that how it came about?

A. Yes, sir. Verbal discussions with Mr. Ulloa.

Q. Was it ever memorialized in, like, an e-mail or a letter or any sort of writing?

A. I don't recall.

Q. Was the charge, that was the $73,000 per month that you charged -- that R Consulting charged for this aircraft under the lease, was that a function of the hours?

A. Based on the -- what the maintenance program for the aircraft is and how many hours a month that the airplane would be used. And the way the aircraft maintenance program is structured, it allows you,



aircraft.
BY MR. CARPENTER:
Q. Well, as the aircraft manager for R Consulting, you were the one that would know these requirements, correct?
A. Yes, sir.
Q. And you were the one that would go and have the aircraft maintained as was necessary in order to keep it airworthy, true?
A. I would have a spreadsheet, yes.
Q. You had a spreadsheet and would list the components, like the engines and the airframe and accessories and all this sort of stuff, and it would tell you when various things had to be done, correct?
A. Yes, sir.
Q. And then you would take the airplane, contact a maintenance outfit, and say it needs to have whatever sort of maintenance that needed to be done based upon that spreadsheet. Is that the way it works?
A. Yes, sir.
Q. So, let me back get back to what we were talking about. In assessing the charge that you make in a lease, you would take into consideration a number of factors in regards to maintenance. One would be the calendar things we talked about. And the other would

be done by R Consulting & Sales, Inc. in Ontario, California, correct?

A. Or a mutually agreed upon facility.

Q. And that would -- mutually agreed upon "in writing," it says, right?

MR. MASON: Objection. The document speaks for itself.

BY MR. CARPENTER:

Q. It was your intent when you negotiated this that if the aircraft was to be maintained in someplace other than Ontario, that there would be a written agreement between the lessor, that's R Consulting & Sales, and the lessee, which is Pablo and his company, correct?

MR. MASON: Same objection.

BY MR. CARPENTER:

Q. You can answer.

A. It says that it was in writing -- may -- "may agree in writing." "May."

Q. "May," okay. So you didn't consider that mandatory?

A. I don't consider it mandatory.

Q. All right. And so during the term of this lease, the three months we're talking about here, where was this aircraft -- and by "this aircraft," I'm



talking about N388 Lima Romeo -- maintained?

MR. MASON: Objection. Calls for speculation.

THE WITNESS: I don't think it needed any maintenance during that three-month period.

BY MR. CARPENTER:

Q. So as you sit here today you have no recollection of any maintenance being done on this aircraft -- by this "aircraft," I'm talking about November 388 Lima Romeo -- during the three months that it was being leased by Pablo and his company; is that fair?

A. Yes, sir.

Q. Okay. Let's turn to the second page of Exhibit 6, please -- well, no before we go there.

On the right-hand side on the first page under "Basement Maintenance," there's a writing on the right-hand side and it looks like -- I don't know. Do you recognize what that is?

A. No, sir.

Q. Is that your initial?

A. Doesn't look like my initials.

Q. And you would recognize Raquel's initial too, I assume, correct?

A. Yes, sir.

Q. Is that hers?
A. It does not look like hers.
Q. Okay. Fair enough.
Let's go to 10, please. Just read that to yourself, please. Let me know when you're done and then I'll ask you a couple of questions about it -- actually, you can just kind of read it down to the bottom of that page. You don't have to read the rest of it.
A. Okay. I'm done.
Q. You finished?
A. Yes, sir.
Q. Do you see -- let me direct your attention to lines 5 and 6 where it says -- it talks about additional insureds. Do you see that? Basically, it says the lessee and the manager will be added as additional insureds under the liability policy. Is that the way you read it?
MR. MASON: Objection. The document speaks for itself. It is the best evidence.
BY MR. CARPENTER:
Q. You can answer.
A. My understanding is if the lessor needed to be additionally insured, we would additionally insure them.



Q. Okay. And is it your understanding that the lessee -- the lessee, that would be Pablo's company -- would ask you to be added and then somebody from R Consulting would contact the broker and ask that they be added? Is that the way it worked?

MR. MASON: Objection. Calls for speculation.

THE WITNESS: If the lessor needed to be -- asked to be -- if the lessee asked to be additionally insured, then we would contact Avsurance.

BY MR. CARPENTER:

Q. Do you recall if Pablo ever requested to be added as an additional insured under the policy for November 388 Lima Romeo?

A. No.

Q. At least he never asked you; is that fair?

A. Yes, sir.

Q. Okay. Let's go back to Exhibit 2, again, please. Do you have that in front of you?

A. Yes, sir.

Q. Okay. And that's the lease for 234 Lima Romeo, correct?

A. Yes, sir.

Q. And then paragraph 13 on page 4, just kind of read through that, and then I'm going to ask you the



same questions. It's about additional insured under that policy.

A. Okay.

Q. Do you know if R Consulting ever asked the broker to add Info Tech Corporation as an additional insured under the policy for November 234 Lima Romeo?

A. Yes, sir.

Q. They did?

A. Yes, sir.

Q. Did they ask you? Were you the person?

A. Yes, sir.

Q. And what did you do?

A. Contacted Avsurance.

Q. And you asked that they be added?

A. Yes, sir.

Q. And I'm gathering the gist of your testimony is that the lessee never asks -- it was your company's policy -- by "your company," I mean, R Consulting & Sales -- not to ask the broker to add them to the policy. Is that the way it worked?

A. Yes, if they didn't ask for it they --

Q. And we know that the aircraft that was leased under Exhibit 2 was based in the United States, correct?

MR. MASON: Objection. Calls for a legal

conclusion as to the word "based."

THE WITNESS: Its base was in California.

BY MR. CARPENTER:

Q. In California, okay. All right. And while the lease was in effect -- Exhibit 6, this lease, the one that we're here today to talk about, did you ever talk to Pablo about, you know, how it was being used, where it was being flown?

A. Yes, sir. I answered those questions earlier.

Q. Okay. And refresh my recollection.

A. He was going to be flying his people and his company around.

Q. Right. Right. I understand that. But during the pendency of the lease, did you understand that he was flying most of the time out of Toluca, Mexico?

MR. MASON: Objection. Misstates his prior testimony.

THE WITNESS: He had offices in Toluca.

BY MR. CARPENTER:

Q. Okay. Well, you delivered the aircraft down to Toluca, did you not?

A. I flew down to Toluca in the aircraft, yes.

Q. When was that?

A. Sometime early September.
Q. All right. And who flew the airplane down there with you?
A. Roberto, I think, and there was somebody else. I don't remember who it was. It was Paul -- it's been a long time, sir. I don't remember.
Q. And you flew it out of where?
MR. MASON: Objection. The question is --
BY MR. CARPENTER:
Q. Where did you depart from?
MR. MASON: Do you mean he physically flew it or he flew in it?
MR. CARPENTER: No.
BY MR. CARPENTER:
Q. Where did you depart from on your flight from the United States to Toluca? What base?
A. I think the airplane might have been in Ontario, but it's been a long time.
Q. All right. So you flew from, you believe, Ontario down to Toluca with the -- and you were the pilot in command, I assume?
A. No, sir.
Q. You weren't? Who was?
A. I think Roberto was.
Q. Roberto, okay. How much time does he have?



ended up calling Roberto Hernandez to ask what -- what I'd like to say -- "What happened," right?

A. Yeah. Yes.

Q. And what did he tell you?

A. He said that he had not been flying the airplane, because he was in a dispute over pay with Pablo.

Q. Ah, okay. Did he tell you specifically what the dispute was about?

A. About how much Pablo -- about how much Roberto was owed for whatever month it was on the trip.

Q. Okay. Did he tell you when the last time it was that he flew for Pablo or his company?

A. Early December, I think, is what it was, if I remember correctly.

Q. And did he tell you, you know, once he stopped flying the airplane was there someone else who took over and started to do the work for Pablo and his company?

A. No. Nobody was supposed to be flying the airplane.

Q. No one was supposed to be flying the airplane.

MR. MASON: Let's -- we agreed to break for lunch.

"based." It's a legal term and calling for a legal conclusion.

BY MR. CARPENTER:

Q. Well, let's see if we can get this straightened out. So you delivered the airplane down to Pablo in September of 2014 in Toluca, right?

A. Delivery is -- I don't understand what you mean by "delivery." But I flew down in the aircraft, met Mr. Ulloa, shook his hand, and then got on airline and flew home.

Q. Okay. Did he tell you where he was going to keep the airplane? Was there a hangar or -- any discussion about where is this airplane going to be kept during the term of this lease?

A. Keeping an airplane -- you don't "keep" an airplane. Airplanes fly.

Q. Right. But it's parked someplace, usually, when it's not flying, right?

A. It could be parked anywhere, and he said he had offices in San Diego -- or going he was going to get an office in San Diego; had an office in Miami; and an office in Toluca.

Q. All right. And did Hernandez fly back with you after the airplane was taken down to Toluca in September?

can put that aside. Thank you.
Now, was November 388LR ever returned to R Consulting as was required under the terms of the lease on December the 4th, 2014?
A. No, sir.
Q. Why not?
MR. MASON: Objection. The question assumes that the lease mandated that the aircraft be returned on December the 3rd, 2014. And the document speaks for itself, and the question calls for a legal conclusion.
BY MR. CARPENTER:
Q. Was it your understanding that the lease was for three months, correct?
A. With 30-day extensions as needed.
Q. Okay. Was there any discussion between you and Pablo about an extension of the lease?
A. Yes, sir.
Q. When did that occur, the first time?
A. Don't really recall.
Q. Was it before December the 4th?
A. Yes, sir.
Q. What did he say?
A. That he needed the aircraft longer.
Q. And was there any writing that reflected the



extension, that you're aware of?

A. I don't have it. I don't know if there was. It was a long time ago.

MR. MASON: Do you mean other than the lease itself?

MR. CARPENTER: No, the extension. I'm talking about the extension.

BY MR. CARPENTER:

Q. You understood that to be the extension, correct?

A. I understand.

MR. MASON: Well, I mean, your question assumes that the lease itself doesn't provide for or allow any extension whatsoever, unless there is some other writing.

MR. CARPENTER: Well, let me just --

MR. MASON: I'm not sure that's what the lease says. The lease speaks for itself.

MR. CARPENTER: I'm asking him to tell me when he spoke to Pablo and he said "We need an extension" and he agreed to that extension.

BY MR. CARPENTER:

Q. Is that right --

A. Yes, sir.

Q. -- Mr. Ricotta?

A. Yes, sir.
Q. And was that ever memorialized in writing? E-mail or mail? That agreement, that he would get a 30-day extension?
A. I don't recall. I don't have any paperwork with that.
Q. And you went through this -- as you talked about earlier in this deposition -- to see if there would be anything like that; is that right?
A. Yes, sir. I did not find anything.
Q. Thank you.
You're going have to --
A. Okay.
Q. -- you know. We talked about that.
Before September 2015 -- 2015, not '14 -- did R Consulting ever inform Avsurance about the existence of the Pablo lease, Exhibit 6?
A. I don't recall.
Q. Who would have informed Avinsurance? Would that have been your responsibility or would that be someone else's?
A. It could have been mine or it could have been Raquel, if we needed it.
Q. And we talked about it earlier, and I'm not going to go through these questions again, just -- I

leases, right?

MR. MASON: The question is vague and ambiguous as "to make money." What does that mean? Does that mean make a net profit or gross profit? What are we talking about?

MR. CARPENTER: All right. Well, let me hand you Exhibit 8, and I'll ask you to take a look at that, if you would.

(Exhibit 8 was marked for identification.)

THE WITNESS: Okay.

BY MR. CARPENTER:

Q. All right. And let me direct your attention, now, to the middle of the page. And this is from you to Jim Coleman. Who is Jim Coleman?

A. Jim Coleman is the insurance agent.

Q. For Avsurance, right?

A. Correct.

Q. And Mr. Ed Underwood, who is he?

A. He's the president of Avsurance.

Q. Okay. And read that first sentence to me.

A. "Jim, I make money leasing these aircraft. I just can't stop."

Q. All right. I was using your language, "make money." What did you mean by that in that e-mail?

A. Well, it costs money to have an aircraft sit,

you tell me when that occurred, when that lightbulb went off and you said, "Wow. This Avinsurance really isn't an insurance company"?

MR. MASON: Objection. That's been asked and answered several times, actually.

MR. CARPENTER: Maybe it refreshes his recollection looking at this stuff.

THE WITNESS: I don't recall exactly when the date was, sir.

MR. CARPENTER: Okay. Great. Fair enough.

I'm going to hand you Exhibit 9 and ask you to take a look at that, if you would, please.

(Exhibit 9 was marked for identification.)

THE WITNESS: Okay.

MR. CARPENTER: And I'll give you 10 too, because 9 is a worse copy than 10, so then we'll compare the two. And it may be easier to read 10 rather than 9.

THE WITNESS: Okay.

MR. CARPENTER: And then we'll kind of look at each of them separately.

(Exhibit 10 was marked for identification.)

THE WITNESS: Okay.

BY MR. CARPENTER:

Q. All right. Do you recognize Exhibit 9?



A. Yes, sir.
Q. And what is it?
A. It's a purchase agreement.
Q. Okay. And Exhibit 10? Do you recognize that?
A. It looks like a better copy of Exhibit 9.
Q. Let me just direct your attention, if you would, to -- well, let's see. Well, strike that. Let's not do that.
Okay. Let's turn to Exhibit 9, if we can, first.
A. Okay.
Q. Well, before we go there, let me ask you: You recognize the document as an aircraft purchase agreement. Is this an R Consulting document? In other words, was this drafted by R Consulting?
A. No, sir.
Q. Who drafted Exhibit 9 and 10?
MR. MASON: Exhibit -- excuse me -- objection. Calls for speculation.
BY MR. CARPENTER:
Q. Do you know?
A. It was received from Pablo.
Q. Okay. And was it received from Pablo, filled out as we see in front of us as Exhibit 9 and 10?

A. Yes, sir.
Q. And how was it received? by fax? by mail?
A. It might have been a fax.
Q. Okay. Let's look at Exhibit 9 just for a moment. Let me ask you this before we do that: Were you the one that handled the negotiations in regards to the sale of 388 Lima Romeo?
A. Yes, sir.
Q. On Exhibit 9, would you turn to page 219 -- 0219 at the bottom.
A. Yes, sir.
Q. Okay. And if you look over on the left-hand side, you'll see a signature block?
A. Yes, sir.
Q. Do you recognize that signature?
A. That's Raquel's signature.
Q. Okay. Do you know what date it was signed?
A. It appears it was on -- well, looking back on -- the 12th of 2015.
Q. I'm sorry? Where --
MR. MASON: Excuse me.
BY MR. CARPENTER:
Q. Where are you looking?
A. "January 12th, 2015."
MR. MASON: Objection. The document is

Q. 222. Triple two on Exhibit 9.
A. Okay.
Q. You got that?
A. Yep.
Q. Can you read it, where it says -- starts out "Pursuant to the Aircraft Purchase," would you read that in the record, if you can. And if you can't read it on 9, we'll go to 10.
A. "Pursuant to the Aircraft Purchase Agreement dated the 1st of December 2014 between R Consulting & Sales, Inc. (hereafter) and Jose Luis Sanchez (hereinafter Purchaser), Purchaser acknowledges delivery on the 1st day of December 2014, of the following aircraft."
Q. Okay. And that's 388 Lima Romeo, right?
A. Yes, sir.
Q. And was the aircraft delivered to the purchaser, which would be Mr. Sanchez, on December the 1st, 2014?
MR. MASON: Objection. Calls for speculation.
THE WITNESS: Not to my knowledge.
BY MR. CARPENTER:
Q. And, again, going to the bottom of 222. Seller's initial, do you recognize that as Raquel's

MR. CARPENTER: Oh, okay.
THE WITNESS: I'm sorry.
BY MR. CARPENTER:
Q. Let's straighten that out then. I want to know about Sanchez. Did Pablo tell you anything about Sanchez?
A. No, sir.
MR. MASON: Wait -- because he was talking about the president of Azteca Airline. You asked about Ulloa and then that's what he told you, and that's what I understood too.
MR. CARPENTER: Okay. All right.
MR. MASON: So that whole line of questioning is null and void.
MR. CARPENTER: Fine.
MR. MASON: Okay.
MR. CARPENTER: Let's go back.
BY MR. CARPENTER:
Q. Did Pablo tell you anything about Mr. Sanchez and his background?
A. No, sir.
Q. All right. Was November 388 Lima Romeo actually delivered to Sanchez?
MR. MASON: Objection. Asked and answered.
THE WITNESS: Not that I -- not from us.

Q. Who?
A. Mr. Scott Weigman.
Q. And this is in one of your telephone calls with Weigman; is that right?
A. Yes, sir.
Q. And he told you that he had an understanding that Sanchez was an interpreter for Pablo?
A. Yes, sir.
Q. Did he tell you -- did you follow up with the question of how he found out that information?
A. I don't recall.
Q. Other than Mr. Weigman, have you heard from anybody else -- this rumor -- that Sanchez was an interpreter working for Mr. Pablo?
A. No, sir.
Q. All right. And you told us that you had an agreement with Pablo to extend the lease for 30 days past the December 4th termination date, correct?
A. Yes, sir.
Q. And did you have any understanding when you agreed to that where the aircraft was physically located?
A. In Toluca.
Q. And did you have an understanding of during the previous three-month period how often it had been

A. The aircraft.
Q. It was supposed to be sold?
A. Sold. Yes, sir.
Q. And I think you answered this question, and forgive me if I'm wrong, but in December when you granted that extension to Pablo, you understood the airplane was in Toluca and that it would be flown out of there, correct?
A. At that time it was in Toluca.
Q. Okay. In September 2015, did you inform Avinsurance that the aircraft had been sold?
A. September of 2105?
Q. 2015, yeah.
A. I don't recall what I informed them of.
Q. I'm sorry?
A. I don't recall what I informed them of.
Q. Do you recall any communications with them in September of 2015? By "them," I'm talking about Avinsurance?
A. Yes.
Q. You did?
A. I do recall talking to them about the situation of -- with the aircraft in 2015.
Q. All right. And my question, though, is before that conversation in September of 2015, did you

inform Avsurance that the aircraft had been sold?

A. No, sir.

Q. And --

MR. MASON: Objection, belatedly. The question assumes that the aircraft had been sold, when, in fact, there's been no evidence at all that it's been sold or that it ever sold.

So go ahead.

BY MR. CARPENTER:

Q. And would your answer be the same -- and we talked about this. I'm sorry to beat it to death -- but you had no contact with Phoenix Aviation Managers or Old Republic Aerospace or Old Republic Insurance?

MR. MASON: Hang on. We've asked -- we've talked about that now probably five times. We'll stipulate on every question going forward that R Consulting, Mr. Ricotta, Raquel Michel had never had communications with Old Republic Insurance Company, Old Republic Aerospace, or Phoenix Aviations Managers, Inc.

MR. CARPENTER: Thank you.

Let me hand you Exhibit 11. I think we want to put them aside for a second -- in some order -- in case I want to go back and talk about something.

Okay. I'm going to hand you 11.



MR. CARPENTER: I'm not asking him that.

MR. MASON: Thank you.

BY MR. CARPENTER:

Q. And you testified earlier that the lease terms remain in effect as far as R Consulting is concerned, correct?

A. Which lease terms?

Q. The fact that you're -- that they -- that Pablo's company continues to owe R Consulting under the terms of the lease agreement?

A. Since the aircraft was not returned, yes.

Q. Yes. Okay. That's all right. Okay. Good.

And I want to make sure we're perfectly clear on this point. The only evidence you're aware of that the $1 million was paid by Sanchez to Pablo and his company was the text message we just talked about, correct?

MR. MASON: Objection. That assumes facts not in evidence. I don't think he testified that he has any evidence that $1 million was paid.

BY MR. CARPENTER:

Q. Do you have any evidence the million dollars was paid?

A. Just from the conversations, and there might have been an e-mail. I don't know if there was one

the 9th, 2015, correct?
A. Yes, sir.
Q. All right. So I understand this response, it's R Consulting's position that a total of $466,404.49 was paid under that three-month lease that was then extended, correct?
A. Correct.
Q. Do you have any understanding -- on item 10 on line 21 -- 200,000 was paid on April the 9th, 2015. January, February, March of 2015. That indicates that that amount was for those three months, correct?
A. Yes.
Q. Is it R Consulting's position that Pablo is still on the hook for this lease? In other words, should still be paying on it?
A. Yes, sir.
Q. And why do you say that?
A. Because he still had the aircraft.
Q. And how do you know he still has the aircraft?
MR. MASON: He didn't say that. He said "had," H-A-D, "had."
BY MR. CARPENTER:
Q. All right. When did he stop having the aircraft?

that he received the full purchase price from Mr. Sanchez.

MR. MASON: Why don't you read the sentence until you understand it and then ask questions on it.

BY MR. CARPENTER:

Q. It's your position that Pablo received in full the $1 million from Sanchez in December 2014. That's R Consulting's position, correct?

MR. MASON: Objection. Calls for speculation.

THE WITNESS: That's what we were told by Pablo.

BY MR. CARPENTER:

Q. And by "we," who was told that?

A. Me and Raquel.

Q. And was that in person? Was it in a telephone call? Was it an e-mail? How did that occur?

A. Mostly, telephone calls.

Q. And was this call -- well, strike that.

When was this call where Pablo said he had received payment in full from Sanchez?

A. I think it was sometime in January, but I can't recall the exact date.

Q. January 2015?

A. Yes, sir.



with Sanchez saying that he's already paid for it or something of that.

Q. Well, you went through the files of R Consulting, and if the e-mail existed, it should be here, correct?

A. If I have the e-mail, it would be here.

Q. Okay. And as far as you know today, this is just conversations between you and Pablo in which he said that he received the $1 million, correct?

A. Correct.

Q. And do you have any specific recollection of the date of that conversation?

A. I don't, sir.

MR. CARPENTER: Okay. Let's go to 16.

(Exhibit 16 was marked for identification.)

BY MR. CARPENTER:

Q. Take your time and read that, and then I'll ask you a few questions about that.

A. Okay.

Q. Okay. Let me just ask you to turn to the second page, if you would. It's dated September the 29th, 2015. Would you agree with me that this is an e-mail from Doug Bland of Old Republic Aerospace to you and that the e-mail set forth on page 1 is your response to Mr. Bland on September the 30th, 2015?



A. Yes, sir.

Q. And did you understand that Mr. Bland was a claim handler at Old Republic Aerospace and that Old Republic represented the interest of Old Republic Insurance Company?

A. Of Avsurance?

Q. Sorry?

A. Of Avsurance or -- I don't know -- I don't really know who Doug Bland is, so --

Q. No idea who he was?

A. He was an insurance adjustor is what I was told.

Q. Well, if you look at the second page, again, you see at the bottom in the signature from Mr. Bland, he claims to be the California claims manager for Old Republic Aerospace, so --

A. Okay.

MR. MASON: And Old Republic Insurance Group, which --

BY MR. CARPENTER:

Q. Slash Old Republic Insurance Group, right?

MR. MASON: Which, to my mind, could mean Old Republic Insurance Company. I don't know what Old Republic Insurance Group is. I don't think I've heard that before until now.

A. 4,000, not 40,000.
Q. 4,000. I'm sorry. 4,000 total hours. He met that as far as you know?
A. Yes, sir.
Q. And "3,000 hours in multi-engine aircraft as PIC." He met that?
A. Yes, sir. He's an ex-airline pilot, also.
Q. Oh. Is he?
A. Yeah.
Q. What airline did he fly for?
A. I knew he flew for an airline in Dubai, and he flew for an airline in Mexico. He had quite a bit of flight experience.
Q. Okay. So I would assume the rest of it -- "2,000 hours in turbojet aircraft," he would have that, correct?
A. Yes, sir.
Q. And "500 hours in the Gulfstream III model aircraft," right?
A. Yes, sir.
Q. All right. Thank you.
In your discussions with Roberto Hernandez, did he ever tell you what he thought happened to R33 Lima Romeo?
A. With the rumors that he heard that the



airplane was stolen from Toluca on the 23rd, it was -- they filed a domestic flight plan so they didn't have to clear customs. And the airplane was taken south to Venezuela.

Q. Where did he hear that information from, if you know?

A. I don't know. It was -- I heard the same rumor from another pilot that was down there. That's when we got really worried about what had happened with the airplane.

Q. Did Hernandez tell you who he thought the pilots were that had taken the airplane?

A. He did not know.

Q. Have you heard from any source whatsoever who the pilots were that might have stolen the airplane?

A. No, sir. Just rumors.

Q. And what rumors are there? Tell me everything you know about any rumors.

A. Just that there were three people poking around the airplane, and that was about it, really. There were -- and then with what Roberto had told me that somebody had tried to take the aircraft without using his name and that, so --

Q. And, in Mexico, filing a flight plan, is it the same process we use in the United States, or is it



think, that I had met down there.
Q. Okay. And what was your understanding of this nondisclosure statement? What was that all about?
A. I don't. Basically, Pablo was worried, I guess, that Roberto might say, you know, you didn't pay me or, you know, basically, bad-mouthing him. And Pablo was worried that Roberto would say derogatory things about not being paid on time.
Q. Did you have a conversation with Pablo about this nondisclosure statement at any point in time?
A. He said that he wanted Roberto to sign a nondisclosure, and that was about as far as it went.
Q. And you didn't ask him specifically other than you just talked about why he needed that?
A. Yes, sir.
Q. So this was in late -- December 30 -- December 2014. December the 30th.
A. Yes, sir.
Q. So you still had ongoing communications with Pablo up to that point in time. As far as you knew, he was operating the aircraft and everything was copesetic under the lease; is that right?
A. Yes, sir.
MR. CARPENTER: Let me hand you Exhibit 18.
(Exhibit 18 was marked for identification.)



A. Yes, sir.

Q. All right. Are you aware that Pablo has stated that he gave possession of the aircraft to Mr. Sanchez?

A. I know that he said that.

Q. Did he say that to you?

A. Yes.

Q. Do you recall when?

A. I don't.

Q. And was it a phone call, or was it in e-mail, writing, or anything like that?

A. I don't recall when it was. I don't recall how he told me. I was obviously not happy with what he had said, but --

MR. CARPENTER: All right. Okay. Let's go to 25.

(Exhibit 25 was marked for identification.)

BY MR. CARPENTER:

Q. And I'd ask you to take a look at this. It's a long document. It's a string of e-mails. And I'll ask you if you recognize this?

A. It's been a long time, but it's an e-mail I could have written or received or whatever.

Q. Okay. Well, let me just ask you a few questions about it.

recording."
Q. Yeah. And this was an e-mail that you sent to Sanchez, right?
A. Yes, sir.
Q. And then could you read the sentence right before that, starting "Hello"?
A. "Hello. I'm glad we were able to have this conversation. The number you need to dial to call me is 0115215564607291."
Q. So I gather that at some point in time that you were able to reach him and have a second conversation; is that right?
A. Yes, sir.
Q. Do you recall when that was?
A. I don't.
Q. Do you remember what the conversation -- the second telephone conversation was about? Can you summarize that to me?
A. I don't recall.
Q. When you spoke to him in July of 2015, did you ever ask him where the airplane was?
A. Yes, sir.
Q. What did he tell you?
A. He said it was in Querétaro.
Q. In where?



MR. MASON: Let's spell that for the record.
THE WITNESS: Q-U-E-R-T-O, I think it is.
MR. MASON: I think it's Q-U-E-R-E-T-A-R-O, Querétaro, but pronounced "Queretro." I think that's what it is.
BY MR. CARPENTER:
Q. Okay. That's in Mexico?
A. Yes, sir.
Q. Did he say who was flying it?
A. I asked him, and he said he didn't know.
Q. So when he told you in July of 2015 that it was there in Mexico, what was your reaction or response?
A. Well, I was obviously in shock, and I called some people to find out if the airplane was there and nobody saw the airplane there.
Q. Okay. Who did you call?
A. There was a mechanic that I had met that was introduced to me by -- and I don't even remember who exactly it was, but he was a mechanic in the airport there. And I asked him, "Have you seen a Gulfstream there?"
And he says, "I know all the hangars here and the ones it will fit in, and it's not here."
Q. Okay. And after you did this, shall I say,



investigation, what did you think?
A. I was worried that something had happened to the airplane. I mean, we kept digging and digging and asking, and the last thing we wanted to do was, you know, have an airplane missing, so --
Q. Okay. Let's go back to 16, again. That's this guy (indicating), your long e-mail.
A. Okay.
Q. I'm reading -- I'm going to read from the middle of it and see if you can follow along with me. This, again, is from you to Doug Bland. You said, "He promised to send us payments, told us he would send us a couple of cars." And by "he," I believe you're referring to Pablo, correct?
A. Yes, sir.
Q. Did he ever send you the couple of cars?
A. No, sir.
Q. Did you have an understanding what the cars were? Were they, like, Mercedes or Toyotas or pickups? Anything?
A. Chevrolet truck and a Suburban.
Q. Did you have any understanding why he was going to do that? Was it a good-faith demonstration or something like that?
A. Yeah, to make up on some of the lease



they said that they were not the right place to report it stolen.

MR. MASON: I've had similar experiences with the FBI. They're never the right person to report anything to.

BY MR. CARPENTER:

Q. Where did they tell you to report it?

A. They weren't sure.

Q. Okay. I thought I was done with 16, but let me just ask you a question about the last sentence on there where it says: "We did hear that Pablo is operating a Hawker 800 November 801" -- it looks like "Juliet Mike which is registered to US trust"?

A. Yes, sir.

Q. Where did that information come from?

A. Gosh. I don't remember where that came from.

MR. CARPENTER: Let me hand you Exhibit 28.

(Exhibit 28 was marked for identification.)

BY MR. CARPENTER:

Q. And this is an e-mail from you to Doug Bland, again, dated November the 30th, 2015.

A. Yes, sir.

Q. Do you have that in front of you?

A. Yes, sir.

Q. Going down into the middle of the message

where it starts out "He told me," could you read the first three sentences of that, and I'll tell you when to stop.

A. "He told me that the sources in Venezuela said the aircraft was destroyed in Venezuela around the 23rd of December, 2014. He said you're welcome to call him, but that's all he knows about the situation. I asked if there was anything illegal, he said there was nothing reported to be illegal."

Q. Did Weigman tell you anything other than in that conversation with you beyond what's contained in Exhibit 28 that you just read to us?

A. Just that his sources said that the aircraft was destroyed on December 23rd, 2000- --

Q. Did you follow up with him to find out who his sources were? Did you ask him that question?

A. I've asked him plenty of times.

Q. And what has he said in response to that?

A. He said that the U.S. government does not have any agents in Venezuela because of the political environment. And they got information from the informants that the airplane was -- crashed or destroyed on December 23rd. And that he -- you know, he is unable to verify anything more than that.

Q. When did you have this conversation with him?



Do you remember?
A. Oh, it would have been probably September, October, November. Somewhere in there.
Q. 2015?
A. Yes, sir.
Q. Have you had any conversations after the 2015 conversations reflected in Exhibit 28?
A. Yes, sir.
Q. How many more conversations have you had with him?
A. Quite a few.
Q. Do you recall the substance of those conversations? Any of them?
A. Just trying to figure out where, approximately, the airplane might have crashed or was destroyed. He said that it was -- they thought it was near Apura, Venezuela.
Q. Could you spell that for her, please.
A. A-P-U-R-A.
Q. And did he tell you the source of that information?
A. It was from a confidential informant.
Q. And did he specify -- you used the word "crashed" or "destroyed." Did he specify which it was?
A. It was burnt, I guess, is what he had heard.



And I've heard a couple of different versions that, you know -- nobody knows.

Q. What versions have you heard?

A. That it crashed, like, 100 miles short.

Q. Of --

A. Apura, Venezuela.

Q. Out in the wilderness.

A. Yes, sir.

Q. And the other version?

A. That it was -- that it crashed in Apura on a dirt runway.

Q. On which runway? Dirt runway?

A. On a dirt runway, yes.

Q. Can the G III operate on a dirt runway?

A. Once.

Q. Legally? Legally?

A. There's an argument that you can, but --

Q. Nothing you would do, I take it?

A. No, sir.

MR. CARPENTER: All right. Let's put that aside.

All right. I'm going to hand you 29.

(Exhibit 29 was marked for identification.)

MR. CARPENTER: Off the record.

(Pause in proceedings.)



back to probably a place where it's maintained and where it picks up pilots and that sort of thing. At least in the airline business, you have bases. But you're saying in the kind of business that we're talking about here, there really are no bases; is that right?

A. You have a maintenance base.

Q. Okay.

A. Pilots may have a base where they operate out of. But, like, the airlines don't have all their airplanes sitting in Dallas. They fly, they operate wherever they need to go.

Q. But when the question is asked, "Where it's based?" when you're filling out this insurance application, what does that mean to you?

A. Where the maintenance is going to be done.

Q. Maintenance?

A. Yes, sir.

Q. All right. Okay. And was the maintenance done at El Paso on 388 Lima Romeo?

A. Yeah. During that lease period we had done a lot of maintenance in El Paso.

Q. And I think your testimony earlier was that while it was in the initial three months of the Pablo lease, there was no maintenance done, correct?



A. Correct.
Q. And had Pablo -- well, strike that.
Had Hernandez said, for instance, a UHF radio is not working, and he was down in Mexico, in Toluca -- well, let me back up for a second.
Does the Gulfstream III have an MEL, minimum equipment list?
A. Yes, sir.
Q. How many UHF radios does it have?
A. It has three.
Q. Three. Can you operate with fewer than three?
A. Yes, sir.
Q. How many do you need to have?
A. I'd have to look. Each aircraft is different for an MEL, and there are a lot of things that you can MEL.
Q. Okay. Well, let's just for the sake of this discussion say that Roberto Hernandez is flying the airplane down in Toluca on behalf of Pablo, and he has an item that needs to be operational. In other words, he could fly the -- if he flies the airplane without meeting the MEL requirements, there would be a problem?
A. Yes, sir.
Q. You with me?



A. Yeah.
Q. And does Mark specialize in any particular aircraft?
A. Not really. I mean, he's --
Q. He's a got an A&P license?
A. Yes, sir.
Q. Anything else?
A. He's got a pilot's license. I know he flies airplanes.
Q. Okay. Is he a designated FAA representative?
A. What do you mean "FAA rep"?
Q. Maintenance rep? Do you know?
A. I don't -- I don't understand.
Q. Okay. All right. Strike that.
MR. CARPENTER: Okay. Exhibit 30.
(Exhibit 30 was marked for identification.)
BY MR. CARPENTER:
Q. Okay. Exhibit 30 is a Certificate of Insurance. It's for 234 Lima Romeo. Do you see that?
A. Yes, sir.
Q. The Gulfstream III. And it's held by Hong Kong Civil Aviation Department. Do you see that at the top?
A. Yes, sir.
Q. And the period is from September the 30th,



2014, to September the 30th, 2015.

A. Yes, sir.

Q. Do you have that? Do you know why that certificate was issued?

A. I think the aircraft was going to Hong Kong, and I think Hong Kong requires special insurance.

Q. Did R Consulting have a lease with the Hong Kong Civil Aviation Department for 234 Lima Romeo?

A. No.

Q. I'm sorry?

A. No, sir.

Q. Was it being sold to them?

MR. MASON: I can clear this up, if you'd like?

MR. CARPENTER: Yeah. Go ahead. Go ahead.

MR. MASON: The Info Tech, Andy Kim lease for 234, that we looked at earlier, I think, was dated July 3, 2014, was in effect at this time. And this company and this individual who were the lessees flew the aircraft, I believe, to Hong Kong. I'm not 100 percent certain about that, but I think that's correct. So there you go.

MR. CARPENTER: Okay. All right. So, yeah. Makes sense. Thank you.

All right. Let me hand you Exhibit 31.

(Exhibit 31 was marked for identification.)

BY MR. CARPENTER:

Q. It's another Certificate of Insurance and it's the Pollard Aircraft Sales, Inc., and it's for your King Air 350, November 860 Kilo Alpha.

A. Yes, sir.

Q. Do you see that?

A. Yes, sir.

Q. Do you know why this certificate was issued?

A. Because the aircraft was -- I don't know if it was actually registered to Pollard Aircraft or if they were a lienholder for Pollard Aircraft.

Q. Was there a lease agreement between R Consulting and Pollard Aircraft Sales?

A. I don't recall.

Q. On this aircraft? You don't recall?

A. I don't recall.

Q. Okay. All right. Let's put that away.

As you sit here today, do you believe the aircraft 388 Lima Romeo was stolen by Pablo?

A. No, sir.

Q. Why not?

A. Pablo doesn't know how to fly the airplane, and I believe that some -- some nefarious person stole the aircraft, and I believe they crashed is -- that's

my belief.

MR. CARPENTER: Let me hand you Exhibit 32, and ask you to take a look at that for a minute, please.

(Exhibit 32 was marked for identification.)

BY MR. CARPENTER:

Q. It's an e-mail from you to Pablo, correct?

A. Yes, sir.

Q. Dated October the 16th, 2015?

A. Yes, sir.

Q. Read that first sentence for me.

A. "Pablo, you act like you're doing me a favor and 'frankly,' you screwed us and lied to us and stole our aircraft. You have no intention of paying" --

Q. No. Just that first sentence.

A. Okay.

Q. You stated to him that you maintain that he "stole our aircraft," which is November 388 Lima Romeo, correct?

A. Yes, sir.

Q. Why is your position today different than it was back on October the 16th, 2015?

A. The facts that somebody tried to use Roberto's information to obtain a flight plan illegally. And the aircraft -- the flight plan from



phone call from somebody or the airplane was seen flying in another country and that's why he contacted us. I think he's -- from what I gather from Mr. Weigman -- that Steve Tochtermann is an investigator from the Federal Aviation Administration for nefarious acts. So he's not like a normal FAA guy that you would -- it was turned over to him for a reason, and that's why we got the phone call in January --

Q. All right.

A. -- of 2015.

Q. Are you aware of any witnesses who saw the aircraft depart Toluca on December the 22nd, 2014?

A. No, sir.

Q. Did you make any investigation of the tower to find out if they recall this departure -- the tower in Toluca?

A. Yes, sir. I said I called the comandante.

Q. The comandante?

A. Yes, sir.

Q. And you specifically asked him questions about this departure on December the 22nd?

A. Yes, sir.

Q. And he had no information whatsoever?

A. Yes.



be with the United States?
A. Yes, sir. Because it's a U.S.-registered aircraft.
Q. And did you file that report?
A. Yes, sir.
Q. And where did you file it?
A. Filed it in North County, San Diego.
Q. And why did you pick that sheriff's station to file the report?
A. Basically, I just go to any local sheriff's department.
Q. And were you the one that actually filed the report?
A. I think I went with Raquel.
Q. And do you recall the officers you filed it with?
A. I recall him, but I don't recall his name offhand, so --
Q. And what did you tell him about what had happened?
A. Told him that we believe that the airplane was stolen and that it was believed to have crashed or been destroyed in Venezuela.
Q. And what was his response?
A. Well, he didn't have a lot of response. I





appears eager to get the premium paid per an email she sent Kathleen earlier today.

Let me know what you would like us to do. We can bind coverage with W. Brown effective tomorrow, September 30th, or we can extend the current Old Republic/Phoenix policy per the terms I outlined in a previous email.

Jim Coleman
Account Manager
Avsurance Corporation
Office: 800-472-7090
Cell: 734-276-9484
Fax: 734-663-8296

---

**From:** Lance [mailto:skywonders@aol.com]
**Sent:** Tuesday, September 29, 2015 6:34 PM
**To:** Coleman, Jim D.
**Cc:** Underwood, Ed W.
**Subject:** Re: lease N388LR

Jim I make money leasing these aircraft I can't just stop. I have 748 out with a client in the US based in Ontario for a possible Lease Purchase. Hopefully you can get W Brown to write this.

Lance

On Sep 29, 2015, at 2:54 PM, Coleman, Jim D. <jcoleman@avfuel.com> wrote:

> Lance,
>
> We need to know the exact date of the flight last December, when the aircraft loss contact with you. Old Republic/Phoenix is going to extending the coverage for 75 days. However, they will not allow you to lease the other two aircraft during your time. If you do, and there is a loss, there will be no coverage. I literally just spoke to the three highest ranking officials at Old Republic, and they are taking this VERY seriously. The more information/detail that can be provided to us, the better.
>
> Unless I find a new home for the other two aircraft, they will remain with Phoenix for a maximum of 75

EXHIBIT 8
PMK - LANCE Z. RICOTTA
2/15/2018
Reported by: Erin E. Cates
CSR. 14096



days. 388LR will not be included in the extension of coverage.

Jim Coleman
Account Manager
Avsurance Corporation
Office: 800-472-7090
Cell: 734-276-9484
Fax: 734-663-8296

jcoleman@avfuel.com

**The contractor and subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60 300.5(a) and 60-741.5(a) and 29 CFR Section Part 471, Appendix A to Subpart A, if applicable. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.**

**From:** Lance [mailto:skywonders@aol.com]
**Sent:** Monday, September 28, 2015 5:48 PM
**To:** Underwood, Ed W.; Coleman, Jim D.
**Subject:** Fwd: lease N388LR

Here is a copy of Lease. And we didn't sit and wait 10 months we did receive a payment in April and have been fighting to get paid. We recently found out about the flight in December where it diverted and never arrived. I don't know if that is even true. Just a rumor.

Lance

Begin forwarded message:

# AIRCRAFT PURCHASE AGREEMENT

THIS AIRCRAFT PURCHASE AGREEMENT (THIS "AGREEMENT") IS MADE THIS 1st DAY OF DECEMBER, 2014 BY AND BETWEEN R CONSULTING & SALES, INC 318 N CARSON St , SUITE 208, CARSON CITY NV 89701 E-MAIL skywonders@aol.com PHONE (760) 809-45-66 ("SELLER") AND JOSE LUIS SANCHEZ E-MAIL joseluissanchez188@yahoo.com PHONE (___) ______ ("PURCHASER") AND WITNESSETH

WHEREAS, SELLER AND PURCHASER PREVIOUSLY EXECUTED A LETTER OF INTENT (THE "LETTER OF INTENT TO PURCHASE") THE GULFSTREAM III AIRCRAFT DESCRIBED BELOW (THE "AIRCRAFT") EXECUTED DECEMBER 1 2014 PROVIDING FOR, AMONG OTHER THINGS A PRE-PURCHASE INSPECTION OF THE AIRCRAFT AND RECORDS

WHEREAS, PURSUANT TO THE OFFER TO PURCHASE THE AIRCRAFT HAS BEEN DELIVERED BY SELLER TO A FACILITY DESIGNATED BY PURCHASER FOR ACCOMPLISHMENT OF THE PRE-PURCHASE INSPECTION AND

WHEREAS, THE LETTER OF INTENT CONTEMPLATES THE EXECUTION OF AN AIRCRAFT PURCHASE AGREEMENT AND THE PARTIES INTEND THIS AGREEMENT TO FULFILL THAT CONTEMPLATION

NOW THEREFORE, SELLER AND PURCHASER HEREBY AGREE AS FOLLOWS

1 Agreement to Purchase Seller agrees to sell and purchaser agrees to purchase the aircraft specified below subject to the terms and conditions set forth below and attached herein (and by this reference made a part hereof)

| YEAR | MODEL | FAA NUMBER | AIRCRAFT SERIAL NUMBER | ENGINES |
|---|---|---|---|---|
| 1983 | Gulfstream III | N388LR | 358 | Rolls Royce Spey Mk 511SR |

Specifications:
Seller represents that the Aircraft has the specifications set forth in Appendix 1 hereto.

| | | |
|---|---|---|
| TOTAL SELLING PRICE | $1,000,000 | 00 |
| TOTAL SALE | $1,000,000 | 00 |
| TOTAL CREDIT TO SALE | | 00 |
| CASH DUE | $1,000,000 | 00 |

2 Payment The Aircraft will be sold for cash payable on the date of Closing (as hereinafter defined) and by delivery of lawful money of the United States of America by wire transfer to R Consulting & Sales Inc

3 Pre-Purchase Inspection Buyer has executed and is satisfied with his own pre-purchase inspection

4 Failure to Close or Accept Delivery. Purchaser accepts and takes delivery of aircraft upon execution of this purchase agreement.

5 Force Majeure Seller shall not be liable for labor difficulties, machinery breakdowns, inability to obtain shipping space or transportation delays of carriers or suppliers fires floods, acts of God or other outbreak of hostilities, mobilization civil commotion riots, embargoes and domestic or foreign governmental regulations or orders (each a "Force Majeure Event") or should the Aircraft be destroyed or damaged beyond repair before or after Closing

6 Closing. The closing (the "Closing") on the Aircraft will take place on or before three (3) business days after the Airworthiness Discrepancies are completed — THIS HAS BEEN COMPLETED WHEN WILL CLOSING TAKE PLACE?

Seller's Initials ______ Date ______

Purchaser's Initials ______ Date ______

RCONS0216

7 Closing, Title and Delivery. On or prior to the Closing Date Purchaser shall (i) wire the remaining portion of the Purchase Price to the Escrow Agent, together with amounts sufficient to pay all taxes pursuant to Paragraph 10 hereof, the filing fees to file for the Registration (as hereinafter defined) and the FAA Bill of Sale (as hereinafter defined) with the FAA, and the Delivery Costs (as hereinafter defined); (ii) deliver to the Escrow Agent an original completed and executed application for registration of the Aircraft with the FAA (the "Registration"), and (iii) deliver to Escrow Agent an executed escrow agreement authorizing the release of the Purchase Price and filing of the Registration and FAA Bill of Sale upon satisfaction of the terms of this Paragraph 9. On or prior to the Closing Date, Seller shall (i) deliver to the Escrow Agent two (2) original executed Federal Aviation Administration Bill of Sale Form 8050-2 in the form attached hereto as Appendix 3 (the "FAA Bill of Sale"), (ii) deliver to Escrow Agent an original executed Warranty Bill of Sale to the Aircraft in the form attached hereto as Appendix 4 and (iii) deliver to Escrow Agent an executed escrow agreement authorizing the release of the Purchase Price and filing of the Registration and the FAA Bill of Sale upon satisfaction of the terms of this Paragraph 9. The Aircraft shall be delivered for closing in or at Purchaser's expense to some other mutually agreeable location within the continental United States (the "Delivery Location"), which shall not give rise to adverse tax consequences for the parties. Purchaser shall pay Seller's reasonable out-of-pocket cost for fuel, pilot travel and the pilot's daily rate if other than Seller's own pilots (not to exceed $500.00 per pilot) to ferry the Aircraft from to the Delivery Location (collectively, the "Delivery Costs"). On the date of Closing the parties shall close on this transaction once it has been verified by the Escrow Agent that (i) Escrow Agent has received all deliveries required by the Purchaser, (ii) Escrow Agent has received all deliveries required by the Seller, (iii) the Aircraft is in position at the Delivery Location and (iv) Purchaser has accepted delivery of the Aircraft by executing and delivering to Seller the Delivery Receipt in a form substantially the same as Appendix 2 attached hereto and incorporated herein. At the time of Closing the Escrow Agent shall simultaneously: i) release to Seller the Purchase Price less any broker commissions to be paid by Seller, any loan payoff and the escrow fees due to Escrow Agent, ii) release the Delivery Costs to Seller, (iii) file the Registration and the FAA Bill of Sale with the FAA, and (iv) release the Warranty Bill of Sale to Purchaser.

Title to the Aircraft free and clear of all liens and encumbrances and risk to the Aircraft shall pass to Purchaser on the date of Closing. Seller will maintain full insurance coverage on the Aircraft until the risk of loss passes to Purchaser at Closing.

8 Taxes. Purchaser agrees to pay and to indemnify Seller for all sales and use taxes or assessments which may be imposed by any governmental authority upon this sales transaction or the use of the Aircraft by Purchaser and any such taxes or assessments which Seller will be obligated under law to collect from Purchaser. Except as provided herein, Seller agrees to pay and to indemnify Purchaser for all taxes, fees or duties and expenses, as well as any penalties, interest and attorney's fees, imposed by any jurisdiction or governmental authority as a result of the ownership, location or usage of the Aircraft prior to the Closing Date/Delivery Time and all taxes on profits, gross receipts or income of Seller applicable to or arising out of the transactions contemplated by this Agreement. Prior to the payment of any assessment for which Purchaser or Seller desires to seek indemnification from the other party hereunder, the party desiring indemnification shall provide the other party with five (5) business days prior written notice of the same. The indemnified party shall allow the indemnifying party to dispute any such assessment and shall cooperate reasonably in regard thereto.

9 DISCLAIMER: BUYER UNDERSTANDS THAT THE AIRCRAFT IS BEING PURCHASED IN AN "AS IS, WHERE IS" CONDITION EXCEPT AS PROVIDED ABOVE TO THE CONTRARY. UNLESS OTHERWISE PROHIBITED BY LAW AND THIS AGREEMENT, BUYER AGREES THAT THE WARRANTIES OF SELLER SET FORTH IN THE FOLLOWING PARAGRAPH ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OF SELLER, WHETHER WRITTEN, ORAL OR IMPLIED, OTHER THAN THE EXPRESS WARRANTIES OF TITLE SET FORTH IN THE WARRANTY BILL OF SALE. BUYER ACKNOWLEDGES AND AGREES THAT SELLER SHALL NOT, BY VIRTUE OF HAVING OWNED AND SOLD THE AIRCRAFT OR OTHERWISE, BE DEEMED TO HAVE MADE ANY REPRESENTATIONS OR WARRANTY AS TO THE MERCHANTABILITY, FITNESS, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN, THE AIRCRAFT, OR TO HAVE MADE ANY OTHER REPRESENTATIONS OR WARRANTIES. SELLER DISCLAIMS AND BUYER WAIVES ALL WARRANTIES AND LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE (INCLUDING STRICT LIABILITY IN TORT), WITH RESPECT TO THE MERCHANTABILITY, FITNESS, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN, THE AIRCRAFT.

10 WARRANTY: Seller warrants that all representations and warranties in this Agreement are true and correct in all material respects as of the contract acceptance date on the front page of this Agreement and will be true and correct as of the date of Closing. Seller warrants that, at closing, it will have good, marketable title and possession

Seller's initials [illegible] Date 1-12-15 | Purchaser's Initials ____ Date ____

RCONS0217

of the Aircraft including the engines free and clear of all liens, claims, demands and encumbrances, which title Seller will convey to Purchaser. Purchaser and Seller warrant that each has the authority to enter into this transaction under its articles of incorporation and the applicable law of the state of its incorporation.

11 **Assignments of Programs and Warranties** Seller hereby assigns to Purchaser (to the extent assignable) as of the date of Closing, all of the rights, warranties, representations, covenants and indemnities made to Seller by or which Seller is entitled to enforce against any predecessor in title to the Aircraft or from the Aircraft manufacturer, if any. Seller agrees to assist Purchaser, at Purchaser's sole cost and expense, in enforcing or arranging for the enforcement by appropriate parties for Purchaser's benefit, at Purchaser's sole cost and expense, all such rights, warranties, representations, covenants and indemnities, including transfer to Purchaser at Closing of any other third party service or maintenance agreements. However, Purchaser shall pay any costs related to the transfer of such warranties and programs.

BEEN ACCOMPLISHED

12 **Acceptance Flight** Shall not exceed two (2) hours with Sellers Pilot in Command as captain during the flight and the Purchaser may provide a qualified co-pilot for such Acceptance Flight. The Acceptance Flight may be combined with the ferry flight to transport the Aircraft to the location of the final Delivery.

13 **Applicable Law:** This Agreement shall be construed and interpreted under the laws of the State of California in the County encompassing the City of San Diego.

14 **Enforceability** In the event any provision of this Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without affecting the remaining provisions of this Agreement which shall continue in full force and effect.

15 **Survival.** The covenants, agreements, representations and warranties by Seller shall survive the Closing of this transaction.

16 **Cooperation.** Each party shall execute and deliver all such documents as may reasonably be requested in order to implement the intent and purposes of this Agreement, and shall cooperate reasonably in carrying out the Closing.

17 **Broker's Commissions** Seller shall be responsible for payment of a commission due to its broker, if any. Purchaser has not engaged any broker. Seller does hereby agree to indemnify and defend Purchaser and hold Purchaser harmless from any and all commissions, claims to such commissions or similar fees, including attorneys fees incurred in any lawsuit regarding such commission or fees to Broker, or any other broker to the extent such claims or liabilities are by any broker claiming by, through or under Seller and are based upon the actions of Seller. Purchaser does hereby agree to indemnify Seller and hold Seller harmless from any and all commissions, claims to such commissions or similar fees, including attorneys fees incurred in any lawsuit regarding such commission or fees, to the extent such claims or liabilities are by any broker claiming by, through or under Purchaser and are based upon the actions of Purchaser.

18 **Non-Disclosure** The material terms and conditions set forth in this Agreement may not be disclosed in any fashion, either in whole or in part, to any third party (excluding governmental authorities and the disclosing party's legal counsel, financial institution, accountants and other relevant personnel with a need to know) unless in connection with enforcement of the terms hereof or unless the party desiring to make such disclosure first obtains the express written approval of the other party.

19 **Litigation Expenses** If litigation is instituted to enforce this Agreement, the prevailing party shall be awarded its reasonable attorney's fees incurred and all reasonable litigation costs, including depositions, expert witness fees, photographic expense, witness travel and lodging expense and all court costs.

20 **Agreement Assignment** Neither party may assign its rights, interests or obligations under this Agreement without the prior written consent of the other party.

21 **International Registry** Purchaser and Seller agree to timely register, and to cause their lenders and/or lessees, if any, to timely register, as users of the International Registry established pursuant to the Cape Town Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (collectively the "Cape Town Treaty") and to make, or cause to be made all filings and consents to filings required to perfect Purchaser's ownership interest, and the lien hold interest of Purchaser's lender, in the Aircraft pursuant to the Cape Town Treaty, concurrent with the Closing.

Seller's Initials ____ Date 1-12-15 Purchaser's Initials ____ Date ____

RCONS0218

22 **International Registry** Purchaser and Seller agree to timely register (and to cause their lenders and/or lessees, if any, to timely register) as users of the International Registry established pursuant to the Cape Town Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (collectively the "Cape Town Treaty") and to make or cause to be made all filings and consents to filings required to perfect Purchaser's ownership interest and the lien hold interest of Purchaser's lender in the Aircraft pursuant to the Cape Town Treaty concurrent with the Closing. Purchaser shall pay for all costs associated with registering Purchaser's and Purchaser's lender's International Interests, including but not limited to registering Purchaser and Purchaser's lender as a Transacting User Entity, filing fees for filing Purchaser's and Purchaser's lender's International Interests in the airframe and engines, and fees associated with searching the International Registry prior to and after registration of Purchaser's and Purchaser's lender's International Interests. Seller shall be required to pay its own costs related to registering Seller as a Transacting User Entity on the International Registry.

23 **Counterparts** This Agreement may be executed in counterparts, each which read together constituting a binding agreement on the parties. E-mailed signatures will have the full force and effect of original signatures.

24 **Entire Agreement** This Agreement constitutes the entire agreement of the parties hereto with respect to the purchase and sale of the Aircraft, all prior representations and understandings having been merged herein. This Agreement may not be modified or terminated orally. No claimed modification, termination or waiver of any of the provisions of this Agreement shall be valid unless in writing signed by the party to be bound thereby. The terms and conditions hereof supersede and cancel any terms contained in any other documents. This Agreement becomes a binding contract when it is signed by both parties hereto.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed by their authorized officers as of the date and year first above mentioned.

| SELLER: R Consulting & Sales, Inc. | PURCHASER |
| --- | --- |
| By [signature] | By ________________ |
| Name Roquel Michel Title President | Name Jose Luis Sanchez Title Individual |
| Address 316 N Carson St Suite 208 | Address 1150 Lee Wagener Blvd Suite 203 |
| City/State/Zip Carson City, Nevada 89701 | City/State Fort Lauderdale, Florida 33315 |
| Phone (760) 809 4566 | Phone ________________ |

Seller's Initials [initials] Date 11/4/15 Purchaser's Initials Date

RCONS0219

APPENDIX 1

4 YEAR OLD SPECS

SPECIFICATIONS

_____ Landings, _____ since mid-life. No Damage, Good P&I, Factory Maintenance Program, CMP

Max Ramp 70 200 Lbs
Max Take-off 69 700 Lbs

Engine Specs:
ROLLS ROYCE SPEY MKC 511-8

APU-Allied Signal GTCP 36-100 G-APU
s/n 440C

Avionics/Radios:
Sperry SPZ 800 Auto-Pilot
HNYWL Primus 860 Radar
Dual Collins FD 109 F D
Allied Signal TCS II W/CH7
Dual Collins VHF 220 Comms
Universal UNSIK FMS
Dual Collins VIR 30 NAVS
Universal UNS 1K GPS
Dual Collins ADF-60 ADF
Dual Litton 92 INS
Dual Collins DME-42 DME
Collins ALT 55B Radar ALT W/VTA
Dual HNYWL RCZ852 XPNDR
Universal Class A EGPWS
Dual Collins 571 URN/SEL H F

Additional Equipment:
AFT Lavatorie
AFT Galley
Convection Oven
Microwave Oven
Three Cabin Monitors
Panasonic DVD Player
Sony VCR
10 Disc CD Player

OTHER OPTIONS

Fairchild A-100 CVR
RVSM Approved

Seller's Initials [initials] Date 1-11-05 Purchaser's Initials _____ Date _____

RCONS0220

Provisions for FDR
6 33 Spacing
FM Immunity
Gulfstream Camp

**Exterior:**
Overall White w/ Black Main Stripes

**Interior:**
12 Passenger Ten Individual Chairs, Three Place Divan, Chairs Beige Leather, Divan Beige and Tan Fabrics, Carpet Brown Sculptured, Headliner in Sand Ultra, Cabinetry and Wood Trim in Dark Burl .

**Inspection Status:**
On Factory Recommended Maintenance Camp Maintenance Records 4 YEAR OLD SPECS

Fresh 12 24 & 72 Mo and 5000 Cycle Inspections and Fresh Landing Gear O.H

Seller's initials ______ Date ______

Purchaser's initials ______ Date ______

RCONS0221

APPENDIX 2

DELIVERY RECEIPT

Pursuant to the Aircraft Purchase Agreement ("Agreement") dated the 1st of December, 2014 between R Consulting & Sales, Inc. (hereinafter "Seller") and Jose Luis Sanchez (hereinafter "Purchaser"). Purchaser hereby acknowledges

delivery on this FIRST day of December, 2014 of the following Aircraft:

Year/Model 1983 Gulfstream III
Serial Number: 388
Registration #: N388LR

Aircraft Total Time: ______________________

Total Engine Hours-Left ______________________

Total Engine Hours-Right ______________________

Delivery of the Gulfstream III has been made to Purchaser at:

(Facility) ______________________

______________________

(City and State) ______________________

complete with all logbooks and equipment (as outlined on the Schedule A to the Agreement), as well as all spare or loose equipment associated with the Aircraft.

Purchaser has visually examined the Aircraft and completed a Pre-purchase Inspection as defined in the Terms and Conditions to the Aircraft Purchase Agreement and hereby accepts delivery of the Aircraft under terms and conditions of the above referenced Agreement. As of this date, Purchaser further accepts the Aircraft "As Is Where Is," with all faults.

Agreed and Accepted By Purchaser

Signed By ______________
Name: ______________
Title ______________

Seller's Initials [signature] Date 1/18/15 | Purchaser Initials ______ Date ______

RCONS0222

APPENDIX 3

B FORM APPROVED
OMB NO 2120-0042

# UNITED STATES OF AMERICA

U S DEPARTMENT OF TRANSPORTATION FEDERAL AVIATION ADMINISTRATION

AIRCRAFT BILL OF SALE

FOR AND IN CONSIDERATION OF $ 1.00 + o.v.c. THE UNDERSIGNED OWNER(S) OF THE FULL LEGAL AND BENEFICIAL TITLE OF THE AIRCRAFT DESCRIBED AS FOLLOWS:

UNITED STATES REGISTRATION NUMBER N338LR

AIRCRAFT MANUFACTURER & MODEL
Gulfstream III

AIRCRAFT SERIAL No
388

DOES THIS ____ DAY OF DECEMBER 2014 HEREBY SELL, GRANT, TRANSFER AND DELIVER ALL RIGHTS TITLE, AND INTERESTS IN AND TO SUCH AIRCRAFT UNTO

Do Not Write in This Block
FOR FAA USE ONLY

PURCHASER

NAME AND ADDRESS
(IF INDIVIDUAL (S), GIVE LAST NAME, FIRST NAME, AND MIDDLE INITIAL )

Sanchez, Jose L

DEALER CERTIFICATE NUMBER

AND TO ____ EXECUTORS, ADMINISTRATORS, AND ASSIGNS TO HAVE AND TO HOLD SINGULARLY THE SAID AIRCRAFT FOREVER, AND WARRANTS THE TITLE THEREOF

IN TESTIMONY WHEREOF ___ HAVE SET ____ HAND AND SEAL THIS ____ DAY OF ________ 2014

SELLER

| NAME (S) OF SELLER (TYPED OR PRINTED) | SIGNATURE (S) (IN INK) (IF EXECUTED FOR CO-OWNERSHIP, ALL MUST SIGN.) | TITLE (TYPED OR PRINTED) |
|---|---|---|
| R Consulting & Sales Inc | | |
| | | |
| | | |

ACKNOWLEDGEMENT (NOT REQUIRED FOR PURPOSES OF FAA RECORDING: HOWEVER MAY BE REQUIRED BY LOCAL LAW FOR VALIDITY OF THE INSTRUMENT.)

ORIGINAL TO FAA

AC Form 8050-2 (9/92) (NSN 0052-00-629-0003) Supersedes Previous Edition

Seller's Initials [signature] Date 1-12-15 Purchaser's Initials ____ Date

RCONS0223

APPENDIX 4

# WARRANTY BILL OF SALE

(hereinafter "Seller") in consideration of the sum of one dollar ($1.00) plus other good and valuable consideration paid by (hereinafter "Purchaser") receipt of which is hereby acknowledged, pursuant and subject to an Aircraft Purchase Agreement between Seller and Purchaser dated December 1st 2014 (the "Agreement") hereby sells, grants, assigns, transfers and delivers to Purchaser its successors and assigns all right, title and interest in and to the Aircraft described as (1) 1983 Gulfstream III bearing FAA Registration N388LR and manufacturer's serial number 382 (2) two (2) engines respectively bearing manufacturer's serial numbers (3) all Aircraft records and (4) other equipment of whatever nature installed on the Aircraft as set forth in the Agreement and as may be more fully set forth in Appendix 1 hereof, those items set forth or as provided in 1) 2) and 3) above being hereinafter collectively referred to as "Aircraft."

Seller hereby represents and warrants to and agrees with, Purchaser, its successors and assigns, that (1) Seller is the lawful owner of the Aircraft and, Seller is hereby transferring and conveying to Purchaser full legal and beneficial title to the Aircraft and that Purchaser will acquire by the terms of this Warranty Bill of Sale and the FAA Bill of Sale (Form 8050 2) good and valid title to the Aircraft and that the Aircraft is free and clear of all mortgages, leases, security interests, claims, charges, liens and encumbrances of any kind whatsoever (2) Seller has the right to sell the Aircraft as aforesaid and (3) Seller shall warrant and defend title to the Aircraft against the claims of any person, party, firm, corporation or entity of any kind whatsoever which may have accrued, existed or attached thereto or arisen prior to transfer of title by Seller to Purchaser

DISCLAIMER: BUYER UNDERSTANDS THAT THE AIRCRAFT IS BEING PURCHASED IN AN "AS IS, WHERE IS" CONDITION EXCEPT AS PROVIDED ABOVE TO THE CONTRARY UNLESS OTHERWISE PROHIBITED BY LAW AND THIS AGREEMENT BUYER AGREES THAT THE WARRANTIES OF SELLER SET FORTH IN THE FOLLOWING PARAGRAPH ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OF SELLER, WHETHER WRITTEN, ORAL OR IMPLIED, OTHER THAN THE EXPRESS WARRANTIES OF TITLE SET FORTH IN THE WARRANTY BILL OF SALE BUYER ACKNOWLEDGES AND AGREES THAT SELLER SHALL NOT, BY VIRTUE OF HAVING OWNED AND SOLD THE AIRCRAFT OR OTHERWISE, BE DEEMED TO HAVE MADE ANY REPRESENTATIONS OR WARRANTY AS TO THE MERCHANTABILITY, FITNESS, DESIGN OR CONDITION OF OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN THE AIRCRAFT, OR TO HAVE MADE ANY OTHER REPRESENTATIONS OR WARRANTIES SELLER DISCLAIMS AND BUYER WAIVES ALL WARRANTIES AND LIABILITIES EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE (INCLUDING STRICT LIABILITY IN TORT) WITH RESPECT TO THE MERCHANTABILITY, FITNESS, DESIGN OR CONDITION OF OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN THE AIRCRAFT

Seller's other warranties and representations, including disclaimers and limitations, with respect to the Aircraft are as set forth in the Agreement

Seller agrees and acknowledges that the terms and conditions of this Warranty Bill of Sale including without limitation, all representations, warranties and agreements for the benefit of Purchaser, shall survive the delivery of the Aircraft and the delivery, execution and recording of the FAA Bill of Sale

In witness whereof Seller has caused this Warranty Bill of Sale to be signed by its duly authorized officer this First day of December 2014

Seller

By ______________________
Name
Title

Seller's Initials ______ Date ______ Purchaser's Initials ______ Date ______

RCONS0224

APPENDIX 5

AIRWORTHINESS DISCREPANCIES

NONE

Seller's Initials [illegible] Date 7-12-15

Purchaser's Initials ____ Date ____

RCONS0225

**From:** Lance [mailto:skywonders@aol.com]
**Sent:** Wednesday, September 30, 2015 5:31 AM
**To:** Doug Bland
**Subject:** Re: R Consulting & Sales, Inc. N388LR

Hello Doug in July 2014 we had a trip to Toluca where the crew met Pablo and he called asking about a dry Lease. We discussed for a couple of months about leasing the aircraft to his company. He said he was doing work for the Mexican Military and working on selling the Army some C-130 aircraft. He would be using for his travel and his clients travel. He use to be the president of Azteca Airlines and had owned many aircraft over the years. I looked up his company and everything checked out. We sent him a sample lease and he made some changes and we agreed to the lease. He had a Universal Fuel Account and had the aircraft fueled and he wired us money for the Lease initiation. He hired a pilot Luis Hernandez that I knew. The initial wire was short because of some bank error he said, but was making payments to make up so we allowed it to continue. He then said one of his clients wanted to purchase the aircraft in December so we said we sell we had been looking at a G4 and we're going to use the money from the sale to purchase the G4. Pablo said he was going to operate the aircraft for his client and would handle the sale and wire us the funds. I told him the Lease would stay in affect until we were paid in full. In January he said he was paid by the client and would be wiring money. He came up with excuse after excuse with banking issues and trying to get exchange rates. He promised to send us payments told us he would send us a couple cars we agreed to as partial trade made more excuses why he couldn't send money. He made a $200,000 payment in April after we told him we wanted the aircraft returned. We have been trying to find the aircraft ever since which I made calls to people trying to locate the aircraft. We started getting concerned about where the aircraft was at I called FAA Legal and explained the situation they said we didn't need to report anything. After a couple more months of not being paid we filed a lawsuit hopping to get Pablo to return the aircraft. He then put me in contact with Jose Luis Sanchez the person Pablo said he sold the aircraft to. I pressed on where the aircraft was located and have been trying to find the aircraft and get paid. We are concerned the aircraft was stolen or seized somewhere or damaged beyond repair and Pablo doesn't want to tell us. We had a call from someone at the FAA in December asking about the aircraft and when we pressed the FAA official from Atlanta Office what was going on he never called back. We could never verify that this person was actually from the FAA or not. We properly filed the Lease with the FAA and told the agent he could contact the Leasor and that was the last we had heard from him.

It has been every week we were supposed to be paid and more and more stories. He turned in a claim because we can not recover our aircraft and feel something bad has happened to it. We have not been able to confirm, but we're told there was a flight in Mid December where the aircraft departed Toluca Mexico and was enroute to Quetero Mexico and the aircraft asked to change destination to Cancun Mexico. We were told it never arrived in Cancun. We are still trying to confirm this and the dates.

We did hear that Pablo is operating a Hawker 800 N801JM which is registered to a US trust.

Lance



EXHIBIT 16
PMK - LANCE Z. RICOTTA
2/15/2018
Reported by: Erin E. Cates
CSR, 14096

# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

R CONSULTING & SALES, INC., a Nevada corporation,

Plaintiff,

vs.

CASE NO. 3:17-cv-00171-LAB-BLM

OLD REPUBLIC INSURANCE COMPANY, a Pennsylvania corporation; and DOES 1 through 10,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF

RAQUEL MICHEL

January 31, 2018

10:16 a.m.

402 West Broadway
Suite 1550
San Diego, California

Renee Kelch, RPR, CLR, CSR No. 5063
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Q. Just yourself?
A. Yes.
Q. Is there any board of directors?
A. I would be the board of directors.
Q. So this is really a sole -- you're the sole person running this R Consulting & Sales?
MR. MASON: Objection. Assumes facts not in evidence. Lacks foundation. Misstates testimony.
BY MR. CARPENTER:
Q. Is that true or not?
A. Yes.
Q. All right. Now, your complaint in this case has a Nevada corporation as the plaintiff; is that right?
A. Yes.
Q. As your counselor just explained, these two corporations merged, and all we have now is a Nevada corporation; is that right?
A. That's correct.
Q. You said were you the president at the beginning of the formation of the Nevada corporation, and you've been the president through today; correct?
A. Yes.
Q. How did you come up with the name R Consulting & Sales?



MR. MASON: Objection. It calls for speculation.
BY MR. CARPENTER:
Q. You can answer.
A. Just the letter R for my name. I don't know.
Q. Just curiosity. R for Rachel?
A. Yes.
MR. MASON: It's not Rachel.
THE WITNESS: It's Raquel.
BY MR. CARPENTER:
Q. Raquel, I'm sorry.
You know Lance Ricotta?
A. Yes.
Q. How do you know him?
MR. MASON: Objection. It calls for information protected by the right to privacy.
But you can answer if you know.
THE WITNESS: He's my flight operations person.
BY MR. CARPENTER:
Q. When did you meet him?
A. I met him about 17 years ago.
Q. You say he's your flight operations person?
A. Yes. And consultant.
Q. What does a flight operations person do?
A. Anything pertaining to the aircraft, he talks



to people about.

Q. And you have this business relationship with him, and also a personal relationship; is that correct?

MR. MASON: Objection. Invades the right to privacy.

BY MR. CARPENTER:

Q. You can answer.

A. Yes.

Q. Has Lance Ricotta ever been an officer of R Consulting?

A. No.

Q. Why not?

A. Because he is a contract employee --

Q. Is he --

A. -- and a consultant.

Q. I'm sorry. Let me apologize. I don't mean to step on you. We all have a tendency when we do these things to have like a natural conversation where you're anticipating any question. And when you start talking, and I may step on you.

So let's make sure we have another break between the answer and question so it makes her job a little bit easier.

A. That's fine.

Q. Or it becomes a real mess.

MR. MASON: I think you interrupted her, so.
MR. CARPENTER: I did.
MR. MASON: Thank you.
MR. CARPENTER: I made the mistake.
MR. MASON: Okay.
MR. CARPENTER: And I was pointing out to her, don't make the mistake I just made.
BY MR. CARPENTER:
Q. And what's Mr. Ricotta's present position with the company? The same, flight operations and consultant?
A. Yes.
Q. What does he do as a consultant?
MR. MASON: Objection. Asked and answered.
But you can answer it again if you want.
THE WITNESS: He does everything that has to do with the aircraft.
BY MR. CARPENTER:
Q. How do you distinguish in your mind flight operations person and consulting? Is it one and the same or are they different?
A. They're the same.
Q. Is he a W-2 employee of R Consulting or a 1099 employee?
A. 1099.

BY MR. CARPENTER:

Q. Would your answer be the same for his company, that you've had no contact with this company, other than what you mentioned about the signature on some documents?

A. Contact with his company? Can you clarify? As a person or contact, because --

Q. Let me even back up further. I'm asking you, because you are the president of R Consulting & Sales -- and I gather you're responding as the president of the company and not just you individually; is that right?

A. I'm supposed to be here individually, but yes, I am the president of the company.

Q. As the president of the company.

And would there be anybody who has greater knowledge about the operation of the company besides yourself?

A. Yes.

Q. Who would that be?

A. Lance Ricotta.

Q. Okay. Lance Ricotta?

MR. CARPENTER: Let me ask the court reporter to mark this as Exhibit 2.

(Exhibit 2 marked)

///

BY MR. CARPENTER:

Q. Do you recognize Exhibit 2?

MR. MASON: If you've seen it before. If not, then --

THE WITNESS: No, I've not seen that.

BY MR. CARPENTER:

Q. The first page, it's marked as 716. You haven't seen that e-mail? It looks like it's from Lance to someone named Ed Underwood and another person, Jim Coleman. You've never seen that before?

A. No.

Q. Okay. Let me ask you to turn, then, to the next page, 717 of Exhibit 2, entitled, "Aircraft Dry Lease."

Have you seen that before?

MR. MASON: Why don't you take a minute to review this document --

MR. CARPENTER: Sure.

MR. MASON: -- so you can --

MR. CARPENTER: Take your time. I'm going to be asking you some questions.

MR. MASON: -- refresh your recollection regarding whether you've ever seen this lease. I guess this is a lease with Ulloa.

He's just asking you to do a quick review of

the lease to see if you've seen it before. Not to review it --

THE WITNESS: Yes --

MR. MASON: -- in its entirety.

THE WITNESS: -- I've seen it.

BY MR. CARPENTER:

Q. Yes, don't -- we'll be here all day.

Okay. You've seen this before?

A. Yes.

Q. Let me direct your attention, then, if we can, to --

MR. MASON: The lease, that is?

BY MR. CARPENTER:

Q. The lease, you've seen the lease, and it's the dry aircraft lease between your company, R Consulting & Sales, and Pablo's company; correct?

A. Yes.

Q. And it involves the aircraft we're here talking about; right?

A. Yes, it is.

Q. Let me direct your attention to page 216, if you will.

A. I don't have that.

Q. It's at the bottom. You'll sees the numbers.

A. I have 723. I don't have a 216.

Q. I'm sorry, disregard that. I'm getting ahead of myself.

All right. Take a look at 723.

Is that your signature on the left-hand side on behalf of R Consulting & Sales Inc.?

A. Yes.

Q. I'm sorry?

A. Yes.

Q. And you recognize the signature of Pablo on the right-hand side?

A. No, I don't know his signature. But there is a signature there. I believe it's his, yes.

Q. Do you recall who signed first?

A. No, I do not.

Q. Do you know if the mailing address for Pablo is his correct mailing address?

A. No, I do not.

Q. Who would know?

A. I don't know.

Q. Would Lance know?

A. You would have to ask Lance that question. I can't answer for him.

Q. Well, who negotiated the lease with Pablo?

A. Lance.

Q. And he was -- who wrote this lease?

A. I don't recall.
Q. You suspect it was written by Lance?
MR. MASON: Objection to the extent it calls for attorney-client privileged information.
THE WITNESS: I don't know.
MR. MASON: You can answer the question if it doesn't involve that.
BY MR. CARPENTER:
Q. Okay. That's true.
You don't know who wrote the lease?
A. No.
Q. Is this a standard boilerplate lease that you've been using for the other leases we talked about earlier on?
MR. MASON: Objection. Calls for speculation.
But if you know the answer to that question.
THE WITNESS: I don't know.
BY MR. CARPENTER:
Q. Who would know?
A. I don't know. Lance Ricotta might know.
Q. Do you have any idea of what the date was that you signed this?
A. No, I do not.
Q. And the lease was effective on September the 4th, 2014; is that right?



Let me ask you to read -- actually, read that first sentence out loud, if you would, please?
A. "Lessee will pay lessor as rental for the aircraft ('Rent') $73,000 per month for lessee's use of aircraft, including for 'Deadhead' legs."
Q. Is that the amount that was being charged by R Consulting & Sales to Pablo for the aircraft?
A. Yes.
Q. $73,000 a month; correct?
A. That is what was being charged.
Q. And according to the terms of the lease that's Exhibit 2, this lease would have run from September of 2014 to three months later, what, December 2014; right?
MR. MASON: If you know, you can answer the question. But the document speaks for itself.
THE WITNESS: That's what the contract states.
BY MR. CARPENTER:
Q. Okay. Let me ask you to take a look at Item 5 on page 717 of Exhibit 2, "Base maintenance."
Before you read it, let me ask you, was it your understanding that during the duration of the lease that R Consulting & Sales, the Nevada corporation, would be maintaining the aircraft?
A. Yes.
Q. And did you have an understanding where that

for insurance; is that correct?
A. That's correct.
Q. Where did you get the information that you use on those applications?
A. What information?
Q. Oh, information about the aircraft that are going to be on there, the pilots. You know, you signed these applications. Do you have any recollection of what was on them?
MR. MASON: Objection. It assumes those pieces of information are on the applications which are not really before us. You're asking her to recollect things that are on an application she hasn't looked at in quite a while.
MR. CARPENTER: We'll get to that.
BY MR. CARPENTER:
Q. Do you have any recollection as you sit here of the application process?
A. Yes, I've seen an application before.
Q. Okay. And you were saying that -- you signed the application; correct?
A. That's correct.
Q. But the information, I gather, most of it came from Lance Ricotta?
A. It was from Lance Ricotta or the insurance

A. No, I don't.

Q. Let me direct your attention, Avsurance is your insurance -- aviation insurance broker; right?

A. That's correct.

Q. And the broker is a company you go to, and you tell them, "I want to insure something," and they go out and find an insurance company to write the risk; is that the way it works?

A. I don't know exactly how our insurance works. But in car insurance companies, yes, that's how I would imagine it would work.

Q. And you expect your broker to go out and get you a policy that is reasonably priced and give you the coverage that you need and want; correct?

A. That's correct.

Q. And is Avsurance still your broker today?

A. Yes.

Q. Okay. Before September 2015 -- we've been talking about 2014. Before September 2015, did you ever let your broker, Avsurance, know that you had a lease with Pablo on this aircraft?

A. Lance was -- would know the answer to that question. I would believe Lance would know the answer to that question.

Q. You personally didn't have any discussions with

exactly when --
Q. Okay.
A. -- honestly.
Q. What was the gist? Can you give us an overall sense what the gist of the conversation was about?
MR. MASON: If you remember.
THE WITNESS: I don't remember. Just that he had somebody that was interested in purchasing it, that had -- that we had the lease on.
BY MR. CARPENTER:
Q. Was it is your understanding that the purchaser -- and I'm talking about when this conversation occurred -- was going to be Pablo or some third party that was not involved with the lease?
MR. MASON: If you know.
THE WITNESS: I don't know.
BY MR. CARPENTER:
Q. You had no understanding one way or another?
A. No. I know we had a lease out on the aircraft. I know the lessee person had some -- I don't know if they were purchasing it or somebody else was purchasing it, or how that was working.
Q. Okay. Fair enough. Thank you.
And you testified earlier, and I think you just re-testified, but as far as you knew in December of

2014, Pablo was still operating the aircraft, and that there had been some agreement reached with his company and him about extending the lease; is that right?

A. That's correct.

Q. And as far as you know, there's no written document that reflects that, is that fair?

A. Yes.

Q. Extension of the lease I'm talking about; is that fair?

A. As far as I know, yes.

Q. And I'm gathering also from the tenor of your general responses, that the person who would probably have firsthand knowledge about the sale transaction and what happened on the extension of the lease would be Mr. Ricotta; is that correct?

A. Mr. Ricotta might have that information, yes.

Q. Is there anybody else involved with your company that you think might also know about what transpired and what led to the lease extension and the sales document we're looking at?

A. Not with my company, no.

Q. Anybody outside your company other than --

A. Probably the person participating in the lease.

Q. Excluding those people. Obviously, they would know. But I'm trying to figure out from your

A. Yes.
Q. So these are your honest and truthful answers contained in these interrogatories?
A. At the time that I did these, yeah. Yes.
Q. Yes?
A. Yes.
Q. Okay. Let's if we could turn to page 4.
And just so you know, if we go to trial and this is read to the jury, just so they understand, these interrogatories are written from one side to the other, and then the lawyers contact you, and you give the information to the lawyers, and then they fill this thing out and answer this stuff and raise objections. And then you read through it, and then you verify that what's in here is true and correct to the best of your knowledge. Is that the way it works, from your understanding?
A. Yes.
Q. Now, let's turn to page 4. You have that in front of you?
A. Uh-huh.
Q. Interrogatory Number 2. And it asks about the lease payments made from the September 24th, through -- looks like April of 2015. And where did you get that information from that's contained in the response to

Interrogatory Number 2?
A. Probably from my bank records.
Q. And this reflects all the payments that were being paid by Pablo during that period of time; is that correct?
A. I believe they were paid through his company, but.
Q. Through the company?
A. Yes.
Q. So that came to total, it says at the bottom there, 466,404.49; right?
A. Yes.
Q. And that's what you --
A. That's what it says.
Q. That's what your company charged him for operating the aircraft and operating under that lease during that period of time --
A. Yes.
Q. -- is that right?
Did you -- strike that.
You told us earlier that there's no written extension of the lease, that this thing just kept going on.
Up until that point of time the last payment was paid, in looks like April the 9th, 2015, was it your

itself.

BY MR. CARPENTER:

Q. Correct?

A. That's what the document states.

Q. Well, that's your understanding. You're the president of this company; right?

MR. MASON: Objection. It assumes facts not in evidence. And it lacks foundation.

BY MR. CARPENTER:

Q. You're the president of R Consulting; correct?

A. Yes.

Q. And you would be the one to retain the lawyers to file a complaint on behalf of R Consulting; right?

MR. MASON: Objection. That lacks foundation. Calls for speculation.

THE WITNESS: Lance sometimes calls the attorney, but yes.

BY MR. CARPENTER:

Q. Well, as you sit here today, do you recall contacting this law firm contained at the top, asking them to file this?

A. I don't recall.

MR. MASON: Objection to this whole line of questioning. Because it calls for attorney-client communications, which are privileged, as you know. Who

MR. MASON: What claim?

MR. CARPENTER: The claim that they still owe $73,000 a month and that it will accrue along with interest at the rate of 10 percent?

MR. MASON: If you know.

THE WITNESS: No.

BY MR. CARPENTER:

Q. Okay. Let's go back, if we can, to the interrogatories. That's Exhibit 5.

And the response --

MR. MASON: What page are you on?

MR. CARPENTER: I'm on page 4.

BY MR. CARPENTER:

Q. Interrogatory Number 3.

Okay. Now, I'll ask you please to turn to page 5. And you can see where it says, "Based upon comments from Mr. Weigman, R Consulting now believes that Sanchez was an employee of Pablo, playing a part at Pablo's behest to cover for the theft of the aircraft by an unknown third-party."

Do you see that?

A. Yes.

Q. Do you have any information that supports that contention, A, that Sanchez was an employee of Pablo?

A. No.

Q. Do you have any information from any source whatsoever that Sanchez was playing a part in Ulloa's behest to cover for theft of the aircraft by an unknown thirty party?

A. No.

MR. MASON: You're asking her as an individual?

MR. CARPENTER: As the president of the company. She's here -- she's the president.

MR. MASON: Well, her deposition was noticed for her as an individual, just so you know.

BY MR. CARPENTER:

Q. All right. Well, she can't divorce herself from what she is, as the president --

MR. MASON: I'm just wondering in what capacity are you asking questions of her.

BY MR. CARPENTER:

Q. Well, what you did --

MR. MASON: When you say "you," do you mean Raquel Michel, or do you mean R Consulting?

BY MR. CARPENTER:

Q. Would your answer be different if I couched my question, instead of saying "you," said "R Consulting"? Would it be the same?

A. Lance might have information in regards to that.



Q. So what I'm gathering -- the gist of what I'm hearing is a lot of these transactions were handled by Lance on behalf of R Consulting; is that fair?
A. Yes.
Q. And you had no personal knowledge? Anything you might know, more than likely you obtained from Lance --
A. Yes.
Q. -- is that correct?
Are you aware of the contention by Pablo that the aircraft was not stolen from him?
A. I believe Lance had mentioned something in regards to that.
Q. And I think -- we established earlier, you never talked to Pablo. So again, it would be from Lance that information would come?
A. If that were something, yes.
Q. And I gather your answer would be the same about the fact that Pablo has stated that he transferred possession of the aircraft to Sanchez, you have no personal knowledge of that; is that fair?
A. That is correct, I have no knowledge.
Q. Now, just to satisfy your counsel's objection, let's just say, does R Consulting have any facts to support the conclusion that the aircraft was stolen from

Pablo?

MR. MASON: If you know. If you don't know, then don't guess.

THE WITNESS: I do not know.

BY MR. CARPENTER:

Q. We've established already that R Consulting is you, with no board of directors, no employees --

MR. MASON: No, no.

MR. CARPENTER: Oh, is that -- all right.

MR. MASON: You just said "with no board of directors." She is the board of directors.

MR. CARPENTER: I'm sorry.

MR. MASON: She is an employee.

BY MR. CARPENTER:

Q. You're everything; right?

A. Yes, that's correct.

MR. MASON: Well, that also misstates her testimony. It's vague and ambiguous --

THE WITNESS: I'm not everything.

MR. MASON: -- as to what the word "everything" means.

BY MR. CARPENTER:

Q. Well, let's go back and let's try again.

MR. MASON: We've already answered these questions, but go ahead.

MR. CARPENTER: I think we have.

BY MR. CARPENTER:

Q. But in any case, what I gathered, you're the president of R Consulting; correct?

A. Yes.

Q. And you're the one and only board of director; correct?

A. Yes.

Q. And you're the only W-2 employee?

A. Yes.

Q. And you have Mr. Ricotta operating as a 1099 consultant; correct?

A. He's a contract employee.

Q. As a contractor.

And the other person is the person that helps you with the filing that you mentioned earlier; correct?

A. Yeah. She helps with the filing. She picks up the kids.

Q. She's like the lady Friday, or something?

A. Like my nanny.

Q. There you go. And is she a W-2 employee or 1099?

A. No. 1099.

Q. 1099?

A. Yes.



Q. All right. Are you aware of any witnesses who saw the aircraft being stolen?
A. Me personally, no.
Q. Have you heard from Lance about any witnesses -- by Lance, I mean Mr. Ricotta -- that saw the aircraft being stolen?
A. You'd have to ask him that. I don't recall hearing him say anything.
Q. That's what I'm trying to get at is, you don't have a recollection of a conversation with him about what happened to the aircraft; is that fair? Or has there been such a conversation?
A. I don't recall, honestly, whether we had one or not.
Q. All right. Let's go down to Interrogatory Number 6. And just read that interrogatory to yourself if you would, please.
And then I'll direct -- after you've done that, take a look at 9, line 9 through 11. Just read that to yourself, if you would.
Do you know where that information came from that's contained in response to Interrogatory 6 on line 9 to 11?
A. No, I do not.
Q. Did it come from you?



A. It probably came from Lance.
Q. Okay. And by "you," I mean you the person, and you the president of the company. Did you understand my question to be the collective "you"?
A. Yes.
Q. All right. Do you have any understanding or belief as to why Pablo -- what Pablo stood to gain by refusing to admit that the aircraft was stolen from him?
A. No.
Q. All right. Let me direct your attention to lines 13 and 14 in the Response to Interrogatory Number 6, where there's mention of learning that the aircraft had been lost, stolen or possibly destroyed from Michael Scott Weigman of the DHS on or about November 30, 2015. Do you know where that information came from?
A. I believe it was -- no, I don't. Probably from Lance.
Q. But you never have any conversation with Mr. Weigman, did you?
A. No.
Q. Let's go to Interrogatory 9 on page 7, please.
And let me just ask you to read the interrogatory to yourself and the response. And I'll ask you a couple questions about it after you've read



A. I don't recall if I did or not, honestly. It could have been Lance. I don't recall.

Q. Were your lawyers involved in the FOIA request, or was it just done by the company?

A. I don't believe it was with the lawyers.

Q. Okay.

A. But I don't recall.

Q. Back to Interrogatory Number 10, line 14 and 15 again. "R consultant later determined around September 2015 that the aircraft had been lost, stolen, or possibly destroyed?"

As between those three options, do you know which was the one that actually occurred?

MR. MASON: Don't guess if you --

THE WITNESS: I don't know for sure.

BY MR. CARPENTER:

Q. The basis of that again was from a conversation as far as you know between somebody and Mr. Weigman; is that right?

A. Yes.

Q. Okay. When did R Consulting first become concerned that the aircraft might have been stolen?

MR. MASON: If you know. If you don't know, don't guess.

THE WITNESS: I don't know.

All right. And it's correct that you were the one that filled out the aviation insurance applications and was responsible for obtaining insurance coverage on your company's aircraft; is that right?

MR. MASON: Objection. The question lacks foundation, and assumes facts not in evidence.

BY MR. CARPENTER:

Q. Is that true?

MR. MASON: I think she testified earlier that Avsurance had something to do with filling out of the application, if you recall, when you asked about it earlier this morning.

MR. CARPENTER: Okay.

BY MR. CARPENTER:

Q. You were the one on behalf of the company?

A. I signed the insurance things for the company, yes.

Q. Okay. Do you recall when you -- the first time you ever tried to obtain insurance for one of the aircraft that was owned by R Consulting?

A. No, I don't know when that started.

Q. And when you first sought insurance for these aircraft, were you using at that time Avsurance as the broker, or did you have some another broker initially?

A. I believe I've always used Avsurance.



broker, we established?

A. The company is broker. So we do buy and sell things. So sometimes there's money in escrow.

Q. All right.

A. And it can be paid out of escrow that way. Or sometimes it gets paid out of the bank.

Q. There's the problem I'm having with your answer. You're the president. You're the board of directors. You said there's no other shareholders but you.

A. Uh-huh.

Q. And these airplanes, aircraft are pretty expensive. I mean, it's a lot of money, and I've been trying to figure out where that money came from to buy these aircraft?

MR. MASON: Well, I think she -- objection. She's asked and answered. She said it either came from Wells Fargo or it was in escrow. I think what you're getting at is, how come R Consulting can afford a Gulfstream aircraft? That's what your question really is.

MR. CARPENTER: Oh, yeah, that's it.

MR. MASON: That's not a legitimate question.

MR. CARPENTER: Sure. Why not? It's discovery.

signature; is that correct?

A. Yes.

Q. And no date on it. Do you have any recollection of when it was signed?

A. No.

Q. Again, I assume the process for this lease -- I'm sorry, this insurance application, was worked on by you and someone from Avsurance and Lance; is that the way it worked?

A. Yeah. It would probably be with Lance and Avsurance, and then I would get a copy of it and sign it.

Q. And when you -- you know, when you signed this -- take a look at what it says there.

It says, "Fraud warning: Any person who knowingly and with intent to defraud an insurance company or other person files an application for insurance containing a material misinformation or conceals, for the purpose of misleading, information concerning any fact at --" something -- "commits a fraudulent insurance act, which is a crime."

You read that, I assume; right?

A. Yes.

Q. Yes?

And then it says, "All answers herein are



warranted true and complete to the best of my knowledge and no information has been withheld or suppressed and we agree the application, the terms and conditions of the policy --" and it goes on and on.

Do you remember reading all that?

A. Honestly, I didn't read all the jargon, no.

Q. But you were aware this application would be submitted by the broker to somebody, and that they would rely on the information contained in the application as far as determining whether they wanted to assume this risk --

A. Yes.

Q. -- is that correct?

Okay. And let me ask you -- let me just ask you if you recall who checked all the boxes on it?

A. I don't recall.

Q. All right. And when you signed this, did you notice that on Item 5, in the middle of the page, there on page 319 it says, "Has any pilot ever been convicted of or pled guilty to a felony or driving while intoxicated?" And that's marked "no." Do you see that?

A. Yes.

Q. Did you know at the time that you signed this that Lance Ricotta, who is a pilot for the company, had been convicted of a felony?

A. I don't recall.

Q. You know that Lance was convicted of a felony at one point in time; correct?

A. I know that now.

Q. When did you find out that information?

A. I don't recall.

Q. Is it your position you didn't know it back when this application was submitted --

A. I don't remember.

Q. Let me finish. -- in 2014?

A. I don't remember.

Q. What -- do you now know when he was convicted of a felony?

A. I don't know exact dates, no. You'd have to ask him. He would have that information.

MR. CARPENTER: Let's mark this Exhibit 10.

(Exhibit 10 marked)

BY MR. CARPENTER:

Q. Do you have Exhibit 10 in front of you?

A. Yes, I do.

Q. I'm going to ask you to look through Exhibit 10.

Have you seen that before?

A. No.

Q. All right. As you can see, it's a Second

Corrected Judgment in a Criminal Case filed December the 2nd, 2004, Lance Z. Ricotta is defendant and United States is the plaintiff.

What was your relationship with Mr. Ricotta in 2004?

A. I don't recall. I don't know if we were in a relationship then or not. I can't remember. In 2004?

Q. Uh-huh.

A. I don't recall, honestly. We could have been dating -- I don't recall.

Q. At some point in time did he ever tell you that he had pled guilty to conspiracy to commit fraud involving an aircraft?

A. He has. But I don't remember when it was, honestly.

Q. Do you know if it was before you signed the insurance application we were just talking about?

A. I don't know. I don't recall.

Q. Let's go back to Exhibit 9 again. Let me direct your attention to where these two aircraft were located. The aircraft we're here to talk about and 234LR.

And when you filled out the application, you were testifying -- you were providing information that it was at the Milton-Tahoe Airport at that time;

correct?

A. I don't know that it was located there at exactly that time. That's where the base operation was supposed to be. I don't know that it was specifically there.

Q. Let's go back to Exhibit 9 again.

10?

THE WITNESS: We're on 11.

(Exhibit 11 marked)

BY MR. CARPENTER:

Q. We're looking at 11. Again, it's an insurance application form; correct?

A. Uh-huh.

Q. Similar to the ones we looked at before.

And let me direct your attention to the second page, 226. Do you have that in front of you?

A. Yes.

Q. And there, looks like -- I don't know if you can -- is that your signature, to start with?

A. Yes.

Q. The date, can you read it? Looks like 8/20/2015 to me.

A. Yeah.

Q. Or 9. Is it 8 or 9?

A. I don't know.

Q. All right. And we have listed on that this aircraft in question, a new aircraft that hasn't been on the previous application, it's N748JX, another Gulfstream III. And then good old 234LR.

You obviously acquired 748JX prior to this application; correct?

A. Correct.

Q. Do you remember where you purchased that Gulfstream from?

A. No, I do not.

Q. And then let's look at the top. It's got it based in Minden-Tahoe Airport; correct?

A. Yes.

Q. And this is from a period of 9/30/2015 to 9/30/2016; correct?

By that time had you not received information that the aircraft in question was gone?

A. We didn't know what happened to it. We're still looking for the airplane.

Q. Okay.

A. We still don't know.

Q. Still don't know? You don't know whether it was lost? Whether it was stolen? What happened?

MR. MASON: Well, I think this is dated in August, when she signed it.



MR. CARPENTER: Is it August?

MR. MASON: This would have been before they found out.

MR. CARPENTER: All right.

THE WITNESS: Could we take a break, though?

MR. CARPENTER: Sure.

MR. MASON: It's been about an hour; right?

MR. CARPENTER: Absolutely.

(Recess)

MR. CARPENTER: Could you read back the last question and answer?

(Record read as follows:

"Question: Still don't know? You don't know whether it was lost? Whether it was stolen? What happened?")

THE WITNESS: No, I don't.

BY MR. CARPENTER:

Q. Do you know a pilot by the name of Roberto Hernandez?

A. I don't know him personally, no.

Q. Has he worked for your company?

A. He has flown the aircraft, yes.

Q. You say you don't know him personally. Have you ever met him?

A. No.



Q. Right. Besides the pilots that obviously knew they flew the airplane, can you think of anybody else who might know that this valuable possession of yours was being flown by somebody?

MR. MASON: First of all, you said 3 million. I don't --

MR. CARPENTER: 1.3 million.

MR. MASON: It's only insured for 1.3 million. Not --

MR. CARPENTER: Right. 1.3 million.

THE WITNESS: I don't know. Maybe the leaseholder. I don't know.

BY MR. CARPENTER:

Q. All right. Back to Exhibit 11 again. We've established your signature. Then back to 5 again. "Has any pilot been convicted of or pled guilty to a felony or driving while intoxicated?" That's marked no. Do you know who marked the "no" box?

A. No, I do not.

Q. Let me ask you this: At the time that you signed this document, back in 2015, did you have knowledge that Lance had been -- Mr. Ricotta had been convicted or pled guilty to this felony?

A. I don't recall.

Q. Do you have a recollection of how you found out

about that?

A. I don't recall.

Q. That's not significant to you?

A. It wasn't something that I thought about asking about, no.

Q. Did he voluntarily tell you?

A. I don't recall.

Q. Okay. Exhibit 12, which was the application for policy from 9/30/2016 to 9/30/17, again looking at the second page, 871 of Exhibit 12 --

A. I don't have an Exhibit 12.

MR. CARPENTER: I'm sorry, getting ahead of myself.

(Exhibit 12 marked)

BY MR. CARPENTER:

Q. Now, you have Exhibit 12.

Do you have that in front of you?

A. Yes, I do.

Q. Now turn to page 2. On page 2 you see the signature dated 8/13/2016?

A. Uh-huh.

Q. And that's your signature, and you wrote in the date; correct?

A. Yes.

Q. And do you have any information as to who

filled out again Item Number 5 under "pilot information" regarding the pleading guilty to a felony?
A. No, I do not know who filled that out.
Q. And you'd agree with me, based upon the information that you know now, that that was not accurate at the time you signed that insurance application that we were just looking at as Exhibit 12; is that right?
MR. MASON: If you know.
THE WITNESS: What was not accurate?
BY MR. CARPENTER:
Q. That none of the pilots had been convicted of a felony?
MR. MASON: When you say "the pilots," what do you mean by that? You mean pilots --
THE WITNESS: All of the pilots?
BY MR. CARPENTER:
Q. Any one of them?
MR. MASON: Pilots named on the policy? Or anyone qualified to fly the aircraft? Or what does that mean?
BY MR. CARPENTER:
Q. What does it say? It says, "Has any pilot ever been convicted of or pled guilty to a felony?"
MR. MASON: Okay.



BY MR. CARPENTER:
Q. And we've established that one of the pilots was Lance Ricotta; correct?
A. Yes.
Q. And that Lance Ricotta pled guilty to a felony; correct?
A. That's what the paperwork says, yes.
Q. And you had knowledge of that? At some point in time you gained knowledge of that; correct?
A. Yeah. I don't recall when that was.
Q. Was it before you signed this insurance application --
A. I don't recall.
Q. -- in 2015?
A. I don't recall.
Q. Well, if you had known that in 2015, would you have signed this application with it marked that there was no pilot convicted of a felony?
A. I don't recall if I would have or not.
Q. Well, that's not --
A. Well, I signed it, obviously. I obviously signed it.
Q. Listen to the question. If you had known back in 2015 that Mr. Ricotta had been convicted of a -- scratch that.



If you had known back in 2015 when you signed this insurance application, Exhibit 11 -- rather, Exhibit --

A. 12?

Q. -- 12 he pleaded guilty to a felony in 2004, if you had known that and had seen that it was marked "no" on Item 5 under "pilot information," would you have signed this application?

A. If I would have seen it and I would have known that, I probably would not have signed it. I would have asked for it to be changed.

Q. You would what?

A. I would asked for it to be changed. But I didn't -- I may have not seen it. I don't recall when that happened.

Q. All right. Okay, let's go back to the interrogatories again, Exhibit 5.

Take a look at Interrogatory Number 14 and the response. I'm going to ask you to read those to yourself, please.

A. Okay.

Q. Have you read it?

A. Yes.

Q. Okay. Were you the source of the information that Ed Underwood of Avsurance stated that Jennifer



pages.

MR. MASON: Huge amount, massive number of pages.

MR. CARPENTER: That's true.

MR. MASON: Massive number, and would take half a day to read all them, if not longer.

MR. CARPENTER: That's true.

BY MR. CARPENTER:

Q. In any case, you see at the top it says, "Old Republic Insurance Company"?

A. Yes.

Q. And you understood that to be the insurance company that covered this aircraft in question; correct?

A. Yes.

Q. Let me just direct your attention to 325 at the bottom of the page, you see it's that a letter entitled, "Notice to policyholders," and dated April the 29th, 2014. And it says, "Dear policyholder." And it's signed -- "Thank you," it says, "Phoenix Aviation Managers, Inc."

Do you have an understanding as to who or what Phoenix Aviation Managers, Inc., is?

And I apologize if I've asked this before. But we established that Avsurance is your broker; correct?

A. Avsurance is the broker.



Q. And they don't write insurance policies; correct?
A. I don't know. Not that I know. I don't know.
Q. Well, you can look at it, and you don't see Avsurance, the broker, writing the policy, we were just looking at it. It was --
A. They did not write this policy --
Q. All right.
A. -- if that's --
Q. Do you know when the last time was that Mr. Ricotta spoke with Pablo?
A. No.
Q. Are there any legal proceedings that have been filed by R Consulting since 2015 against Pablo, or his company? Either --
MR. MASON: Other than the one that was filed?
BY MR. CARPENTER:
Q. Correct, other than the one that was filed. Any others here in the United States or Mexico?
A. You'd have to ask my attorney. I don't recall.
Q. You have no knowledge of any?
A. No.
Q. Correct?
A. Correct.
MR. CARPENTER: All right. Let's mark this 14.



(Exhibit 14 marked)

BY MR. CARPENTER:

Q. Let me direct your attention to -- have you seen that document before that's in front of you, 14?

A. I may have.

Q. It's the complaint in this case; correct?

A. Yes, looks to be.

Q. It is?

A. Yes.

Q. Let me just direct your attention to page 4, if you would, and line 11.

And this complaint was filed by the company that you're president of, R Consulting & Sales; correct?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. And on 11, line 11 it says, "Old Republic has breached its duty of good faith and fair dealing in various respects, including, a, refusing to provide insurance benefits at a time when it knew or reasonably should have known it had an obligation to do so."

Do you have that?

A. Yes.

Q. Do you know of any facts that support that

allegation?

MR. MASON: Objection. It calls for legal conclusion and also calls for attorney-client communications.

BY MR. CARPENTER:

Q. You can answer.

A. I defer to my attorney for that.

Q. Except if there's attorney-client discussion, don't answer that part.

But if you know of any facts that support that contention in 20a, now is the time for us to hear it.

MR. MASON: If you don't know, you know, don't guess.

THE WITNESS: No.

BY MR. CARPENTER:

Q. You don't know of any facts?

MR. MASON: Do you know?

THE WITNESS: I know that they've refused our claim.

BY MR. CARPENTER:

Q. Okay.

A. Which I think is bad faith. Because I don't have an aircraft.

Q. All right. Let me rephrase the question as to part b.

the facts.

MR. CARPENTER: And I think she already answered. She said there's bad faith, and that was her answer.

MR. MASON: She said the claim was refused, and that's bad faith. That was her answer, I believe.

BY MR. CARPENTER:

Q. And that's your answer?

A. Yes.

Q. The mere fact that the claim was refused is bad faith; is that what you're saying?

A. I don't --

MR. MASON: She's not a lawyer.

THE WITNESS: And I don't have an aircraft.

MR. MASON: Don't try to trap her into some question.

THE WITNESS: I do not have airplane.

MR. MASON: Old Republic improperly denied the claim. That's why we're here. That's the very basis for the lawsuit. Please don't ask her about the elements of cause of action for bad faith.

MR. CARPENTER: One last exhibit.

(Exhibit 15 marked)

BY MR. CARPENTER:

Q. I'm going to hand you what's been marked as

REPORTER'S CERTIFICATION

I, Renee Kelch, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that reading and signing was requested; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 8th day of February, 2018.

Renee Kelch, CSR No. 5063

 # AIRCRAFT INSURANCE APPLICATION

**Legal Name of Applicant:** R Consulting and Sales Firm

**Physical Address:** 228 Neptune Ave., Encinitas, CA 92024-2518

**Mailing Address:** P.O. Box 2840, San Marcos, CA 92079-2840

**AircraftBasedAt:** Minden-Tahoe Airport **Identifier:** MEV

**Policy Period:** from 12:01 am on 9/30/2015 until 12:01am on 9/30/2016 *local time at address above*

Business or Occupation of Applicant: Consulting Firm Years in Business: 8

Applicant Is: ☐ Individual(s) ☐ Holding Company ☒ Corporation ☐ Partnership ☐ Other

Is applicant incorporated solely for ownership of the aircraft? ☒ NO ☐ YES

| | LIMITS OF LIABILITY DESIRED | |
|---|---|---|
| **LIABILITY COVERAGE** | **EACH PERSON** | **EACH OCCURRENCE** |
| Combined Single Limit including Passengers | | $10,000,000 |
| Passenger Liability sublimited to: | $ | |
| Medical Payments: including Crew | $5,000 | $70,000 |
| Non-Owned Aircraft Liability: | $ | $ |
| **PHYSICAL DAMAGE COVERAGE** | **AGREED HULL VALUE** | **DEDUCTIBLES** |
| ☒ All Risk / Ground & Flight | $ see below | $0 In Motion |
| ☐ Not In Flight (Ground Only) | $ | $0 Not In Motion |
| | $ | |
| Non-Owned Physical Damage: | | $ |
| **ADDITIONAL COVERAGE(S)** | **EACH PERSON** | **EACH OCCURRENCE** |
| Mexican | $ | $ |
| Broad Coverage | $ | $ |
| | $ | $ |

**SCHEDULE OF AIRCRAFT INSURED**

| FAA REG # | YR | MAKE & MODEL | SEATING CREW + PAX | EST. HULL VALUE | AIRCRAFT USE* | # HOURS FLOWN PAST 12 MONTHS | HANGARED? |
|---|---|---|---|---|---|---|---|
| N388LR | 83 | Gulfstream III | 2 + 12 | $1,300,000 | IA | Hrs | ☒ YES ☐ NO |
| N748JX | 83 | Gulfstream III | 2 + 12 | $1,500,000 | IA | Hrs | ☐ YES ☐ NO |
| N234LR | 80 | Gulfstream III | 2 + 12 | $1,000,000 | IA | Hrs | ☐ YES ☐ NO |
| | | | + | $ | | Hrs | ☐ YES ☐ NO |

*Aircraft Use Codes: CML = Full Commercial / I&R = Instruction & Rental Only / CHTR = Charter/Part 135Use/ SD = Sales Demo / IA = Industrial Aid (pro flown) / P&B = Pleasure & Business (owner/non-pro flown) / GO = Ground Only Coverage

1. If used under Part 135, who owns the Part 135 Operating Certificate? N/A
2. Under Part 135, who maintains operational control of the aircraft being operated? N/A
3. Are any aircraft registered under a name other than that of the Applicants? ☒ NO ☐ YES
   Describe:
4. Does applicant hangar, service, repair, or crew aircraft of others? ☒ NO ☐ YES Describe:
5. Does applicant use any unapproved runways or airports? ☒ NO ☐ YES Describe:
6. Describe any navigation outside the USA & Canada: Mexico

**NAMED PILOT INFORMATION**

AVSURANCE CORPORATION
47 W. Ellsworth Rd, PO Box 1387, Ann Arbor, MI 48108
Phone (800) 472-7090 Fax: (734) 663-8266

EXHIBIT 11
Raquel Michel
1/31/18
Esquire - RK

OR 0225

AVSURANCE CORPORATION

# AIRCRAFT INSURANCE APPLICATION

| LEGAL NAME OF PILOT | DOB | CERTS/RATINGS: STUDENT | PVT | INSTR | MEL | COM | ATP | Total Hrs PIC in all Aircraft | Total Hrs in Multi Engine Aircraft | Total PIC Hrs in Turbine / TP Aircraft | Total Hrs in Make & Model | Total Hrs Past 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| See Pilot Exp. Forms | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**OPEN PILOT WARRANTY:** The aircraft must be operated in flight by a PIC and another pilot designated as SIC.

All pilots must successfully complete a ORA approved training course for the Make & Model aircraft operated within the last 12 months.

PIC: Any pilot who holds a ATP, is type rated in the make & model aircraft operated & has a minimum of 4,000 total hrs. 3,000 must be ME jet a/c, 2,000 turbojet a/c and 500 hrs. in MM

SIC: Any pilot who holds a Commercial Pilot certificate or better with ME & Instrument rating & has logged a minimum of 3,000 total hrs. 2,000 with ME jet a/c, 500 turbojet a/c and 100 hrs. in MM Insured

**PILOT INFORMATION** ***Explain all YES responses – attach a separate sheet if necessary***

1. Do all pilots attend the Manufacturers Ground & Flight School every 12 months in the Make & Model flown? ☐ NO ☒ YES
*If YES, provide copies of the school completion certificates for each pilot.*
2. Do any pilots have any (a) physical impairment? ☒ NO ☐ YES
(b) Waivers, limitations or conditions on their medicalcertificate or on their pilot certificate? ☒ NO ☐ YES
If YES: ___
3. Has any pilot certificate held ever been suspended or revoked by the FAA, Transport Canada or Military? ☒ NO ☐ YES
If YES: ___
4. Has any pilot ever been cited for violation of any aviation regulation in any country? ☒ NO ☐ YES
If YES: ___
5. Has any pilot ever been convicted of or plead guilty to a felony or driving while intoxicated? ☒ NO ☐ YES
If YES: ___

**ADDITIONAL INTERESTS**

1. Is there a lien on the aircraft? ☒ NO ☐ YES If Yes, give complete name & mailing address for Lienholder below:
2. Are there any companies who need to be an Additional Insured with regard to your aircraft operations? ☐ NO ☒ YES
If YES, provide Name, Address & Interest: ___

**LOSS HISTORY & PREVIOUS AVIATION INSURANCE**

1. Has applicant had any aviation/aircraft losses, claims, or incidents in the past five (5) years? ☒ NO ☐ YES
If YES: ___
2. Has any insurer cancelled, declined, sent notice of cancellation, or refused to renew any aviation insurance?
☒ NO ☐ YES If YES: ___

FRAUD WARNING: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

All answers herein are warranted true and complete to the best of my/our knowledge and no information has been withheld or suppressed, and I/we agree that this Application and the terms and conditions of the policy in use by the insurer shall be the basis of any contract between me/us and the insurer. I hereby authorize this company to investigate all or any qualifications or statements contained herein.

Applicant's Signature X [signature] Date: 8/26/2015

This application does not commit the Company to any liability nor make the Applicant liable for any premium unless and until the Company agrees to effect this insurance.

AVSURANCE CORPORATION
47 W. Ellsworth Rd, PO Box 1387, Ann Arbor, MI 48108
Phone (800) 472-7090 Fax: (734) 663-8298

OR 0226

# EXHIBIT 3

USDC SCAN INDEX SHEET

AXR 2/9/05 9:49

3:02-CR-00333 USA V. ESQUINO

*123*

*CRJGMCOMXC.*

FILED

2004 OCT 18 PM 2:56

AO 245B (Rev. 9/00) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
v.
LANCE Z. RICOTTA (02)

**CORRECTED JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number: 02CR0333-W

THOMAS WARWICK
Defendant's Attorney

FILED
FEB - 9 2005
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

REGISTRATION NO. 82251198

THE DEFENDANT:

X pleaded guilty to count(s) one of the superseding indictment

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 18 USC 38(a)(3) and 38(a)(1)(C) | CONSPIRACY TO COMMIT FRAUD INVOLVING AIRCRAFT | 1 |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

X Count(s) Remaining superseding counts and the underlying indictment are dismissed on the motion of the United States.

X Assessment : $ 100.00 payable forthwith.

X Fine ordered waived.

IT IS ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

October 13, 2004
Date of Imposition of Sentence

THOMAS J. WHELAN
UNITED STATES DISTRICT JUDGE

OCT 20 11 13 AM '04

107/123

Entered Date: 10-

I hereby attest and certify that this is a true, correct and full copy of the original document on file in my legal custody.
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEFENDANT: LANCE Z. RICOTTA (02)
CASE NUMBER: 02CR0333-W

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 1 month.

The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ____________ ☐ a.m. ☐ p.m. on ____________ .

☐ as notified by the United States Marshal.

X The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

or USM by noon 2/6/05 .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on 2-7-05 to MCC San Diego

at San Diego , with a certified copy of this judgment.

UNITED STATES MARSHAL

By [signature]
DEPUTY UNITED STATES MARSHAL

I hereby attest and certify that this is a true, correct and full copy of the original document on file in my legal custody.
W. Samuel Hamrick, Jr.
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEFENDANT: LANCE Z. RICOTTA (02)
CASE NUMBER: 02CR0333-W

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 3 years.

## MANDATORY CONDITIONS

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court. The defendant shall also comply with any special conditions imposed.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

I hereby attest and certify that this is a true, correct and full copy of the original document on file in my legal custody.
W. Samuel Hamrick, Jr.
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEFENDANT: LANCE Z. RICOTTA (02)
CASE NUMBER: 02CR0333-W

**SPECIAL CONDITIONS OF SUPERVISION**

X The defendant shall not possess firearms, explosive devices, or other dangerous weapons.

X The defendant shall submit to search of person, property, residence, abode or vehicle, at a reasonable time and in a reasonable manner, by the probation officer or other law enforcement officer.

X The defendant shall report all vehicles owned, operated, or in which the defendant has an interest to the probation officer.

X The defendant shall provide complete disclosure of personal and business financial records to the probation officer as requested.

X The defendant shall be prohibited from opening checking accounts or incurring new credit charges or opening additional lines of credit without approval of the probation officer

X The defendant shall not engage in the employment or profession of aircraft sales or any other occupation involving fiduciary responsibilities or the solicitation of funds.

X The defendant shall notify the collections unit of the U.S. Attorney's office, and the U.S. Probation office, of any interest in property obtained, directly, or indirectly, including any interest obtained under any other name, or entity, including a trust, partnership or corporation, until any fine or restitution ordered is paid in full.

X The defendant shall notify the collections unit of the U.S. Attorney's office and the U.S. Probation office, before transfer of any interest in property owned directly or indirectly by the defendant.

X The defendant shall make restitution in the amount of $185,000.00, through the Clerk, U.S. District Court, to the victims on file with the U.S. Attorney's Office, in the amounts specified in said list, payable forthwith or through the Inmate Financial Responsibility Program during the period of incarceration, with the payment of any remaining balance to be made following the defendant's release from prison, at the rate of $750.00 per month. Distribution of restitution to the victims is to be on a pro rata basis. This restitution liability will be jointly and severally with codefendant Christian E. Esquino.

X The defendant shall participate in a program of three months home detention as directed by the probation officer. No electronic monitoring ordered.



# EXHIBIT 4

USDC SCAN INDEX SHEET

HBH 4/4/06 15:00

3:02-CR-00333 USA V. ESQUINO

*129*

*CR12C.*



PROB 12C
(04/05)

March 29, 2006

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF CALIFORNIA

FILED
06 APR -4 PM 12:20
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

**Petition for Warrant or Summons for Offender Under Supervision**

**Name of Offender:** Lance Z. Ricotta (English)
Charged As: (same)

**Dkt No.:** 02-CR-0333-002-W

**Reg. No.:** 82251-198

**Name of Sentencing Judicial Officer:** The Honorable Thomas J. Whelan, U.S. District Judge

**Date of Sentence:** October 13, 2004

**Original Offense:** 18 U.S.C. § 38 (a) (3) and (a) (1) (C) Conspiracy to Commit Fraud Involving an Aircraft, a Class C felony.

**Sentence:** 1 month custody, 3 years supervised release. *(Special Conditions : no firearms; search; provide complete financial disclosure; not open any new checking accounts or incur new charges; not engage in the employment or profession of aircraft sales or any other occupation involving property obtained through a trust or any other entity until the restitution is paid in full; notify the U.S. Attorney and Probation office prior to the transfer of any property; serve three months of home detention and pay restitution in the amount of $185,000.).*

**Type of Supervision:** Supervised Release

**Date Supervision Commenced:** February 25, 2005

**Asst. U.S. Atty.:** Timothy D. Coughlin

**Defense Counsel:** Thomas Warwick (Retained)
(619) 232-9700

**Prior Violation History:** None

---

**PETITIONING THE COURT**

**TO ISSUE A NO-BAIL BENCH WARRANT**

The probation officer believes that the offender has violated the following condition(s) of supervision:

129



| CONDITION(S) | | ALLEGATION(S) OF NONCOMPLIANCE |
|---|---|---|
| **(Mandatory Condition)** Not commit another federal, state, or local crime. *(nvl)* | 1. | On December 22, 2005, Mr. Ricotta committed Battery, in violation of 242(a) PC as evidenced by El Cajon Police Report No. 05-020733 and Gillespie Air Field surveillance video. |

***Grounds for Revocation:*** I have received and reviewed El Cajon Police Department Report Number 05-020733 which included statements taken from the victim and witnesses. Additionally, I have viewed the surveillance video which confirms the following: Mr. Ricotta landed a private jet at the Gillespie Air Field in San Diego county on December 22, 2005, at about 4:15pm. He proceeded to the hanger were he completed an application for a rental car. The victim, Wafaa Magid Stelse who is the Director of Business Operations for Jet Air, advised Ricotta that he would have to pay a $100 storage and hanger fee for the airplane. He replied that he would not pay the fee and walked out of the office leaving his plane on the tarmac. The victim followed him and told him that the payment was a requirement and that he must pay. Ricotta again refused and told her to, "Fuck Off."

The victim then returned to the hanger and retrieved an electrically powered tug to remove the plane from the front of the hanger. Ricotta then ran toward the vehicle, jumped on top of it and struck the victim on the right side of her face, near her eye, with a closed fist causing pain and discomfort. Robert Hembury, Director of Operations, was summoned to the scene and reported that had he not intervened, Mr. Ricotta would have struck the victim again. Mr. Ricotta was screaming at Mr. Hembury, "Do you know who I am," and shouting obscenities. Ricotta activated the plane's engine and drove the plane to the south side of the air field. Mr. Hembury indicated that Ricotta's operation of the jet could have resulted in damage to a structure on the premises and employees inside. Further, he was operating the jet alone, with no other crew, with the top half of the cabin door open. When police arrived, Ricotta was not found in or around the area of Gillespie Field. Security camera footage captured the battery.

The undersigned spoke with the lead detective looking into the above listed matter. He informed that although this assault was criminal in nature and certainly capable of prosecuting, he did not have the man power to spare to pursue it at this time. He said he would be advising the victim to pursue the issue through civil court.

The probation officer contacted and interviewed the victim. She related that she was completely shocked by Mr. Ricotta's behavior. She said she had never seen a pilot behave in such a manner before. Moreover, the fees she was asking for were a standard in the industry. When asked if she had received any injuries, she said she had and that it had taken some time to get over the pain on the side of her face. The victim had already been in contact with the detective and had been informed that criminal charges were not being filed. She related that she had already secured the services of a private attorney and had every intention to pursue the matter civilly.

PROB 12C
Name of Offender: Lance Z. Ricotta
Docket No.: 02-CR-0333-002-W

March 29, 2006
Page 3

**U.S. Probation Officer Recommendation:** If found in violation, that supervised release be revoked.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on:** **March 29, 2006**

Respectfully submitted:

by [signature]
Bruce Gaffney
U.S. Probation Officer
(619) 557-2652

Reviewed and approved:

[signature]
Cynthia M. Poblete
Supervising U.S. Probation Officer

Attachments

**THE COURT ORDERS:**

______ A NO-BAIL BENCH WARRANT BE ISSUED BASED UPON A FINDING OF PROBABLE CAUSE TO BRING THE OFFENDER BEFORE THE COURT TO SHOW CAUSE WHY SUPERVISED RELEASE SHOULD NOT BE REVOKED FOR THE ALLEGED VIOLATIONS.

X Other NOTIFY TO APPEAR 4/10/06 @ 9 AM

[signature]
The Honorable Thomas J. Whelan
U.S. District Judge

4/3/06
Date

bg/bg

Exhibit 4, page 4

# EXHIBIT 5

USDC SCAN INDEX SHEET

MAM 6/28/06 9:02

3:02-CR-00333 USA V. ESQUINO

*139*

*CRMO.*



Minutes of the United States District Court
Southern District of California
Friday, June 23, 2006

2002CR00333-W

For the Honorable: Thomas J. Whelan District Judge

Deputy Clerk: Corey Tremble Court Reporter/ECR: Melissa Pierson

On Calendar:

2002CR00333-W

USA vs.

(2) LANCE Z. RICOTTA (R)

Lang Booking #
ENG 82251198 (2) Thomas J. Warwick, JR RET
619 232-9700
Timothy D. Coughlin AUSA
619 557-5610

SUP RELEASE REVOCATION HRG (2)

Minutes:
CONTINUED SUPERVISED RELEASE REVOCATION HEARING

(FURTHER EVIDENTIARY HEARING 9:00-10:30)

TESTIMONY OF WILLIAM WAGNER RESUMES.
WITNESS, JASON WARNER, SWORN AND TESTIFIES.
DEFENDANT'S EXHIBIT I (COPY OF COMPLAINT FOR DAMAGES) MARKED AND ADMITTED.
DEFENDANT'S EXHIBITS A, B, C, D, E, AND F ADMITTED.
GOVT EXHIBIT 2 (PORTION OF TOW GUIDE) MARKED AND ADMITTED.
GOVT EXHIBIT 3 (HOLD DOWN BAR) MARKED AND ADMITTED.
GOVT EXHIBIT 4 (NORTH AMERICA FBO GUIDE) MARKED AND ADMITTED.
GOVT EXHIBIT 5 (CERTIFICATE OF TRAINING FOR JASON WARNER) MARKED AND ADMITTED.

THE COURT FINDS THE DEFENDANT IN VIOLATION OF SUPERVISED RELEASE, ORDERS THE DEFENDANT CONTINUED ON SUPERVISED RELEASE FOR A TERM OF 24 MONTHS ON ALL PRESENT TERMS AND CONDITIONS WITH TWO ADDITIONAL CONDITIONS:
1)THE DEFENDANT SHALL COMPLETE AN ANGER MANAGEMENT PROGRAM WITHIN SIX MONTHS.
2)THE DEFENDANT SHALL COMPLETE 120 HOURS OF COMMUNITY SERVICE AS DIRECTED BY THE PROBATION OFFICER.

CC:PROBATION

Printed: 06/23/2006 10:36 am

139 man

# EXHIBIT 6



# AIRCRAFT INSURANCE APPLICATION

**Legal Name of Applicant:** R Consulting and Sales Firm

**Physical Address:** 228 Neptune Ave , Encintas, CA 92024-2518

**Mailing Address:** P.O. Box 2840, San Marcos, CA 92079-2840

**Aircraft Based At:** Brown Field Municipal Airport **Identifier:** SDM

**Current Carrier:** ______ **Current Policy Expiration Date:** 9/30/2013

**Policy Period:** from 12:01 am on 9/30/2013 until 12:01am on 9/30/2014 *local time at address above*

Business or Occupation of Applicant: Consulting Firm Years in Business: 7

Applicant Is: ☐ Individual(s) ☐ Holding Company ☒ Corporation ☐ Partnership ☐ Other ______

Is applicant incorporated solely for ownership of the aircraft? ☒ NO ☐ YES

| | LIMITS OF LIABILITY DESIRED | |
|---|---|---|
| **LIABILITY COVERAGE** | **EACH PERSON** | **EACH OCCURRENCE** |
| Combined Single Limit including Passengers | | $10,000,000 |
| Passenger Liability sublimited to: | $ | |
| Medical Payments: including Crew | $5,000 | $70,000 |
| Non-Owned Aircraft Liability: | $ | $ |
| **PHYSICAL DAMAGE COVERAGE** | **AGREED HULL VALUE** | **DEDUCTIBLES** |
| ☒ All Risk / Ground & Flight | $1,300,000 | $0 In Motion |
| ☐ Not In Flight (Ground Only) | $ | $0 Not In Motion |
| | $ | |
| Non-Owned Physical Damage: | | $ |
| **ADDITIONAL COVERAGE(S)** | **EACH PERSON** | **EACH OCCURRENCE** |
| Mexican | $ | $ |
| Broad Coverage | $ | $ |
| | $ | $ |

**SCHEDULE OF AIRCRAFT INSURED**

| FAA REG # | YR | MAKE & MODEL | SEATING CREW + PAX | EST. HULL VALUE | AIRCRAFT USE* | # HOURS FLOWN PAST 12 MONTHS | HANGARED? |
|---|---|---|---|---|---|---|---|
| N797BD | 83 | Gulfstream III | + | $1,300,000 | IA | Hrs | ☒ YES ☐ NO |
| | | | + | $ | | Hrs | ☐ YES ☐ NO |
| | | | + | $ | | Hrs | ☐ YES ☐ NO |
| | | | + | $ | | Hrs | ☐ YES ☐ NO |

*Aircraft Use Codes: CML = Full Commercial / I&R = Instruction & Rental Only / CHTR = Charter/Part 135 Use / SD = Sales Demo / IA = Industrial Aid (pro flown) / P&B = Pleasure & Business (owner/non-pro flown) / GO = Ground Only Coverage

1. If used under Part 135, who owns the Part 135 Operating Certificate? N/A
2. Under Part 135, who maintains operational control of the aircraft being operated? N/A
3. Are any aircraft registered under a name other than that of the Applicants? ☐ NO ☐ YES
   Describe: ______
4. Does applicant hangar, service, repair, or crew aircraft of others? ☒ NO ☐ YES Describe: ______
5. Does applicant use any unapproved runways or airports? ☒ NO ☐ YES Describe: ______
6. Describe any navigation outside the USA & Canada. Mexico

AVSURANCE CORPORATION
47 W. Ellsworth Rd. PO Box 1387, Ann Arbor, MI 48108
Phone (800) 472-7090 Fax (734) 663-8296

Revised 06/2013



# AIRCRAFT INSURANCE APPLICATION

| NAMED PILOT INFORMATION | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CERTS/RATINGS | | | | | | | | | | | |
| LEGAL NAME OF PILOT | DOB | STUDENT | PVT | INSTR | MEL | COMM | ATP | Total Hrs PIC in all Aircraft | Total Hrs In Multi Engine Aircraft | Total PIC Hrs In Turbine / TP Aircraft | Total Hrs In Make & Model | Total Hrs Past 12 Months |
| See Pilot Exp. Forms | | | | | | | | | | | | |
| | | | | | | | | | | | | |

OPEN PILOT WARRANTY:

All pilots must successfully complete full-motion sim based annual ground & flight recurrent training in MM insured. Any commercial pilot holding a valid ME and Inst. Rating.

PIC: Logged minimum of 3000 total hrs of which 1500 must be ME jet a/c and 100 hrs in MM insured.

SIC: Logged minimum of 2000 total hrs of which 1000 with ME jet a/c and 50 hrs in MM insured.

PILOT INFORMATION *Explain all YES responses – attach a separate sheet if necessary*

1. Do all pilots attend the Manufacturers Ground & Flight School every 12 months in the Make & Model flown? ☐ NO ☐ YES
   *If YES, provide copies of the school completion certificates for each pilot.*
2. Do any pilots have any (a) physical impairment? ☐ NO ☐ YES
   (b) Waivers, limitations or conditions on their medical certificate or on their pilot certificate? ☐ NO ☐ YES
   If YES, _____
3. Has any pilot certificate held ever been suspended or revoked by the FAA, Transport Canada or Military? ☐ NO ☐ YES
   If YES: _____
4. Has any pilot ever been cited for violation of any aviation regulation in any country? ☐ NO ☐ YES
   If YES: _____
5. Has any pilot ever been convicted of or plead guilty to a felony or driving while intoxicated? ☐ NO ☐ YES
   If YES, _____

ADDITIONAL INTERESTS

1. Is there a lien on the aircraft? ☐ NO ☐ YES If Yes, give complete name & mailing address for Lienholder below:
2. Are there any companies who need to be an Additional Insured with regard to your aircraft operations? ☐ NO ☐ YES
   If YES, provide Name, Address & Interest _____

LOSS HISTORY & PREVIOUS AVIATION INSURANCE

1. Has applicant had any aviation/aircraft losses, claims, or incidents in the past five (5) years? ☒ NO ☐ YES
   If YES: _____
2. Has any insurer cancelled, declined, sent notice of cancellation, or refused to renew any aviation insurance?
   ☒ NO ☐ YES If YES: _____

**FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

All answers herein are warranted true and complete to the best of my/our knowledge and no information has been withheld or suppressed, and I/we agree that this Application and the terms and conditions of the policy in use by the Insurer shall be the basis of any contract between me/us and the Insurer. I hereby authorize this company to investigate all or any qualifications or statements contained herein.

Applicant's Signature X [signature] Date: 7/10/2013

This application does not commit the Company to any liability nor make the Applicant liable for any premium unless and until the Company agrees to effect this insurance.

AVSURANCE CORPORATION
47 W. Ellsworth Rd. PO Box 1387, Ann Arbor, MI 48108
Phone: (800) 472-7090 Fax (734) 663-8296

Revised 06/2013

AVSUR0000402

# EXHIBIT 7

 # PILOT EXPERIENCE FORM

NAMED INSURED: R Consulting and Sales Inc.

INSURED ADDRESS: P.O. Box 2840, San Marcos, CA 92079

**PILOT GENERAL INFORMATION:**

Pilot Legal Name: Lance Ricotta — Date of Birth: 7/3/1971

Pilot Home Address: P.O. Box 72529, Yuma, AZ 85365 — Phone #: 760-803-9985

Present Employer: Self — Employed Since: 1996

Employer Address: P.O. Box 2840, San Marcos CA 92079 — ☐ FULL TIME ☐ PART TIME

List all aircraft you have received training in the last 12 months: IA Jet/G-1159/LR-Jet/RA-390/BE-300/Agusta 109

Do you receive any other training? (in-house, bi-annual, IPC, etc ): IPC

Do you have ownership interest in the above Named Insured entity? ☐ NO ☐ YES If so, provide %:

Airman Cert #: 3312397 Date & Class of Last Physical: Date of last Flight Review:

**CERTIFICATES/RATINGS:**

Airplane:

☐ STUDENT ☐ PRIVATE ☐ COMMERCIAL ☒ AIRLINE TRANSPORT ☐ INSTRUCTOR

☐ SINGLE ENGINE LAND ☒ SINGLE ENGINE SEA ☐ MULTI ENGINE LAND ☐ MULTI ENGINE SEA ☐ INSTRUMENT RATING

☐ GLIDER ☒ HELICOPTER ☐ FAA CHECK AIRMEN ☐ MILITARY INSTRUMENT CARD ☐ OTHER:

☐ AIRCRAFT TYPE RATINGS: (LIST ALL AIRCRAFT TYPES)

BE-2000, BE-3000, IA-Jet, LR- Jet, L-1329, G-1159, RA-390, FA-20

**TOTAL LOGGED PILOT HOURS:**

TOTAL TIME: 14,300 TOTAL PIC TIME: TOTAL SIC HOURS: 15,800

| | | | |
|---|---|---|---|
| Single Engine Fixed Gear: | 550 | Helicopter (Piston): | 50 |
| Single Engine Retractable Gear: | 800 | Helicopter (Turbine): | 1500 |
| Conventional Gear/Tail Wheel: | 300 | Last 90 Days: | 125 |
| Multi-Engine (under 12,500 lbs): | 1800 | Last 12 Months: | 450 |
| Multi-Engine (over 12,500 lbs): | 11,000 | Cross Country: | 9000 |
| Turbo Prop: | 2900 | Night Flying: | 2000 |
| Turbo Jet: | 8500 | Instrument Flying (Actual): | 700 |
| Warbird: | 350 | Instrument Flying (Simulated): | 500 |

**APPLICANT REQUESTS APPROVAL IN THE FOLLOWING MAKE & MODEL AIRCRAFT:**

| MAKE/MODEL | TOTAL LOGGED HOURS: (SPECIFY PIC OR SIC) | HAVE YOU RECEIVED TRAINING? | WHEN/WHERE? |
|---|---|---|---|
| G-1159 | 2500 PIC | ☐ NO ☒ YES | Simuflight 9/2012 |
| IA Jet | 3000PIC | ☐ NO ☒ YES | Simcom 9/2012 |
| LR Jet | 2000 PIC | ☐ NO ☒ YES | Flight Safety 9/2012 |

**ADDITIONAL INFORMATION (explain "Yes" answers on a separate sheet of paper):**

1) Do you have any physical impairments, waivers, limitations or conditions on your medical or pilot certificate? ☒ NO ☐ YES
2) Has your pilot certificate ever been suspended or revoked by the FAA, Transport Canada or Military? ☒ NO ☐ YES
3) Have you ever had an Aircraft Accident/Incident, or been penalized for an FAR violation? ☒ NO ☐ YES
4) Has any insurance company or underwriter declined, cancelled, or refused to write aircraft coverage for you? ☒ NO ☐ YES
5) Have you ever been convicted of or pleaded guilty to a felony or driving while impaired or intoxicated? ☒ NO ☐ YES
6) Have you ever been convicted of or are you under indictment in a legal action involving drugs or narcotics? ☒ NO ☐ YES

**I warrant that the answers given are true and complete to the best of my knowledge and belief. I further warrant that no material information has been withheld or suppressed.**

**Pilot Signature:** [signature] **Date:** 9/4/13

RETURN THIS COMPLETED FORM TO:

Avsurance Corporation, PO Box 1387, Ann Arbor, MI 48106-1387 PH: 800-472-7090 FX: 734-663-8296 avsurance@avfuel.com

Revised 05/2013

OR 0902

# EXHIBIT 8

**From:** Jennifer Melvin
**Sent:** Wednesday, September 11, 2013 11:05 AM
**To:** jcoleman@avfuel.com
**Subject:** R Consulting

It's a go. Here's what I need:

- Airframe TT (do the best you can)
- PHFs – I'll get you an indication today though without them
- The BB is $1M... we're ok this year, but next year we'll likely need to bring it down a bit or get substantiation, so if you can nip it in the bud and pester them now, that's a win
- Confirmation that the aircraft is not **predominantly** based in, or conducting flights in Mexico (the policy territory is Worldwide, so we do not mind the occasional vacation south of the border, but if they spend more time down there than up here we'd have to pass)

Thanks!

Jen Melvin
**Underwriter**
Direct: 678-264-0547
Main: 630-369-1076
Fax: 630-369-1221
jmelvin@pamav.com

PHOENIX AVIATION MANAGERS, INC.

Phoenix Aviation Managers is a paperless company. We request that all communications to our attention be in electronic format. In those instances when it is necessary to provide a paper/ hard copy document, they should be directed to our Chicago branch office located at Phoenix Aviation Managers Inc. 215 Shuman Blvd Suite 208 Naperville, IL 60563, unless otherwise instructed. Thank you for your cooperation.

# EXHIBIT 9

**Jennifer Melvin**

**From:** Jennifer Melvin
**Sent:** Tuesday, September 17, 2013 6:16 PM
**To:** jcoleman@avfuel.com
**Subject:** R Consulting and Sales Firm
**Attachments:** R Consulting - Quote - 9-30-13.pdf

Followed up on 9/23/2013

Hi Jim,

Thanks for doing so much legwork on this one for me!

Airport change to ELP

JRM 9/19/2013

Just to confirm the series of emails and phone calls...

- Airframe TT is 9,400 hours
- All pilots have attended Simcom in the MM aircraft in the past 12 months
- While there are several vacation flights a year to Mexico, their operations are predominantly domestic
- Roberto Hernandez is a contract pilot they may use from time to time. **We will not add him as a named pilot until we receive a completed and signed PHF and training information**
- We still need a signature on Brian Good's PHF and copies of their training certs within 30 days of binding
- We're assuming G-1159 hours shown for Ricotta and Good are in the MM (G-1159A or GIII)

Phoenix Aviation Managers, Inc. is pleased to offer the attached quote. Please contact us if you have any questions.
Note:

1. WAR Hull and WAR Liability are optional.
2. TRIA Hull and TRIA Liability are optional.
3. Quote is based on no losses from date quoted until date bound.
4. Phoenix Aviation Managers require an updated application, if the application for the insurance we have on file is older than 5 years.
5. When requesting Additional Insured addition to the policy please provide the reason for additional insured status and the lowest limit of liability they require. On policies with limits above $1,000,000 CSL it is Phoenix Aviation Managers practice to not represent the full limit of liability without a specific request or need. If a certificate of insurance is required an address must be provided.
6. Please advise if you would like to bind a Mexican Policy for $250 additional for each aircraft. No commission is paid on Mexican Policies.

Best,

**Jen Melvin**
Underwriter
Direct: 678-264-0547
Main: 630-369-1076
Fax: 630-369-1221
jmelvin@pamav.com

# EXHIBIT 10

Ralph S. LaMontagne, Jr. [State Bar No. 91536]
Eric A. Amador [State Bar No. 143395]
Thomas T. Carpenter [State Bar No. 98051]
LaMONTAGNE & AMADOR LLP
150 S. Los Robles Avenue, Suite 940
Pasadena, California 91101
Telephone: (626) 765-6800
Facsimile: (626) 765-6801

Attorneys for Defendant
OLD REPUBLIC INSURANCE COMPANY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

R CONSULTING & SALES, INC., a Nevada corporation,

Plaintiff,

vs.

OLD REPUBLIC INSURANCE COMPANY, a Pennsylvania corporation; and DOES 1 through 10,

Defendants.

Case No. 3:17-cv-00171-LAB-BLM

**NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION (F.R.C.P. 45(a)(4))**

LAW OFFICES
LaMONTAGNE &
AMADOR LLP

NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, ETC. (F.R.C.P. 45(a)(4))

238565

Exhibit 10, page 1

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to Fed. R. Civ. P. 45(a)(4), Defendant Old Republic Insurance Company ("Old Republic"), will be serving upon Avsurance Corporation, the subpoena attached hereto as Exhibit A, commanding the production of the documents described therein.

Dated: January 5, 2018

LaMONTAGNE & AMADOR LLP

By: ______________________
Ralph S. LaMontagne, Jr.
Eric A. Amador
Thomas T. Carpenter
Attorneys for Defendant
OLD REPUBLIC INSURANCE COMPANY

2

NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, ETC. (F.R.C.P. 45(a)(4))

LAW OFFICES LAMONTAGNE & AMADOR LLP

238565

Exhibit 10, page 2

**EXHIBIT A**

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of California

R Consulting & Sales, Inc.
*Plaintiff*
v.
Old Republic Ins. Co.
*Defendant*

Civil Action No. 3:17-cv-00171-LAB-BLM

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Avsurance Corporation, Custodian of Records
47 W. Ellsworth Rd., Ann Arbor, MI 48108 (800) 472-7090

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Your entire file (or files, as applicable), relating to R Consulting & Sales, Inc. (both the Nevada and the California corporations), for the time period January 1, 2013, to the present.

| Place: Relentless Court Service, Inc.<br>4337 E. Grand River Ave. #101<br>Howell, MI 48843 | Date and Time:<br>01/22/2018 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 01/05/2018

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

[signature]

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Old Republic Ins. Co., who issues or requests this subpoena, are:

Ralph S. LaMontagne, Jr.
LaMontagne & Amador, 150 S. Los Robles Ave., Suite 940, Pasadena, CA 91101 626-765-6800

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 3:17-cv-00171-LAB-BLM

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

☐ I served the subpoena by delivering a copy to the named person as follows: ______________________
______________________________________________ on *(date)* ______________ ; or

☐ I returned the subpoena unexecuted because: ______________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

Exhibit 10, page 5

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
      (i) is a party or a party's officer; or
      (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
   (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
   (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
   (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      (i) fails to allow a reasonable time to comply;
      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv) subjects a person to undue burden.
   (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      (i) disclosing a trade secret or other confidential research, development, or commercial information; or

      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
   (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      (i) expressly make the claim; and
      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Exhibit 10, page 6

**PROOF OF SERVICE**
***R Consulting & Sales, Inc. v. Old Republic Insurance Company, et al.***
**Case No. 3:17-cv-00171-LAB-BLM**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 150 S. Los Robles Avenue, Suite 940, Pasadena, California 91101.

On January 5, 2018, I served the within document(s) described as:

**NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION (F.R.C.P. 45(a)(4))**

on the interested parties in this action as stated on the attached mailing list.

[X] **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day, with postage thereon fully prepaid at Pasadena, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **BY FAX:** I transmitted a copy of the foregoing document(s) this date via telecopier to the facsimile numbers shown on the attached mailing list.

[ ] **BY OVERNIGHT COURIER:** I caused such envelope to be placed for collection and delivery on this date in accordance with standard Federal Express delivery procedures.

[X] **BY EMAIL:** I transmitted a copy of the foregoing document by electronically sending it to the email addresses of the persons set forth on the attached service list.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 5, 2018, at Pasadena, California.

| Yvonne Allfie | Yvonne Allfie |
|---|---|
| (Type or print name) | (Signature) |



**<u>SERVICE LIST</u>**

***R Consulting & Sales, Inc. v. Old Republic Insurance Company, et al.***

**Case No. 3:17-cv-00171-LAB-BLM**

| | |
|---|---|
| Michael J. Mason, Esq.<br>Metsch & Mason, LLP<br>Emerald Plaza<br>402 W. Broadway, Suite 2700<br>San Diego, CA 92101<br>Email: *mmason@metschlaw.com*<br><br>Attorneys for Plaintiff<br>R CONSULTING & SALES, INC. | Tel: 619-230-1642<br>Fax: 619-230-1839 |

# EXHIBIT 11

**Winkelhaus, Kathleen**

**From:** Coleman, James D.
**Sent:** Wednesday, September 18, 2013 10:49 AM
**To:** Jennifer Melvin
**Cc:** Winkelhaus, Kathleen
**Subject:** RE: R Consulting and Sales Firm

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Hi Jen,

The insured has confirmed all of your questions. However, they do go to Mexico from time to time for business, so I wouldn't classify it solely as "vacation" trips.

**Jim Coleman**
Account Manager
Avsurance Corporation
Office: 800-472-7090
Cell: 734-276-9484
Fax: 734-663-8296

---

**From:** Jennifer Melvin [mailto:jmelvin@pamav.com]
**Sent:** Tuesday, September 17, 2013 7:16 PM
**To:** Coleman, James D.
**Subject:** R Consulting and Sales Firm

Hi Jim,

Thanks for doing so much legwork on this one for me!

Just to confirm the series of emails and phone calls...

- Airframe TT is 9,400 hours
- All pilots have attended Simcom in the MM aircraft in the past 12 months - **CONFIRMED**
- While there are several vacation flights a year to Mexico, their operations are predominantly domestic
- Roberto Hernandez is a contract pilot they may use from time to time. **We will not add him as a named pilot until we receive a completed and signed PHF and training information**
- We still need a signature on Brian Good's PHF and copies of their training certs within 30 days of binding
- We're assuming G-1159 hours shown for Ricotta and Good are in the MM (G-1159A or GIII) -**CONFIRMED**

Phoenix Aviation Managers, Inc. is pleased to offer the attached quote. Please contact us if you have any questions.
Note:

1. WAR Hull and WAR Liability are optional.
2. TRIA Hull and TRIA Liability are optional.