# EXHIBIT 52

## MANAGEMENT AGREEMENT

This Agreement, effective the __1st__ day of __January__, __2007__ by and between PHOENIX AVIATION MANAGERS, INC., a corporation headquartered in Kennesaw, Georgia, (hereinafter called "Manager") and OLD REPUBLIC INSURANCE COMPANY, a Pennsylvania Insurance company (hereinafter called "Company"),

WHEREAS, a portion of the Company's operations with respect to certain specified lines of business are operated as a Branch Office of the Company and are currently being managed by the Manager; and

WHEREAS, the Company desires to continue to utilize the services of the Manager with respect to the operations of the aforesaid Branch Office operations; and

WHEREAS, the parties desire to enter into this written agreement regarding the rights and obligations of the parties with respect to the management of the Branch Office operation;

NOW, THEREFORE, Company and Manager, in consideration of the mutual promises herein contained and for other good and valuable consideration, hereby agree as follows:

### 1. Appointment

Company does hereby nominate, constitute and appoint Manager its manager to supervise the solicitation and underwriting of certain insurance risks and the adjusting, administration, settlement and defense of claims for the Company on the terms and conditions herein prescribed.

Manager accepts the appointment and agrees faithfully to perform the duties thereof to the best of its knowledge, skill and judgment, and to obey promptly such instructions as it may receive from time to time from the Company in accordance with this Agreement.  Further, Manager agrees that it will not assign its rights and obligations under this Agreement.

If Manager fails at any time to obey Company's reasonable instructions with respect to Manager's performance of its duties, Company may, as one remedy but not as an exclusive remedy, require its own employees or designated representatives to carry out such instructions. Manager shall reimburse Company for its expenses, including salaries, incurred for having its

OR 1672

Exhibit 52, page 1

employees or representatives provide such services, or, at Company's option, shall pay such employees or representatives directly. If such reimbursement is to Company, Manager shall pay Company within five (5) days after receiving Company's statements of such expenses to Manager from time to time.

### 2. Territory

Manager's authority extends to risks domiciled in all the United States, its territories possessions, Puerto Rico and Canada, as agreed in writing with the Company, and as initially set forth in the Schedule A attached to this Agreement, provided that such authority shall only extend to those jurisdictions in which the Company has the authority to write the proposed business.

Manager may expand this territory only with the specific prior written approval of the Company.

### 3. Classes of Insurance

Manager is hereby authorized by Company to solicit and underwrite on behalf of Company insurance in those lines of insurance set forth in the attached Schedule A which Company is authorized to write and which are produced by the Manager. The Manager's authority is subject at all times to (1) the limits specified herein; (2) each of the exclusions stated in applicable reinsurance agreements covering insurance, certificates and binders with respect to the business covered by this Agreement and to which the Company is subject; (3) the exclusions as communicated to the Manager in writing by the Company and as initially set forth in Schedule A attached to this Agreement; (4) a maximum annual premium volume mutually agreed upon; and (5) the underwriting guidelines developed, and as may be amended from time to time, by Company and Manager, including such rates, policy limits, types of risks to be written, policy cancellation provisions and policy terms as may be set forth therein.

### 4. Reinsurance



OR 1673



**5.  Budgeted Premium Production.**



**6.  Compliance with State Laws**

Manager shall comply with the laws of the governmental jurisdictions applicable to the territories in which it is authorized to service insurance for Company and with the rules and regulations of the regulatory agencies, including insurance regulators, thereof and shall, whenever necessary, maintain at its own expense all licenses required to conduct its business in such jurisdictions.  Manager shall defend and indemnify Company against any claim, action or loss arising from any allegation, whether or not the allegation is groundless, that Manager has not complied with such laws, rules or regulations.

OR 1674

### 7. Company Net Retained Limits of Liability

Manager's underwriting authority with respect to the limit of liability to be retained by the Company shall be as agreed upon in writing between the parties and as initially set forth in Schedule A attached to the Agreement.

### 8. Duties of Manager

Manager is authorized to perform, or to contract with other parties acceptable to the Company to perform, on behalf of the Company, the following services with respect to insurance contracts covered by this Agreement in addition to those otherwise enumerated herein:

- A. Underwrite each risk and issue and service the insurance contract, including the accounting thereon and payment of the expenses thereunder;

- B. Collect all premiums due on the insurance contracts, including retrospective premium adjustments and additional premiums due under audit premium adjustments, and hold them in a premium account until it remits them to Company as provided in this Agreement;

- C. Cancel or not renew insurance contracts;

- D. Settle claims as provided in this Agreement;

- E. Enter into contracts with, and appoint lawfully licensed agents and terminate such contracts and appointments.

- F. Offer the ability to finance premiums through an affiliated premium finance company.

Provided, however, that the Company also retains the right to perform such functions, specifically including, but not limited to, the right to cancel or not renew any policy of insurance produced by the Manager subject to the applicable laws and regulations concerning the cancellation and nonrenewal of insurance policies.

### 9. Inspection and Audit

OR 1675

**10. Claim Settlement Authority**



OR 1676



11. Compensation of Manager and Payment of Agents



**12. Reports and Settlement of Balance**





OR 1679

Exhibit 52, page 8



### 13. Term and Cancellation

This Agreement may be terminated at any time by either party giving the other party notice in writing not less than one hundred twenty (120) days prior to the effective date of termination.



OR 1680



14. Inspection of Records

15. Ownership of Books, Records and Expirations

16. Errors and Omissions, and Fidelity Insurance

**17. Nonwaiver**

No waiver by Company of any breach of this Agreement by Manager shall be deemed to be a waiver of another breach of the same or of any other provision.

**18. Arbitration**



OR 1682



**19. Examination**



**20. Miscellaneous**

All amendments and changes to this agreement must be in writing and specify the effective date.

Company may suspend the authority of the Manager during the pendency of any dispute regarding any default by the Manager under this agreement.

Manager shall not jointly employ any individual who is also employed by the Company. Neither the Manager nor any of its sub-agents shall be permitted to serve on the Board of Directors of the Company.

OR 1683

### 21. Applicable Law

This Agreement shall be governed and construed in accordance with the laws of the State of Pennsylvania.

### 22. Severability.

In the event that any provision in this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, that provision shall survive to the extent it is not so declared and the other provisions of this Agreement shall remain in full force and effect.

### 23. Notices.

Each party hereto shall specify to the other party a person or persons to whom notices required or permitted to be given hereunder shall given and may change the identity of such person at any time by providing the other party with written notice of the person to whom notices shall be given.

### 24. Prior Agreements.

This Agreement shall replace any prior agreements, including the Service Agreement between the parties dated July 15, 1983, and any amendments or other agreements pertaining thereto, between the parties with respect to the rights and obligations of the parties as respects the Manager's providing of services to the Company as generally set forth herein.

OR 1684

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed on the __5th__ day of _____May_____, 2007.

ATTEST:

_____

ATTEST:

_____

OLD REPUBLIC INSURANCE COMPANY

By_____

PHOENIX AVIATION MANAGERS, INC.

By_____

OR 1685

Exhibit 52, page 14

SCHEDULE A.

to the Management Agreement

between

Phoenix Aviation Managers, Inc. (the "Manager")

And

Old Republic Insurance Company (the "Company").

A. **Territorial Limits**

Worldwide.

Assureds to be domiciled in the USA, its territories or possessions, the District of Columbia, and in all of the provinces of the Dominion of Canada.

B. **Classes of Business:**

Manager's authority is limited to services on behalf of Company for aviation hull and liability insurance, including but not limited to

- airport (including non-owned aircraft liability and public officials errors and omissions liability),
- premises,
- hangarkeepers,
- employers liability,
- auto liability,
- other non-aviation liability exposures and non-specified aviation exposures but only in conjunction with the policies providing the aforesaid types of coverages,
- Aviation manufacturer's products liability and related coverages, and
- worker's compensation insurance,

subject to (1) the limits listed below regarding net limits of liability; (2) each of the exclusions stated in any quota share, excess or facultative reinsurance agreement covering any policy,

OR 1686

Exhibit 52, page 15

certificate or binder issued or bound pursuant to this Agreement; and (3) the following specific exclusions:

1. Trunk Airlines

2. Airframe or Engine Manufacturers

3. Aircraft having more than forty (40) passenger seats

4. Reinsurance – Nevertheless, this exclusion shall not apply to those risks where the primary underwriting and claims handling is done by the Manager.

5. Profit Commission or Similar Contingent Commission Insurance

**C. Limits of Liability**

Manager is hereby authorized to service on behalf of Company, the kinds of insurance specified above in amounts on any one insured without regard to the number of certificates insuring liability of that insured as shown in the following schedule:

Gross Policy Limits

Aviation Liability          USD ▮▮▮▮ for any one accident or occurrence for Aviation Liability business to include:

- Airport (including non-owned aircraft liability and public officials errors and omissions liability),

- Premises,

- Aviation Manufacturer's Products,

- Hangarkeepers (including in flight),

- Employer's Liability,

- automobile liability, and

- other non-aviation liability and non-specified Aviation exposures but only in conjunction with the policies providing the aforesaid types of coverages,

OR 1687

| | |
|---|---|
| Aviation Hull | USD ████ for any one aircraft for Hull All Risks (including Engines and/or spare parts), War, and Allied Perils. |
| Workers' Compensation | Statutory limits (████████████████████) for Workers' Compensation. |

Provided that, net of any applicable reinsurance, the Company's ultimate retained limit shall not exceed the following:

| | |
|---|---|
| Aviation Liability, including Products and Airport Liability | $ ████ per any one occurrence |
| Aviation Hull | $ ████ per any one aircraft |

Except as respects expenses constituting part of the indemnity provided in the policy, allocated loss adjustment expense shall be in addition to the limits of liability set forth herein.

Workers' compensation and other permitted kinds of insurance will be issued only with respect to aviation and aviation related risks. Manager is not authorized to settle claims on workers' compensation insurance.

D. **Claim Settlement Authority:**

Maximum of Policy Limits up to and including USD ████ for Aviation Liability in addition to USD ████ for Aviation Hull business.



OR 1688

Exhibit 52, page 17

<u>SCHEDULE B</u>

to the Management Agreement

between

Phoenix Aviation Managers, Inc. (the "Manager")

And

Old Republic Insurance Company (the "Company").

<u>Compensation of Manager:</u>



OR 1689

<u>SCHEDULE A</u>

to the Management Agreement

between

Phoenix Aviation Managers, Inc. (the "Manager")

and

Old Republic Insurance Company (the "Company").

With effect from August 1, 2009 Schedule A has been revised to:

A. <u>Territorial Limits</u>

Worldwide.

Assureds to be domiciled in the USA, its territories or possessions, the District of Columbia, and in all of the provinces of the Dominion of Canada.

B. <u>Classes of Business:</u>

Manager's authority is limited to services on behalf of Company for aviation hull and liability insurance, including but not limited to

- airport (including non-owned aircraft liability and public officials errors and omissions liability),

- premises,

- hangarkeepers,

- aviation excess liability

- employers liability,

- auto liability ,

- other non-aviation liability exposures  and non-specified aviation exposures but only in conjunction with the policies providing the aforesaid types of coverages,

- aviation manufacturer's products liability and related coverages, and

- worker's compensation insurance,

Page 1 of 4

OR 1690

Exhibit 52, page 19

subject to (1) the limits listed below regarding net limits of liability; (2) each of the exclusions stated in any quota share, excess or facultative reinsurance agreement covering any policy, certificate or binder issued or bound pursuant to this Agreement; and (3) the following specific exclusions:

1. Trunk Airlines

2. Airframe or Engine Manufacturers

3. Aircraft having more than forty (40) passenger seats

4. Reinsurance – Nevertheless, this exclusion shall not apply to those risks where the primary underwriting and claims handling is done by the Manager.

5. Profit Commission or Similar Contingent Commission Insurance

C.  **Limits of Liability**

Manager is hereby authorized to service on behalf of Company, the kinds of insurance specified above in amounts on any one insured without regard to the number of certificates insuring liability of that insured as shown in the following schedule:

**Gross Policy Limits**

Aviation Liability          USD ████████ for any one accident or occurrence for Aviation Liability business to include:

- Airport (including non-owned aircraft liability and public officials errors and omissions liability),

- Premises,

- Aviation Manufacturer's Products,

- Hangarkeepers (including in flight),

- Aviation excess liability

- Employer's liability,

- Automobile liability, and

- Other non-aviation liability and non-specified Aviation exposures but only in conjunction with the policies providing the aforesaid types of

Page 2 of 4

PAM-ORINSCO
Schedule A

OR 1691

Exhibit 52, page 20

coverages,

| | |
|---|---|
| Aviation Hull | USD ██████ for any one aircraft for Hull All Risks (including Engines and/or spare parts), War, and Allied Perils. |
| Workers' Compensation | Statutory limits (██████████████████████) for Workers' Compensation. |

Provided that, net of any applicable reinsurance, the Company's ultimate retained limit shall not exceed the following:

| | |
|---|---|
| Aviation Liability, including Products and Airport Liability | $ ██████ per any one occurrence |
| Aviation Hull | $ ██████ per any one aircraft |

Except as respects expenses constituting part of the indemnity provided in the policy, allocated loss adjustment expense shall be in addition to the limits of liability set forth herein.

Workers' compensation and other permitted kinds of insurance will be issued only with respect to aviation and aviation related risks. Manager is not authorized to settle claims on workers' compensation insurance.

D. **Claim Settlement Authority:**

Maximum of Policy Limits up to and including USD 250,000,000 for Aviation Liability in addition to USD ██████ for Aviation Hull business.



Page 3 of 4

PAM-ORINSCO
Schedule A

OR 1692

Exhibit 52, page 21

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed on the 22ᴺᴰ day of _____ , 20 11 .

ATTEST:

_William J. Rosso_

OLD REPUBLIC INSURANCE COMPANY

By _____

ATTEST:

_____

PHOENIX AVIATION MANAGERS, INC.

By _____

Page 4 of 4

PAM-ORINSCO
Schedule A

OR 1693

<u>SCHEDULE A</u>

to the Management Agreement

between

Phoenix Aviation Managers, Inc. (the "Manager")

and

Old Republic Insurance Company (the "Company").

With effect from August 1, 2012 Schedule A has been revised to:

A.  <u>Territorial Limits</u>

Worldwide.

Assureds to be domiciled in the USA, its territories or possessions, the District of Columbia, and in any of the provinces of the Dominion of Canada.

B.  <u>Classes of Business:</u>

Manager's authority is limited to services on behalf of Company for aviation hull and liability insurance, including but not limited to

- airport (including non-owned aircraft liability and public officials errors and omissions liability),

- premises,

- hangarkeepers,

- aviation excess liability

- employers liability,

- auto liability ,

- other non-aviation liability exposures  and non-specified aviation exposures but only in conjunction with the policies providing the aforesaid types of coverages,

- aviation manufacturer's products liability and related coverages, and

- worker's compensation insurance,

Page 1 of 4

OR 1694

subject to (1) the limits listed below regarding net limits of liability; (2) each of the exclusions stated in any quota share, excess or facultative reinsurance agreement covering any policy, certificate or binder issued or bound pursuant to this Agreement; and (3) the following specific exclusions:

1. Trunk Airlines

2. Airframe or Engine Manufacturers

3. Aircraft having more than fifty (50) passenger seats unless written on a quota share basis

4. Reinsurance – Nevertheless, this exclusion shall not apply to those risks where the primary underwriting and claims handling is done by the Manager.

5. Profit Commission or Similar Contingent Commission Insurance

C. **Limits of Liability**

Manager is hereby authorized to service on behalf of Company, the kinds of insurance specified above in amounts on any one insured without regard to the number of certificates insuring liability of that insured as shown in the following schedule:

Gross Policy Limits

Aviation Liability           USD $███████ for any one accident or occurrence for Aviation Liability business to include:

- Airport (including non-owned aircraft liability and public officials errors and omissions liability),

- Premises,

- Aviation Manufacturer's Products,

- Hangarkeepers (including in flight),

- Aviation excess liability

- Employer's liability,

- Automobile liability, and

- Other non-aviation liability and non-specified Aviation exposures but

Page 2 of 4

PAM-ORINSCO
Schedule A 09/2012

only in conjunction with the policies providing the aforesaid types of coverages,

| | |
|---|---|
| Aviation Hull | USD $ ███████ for any one aircraft for Hull All Risks (including Engines and/or spare parts), War, and Allied Perils. |
| Workers' Compensation | Statutory limits (███████████████████████████████) for Workers' Compensation. |

Provided that, net of any applicable reinsurance, the Company's ultimate retained limit shall not exceed the following:

| | |
|---|---|
| Aviation Liability, Including Products and Airport Liability | $ ██████ per any one occurrence |
| Aviation Hull | $ ██████ per any one aircraft |

Except as respects expenses constituting part of the indemnity provided in the policy, allocated loss adjustment expense shall be in addition to the limits of liability set forth herein.

Workers' compensation and other permitted kinds of insurance will be issued only with respect to aviation and aviation related risks.  Manager is not authorized to directly settle claims on workers' compensation insurance but can provide settlement authority to the TPA providing workers' compensation claims adjustment services pursuant to written contract with manager.

D.  **Claim Settlement Authority:**

Maximum of Policy Limits up to and including USD $ ██████ for Aviation Liability in addition to USD $ ██████ for Aviation Hull business.



Page 3 of 4



IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed on the ___25th___ day of ___September___, 20_12_.

ATTEST:

OLD REPUBLIC INSURANCE COMPANY

By _____

ATTEST:

PHOENIX AVIATION MANAGERS, INC.

By _____

Page 4 of 4

PAM-ORINSCO
Schedule A 09/2012

OR 1697

Exhibit 52, page 26

<u>SCHEDULE A</u>

to the Management Agreement

between

Old Republic Aerospace, Inc.  (the "Manager")

and

Old Republic Insurance Company (the "Company").

With effect from December 1, 2015, Schedule A has been revised to:

A. <u>Territorial Limits</u>

Worldwide.

Assureds to be domiciled in the USA, its territories or possessions, the District of Columbia, and in all of the provinces of the Dominion of Canada.

B. <u>Classes of Business:</u>

Manager's authority is limited to services on behalf of Company for aviation hull and liability insurance, including but not limited to

- airport (including non-owned aircraft liability and public officials errors and omissions liability),
- premises,
- hangarkeepers,
- aviation excess liability
- employers liability,
- auto liability ,
- other non-aviation liability exposures  and non-specified aviation exposures but only in conjunction with the policies providing the aforesaid types of coverages,
- aviation manufacturer's products liability and related coverages,
- worker's compensation insurance, and
- North American airlines

Page 1 of 4

OR 1698

subject to (1) the limits listed below regarding net limits of liability; (2) each of the exclusions stated in any quota share, excess or facultative reinsurance agreement covering any policy, certificate or binder issued or bound pursuant to this Agreement; and (3) the following specific exclusions:

1. Space/Satellite Insurance written as such,
2. Reinsurance – Nevertheless, this exclusion shall not apply to those risks where the primary underwriting and claims handling is done by the Manager.
3. Profit Commission or Similar Contingent Commission Insurance

## C. Limits of Liability

Manager is hereby authorized to service on behalf of Company, the kinds of insurance specified above in amounts on any one insured without regard to the number of certificates insuring liability of that insured as shown in the following schedule:

**Gross Policy Limits**

Aviation Liability     USD $ ▮▮▮▮▮▮ for any one accident or occurrence for Aviation Liability business to include:

- Airport (including non-owned aircraft liability and public officials errors and omissions liability),
- Premises,
- Aviation Manufacturer's Products,
- Hangarkeepers (including in flight),
- Aviation excess liability
- Employer's liability,
- Automobile liability, and
- Other non-aviation liability and non-specified Aviation

Page 2 of 4

PAM-ORINSCO
Schedule A

OR 1699

Exhibit 52, page 28

exposures but only in conjunction with the policies providing the aforesaid types of coverages,

**Aviation Hull**      USD $█████ for any one aircraft for Hull All Risks (including Engines and/or spare parts), War, and Allied Perils.

**Workers'**      Statutory limits (████████████████████████

**Compensation**      ██████) for Workers' Compensation.

Provided that, net of any applicable reinsurance, the Company's ultimate retained limit shall not exceed the following:

**Aviation Liability, Including**    $█████ per any one

**Products and Airport**    occurrence;

**Liability**

Except as respects expenses constituting part of the indemnity provided in the policy, allocated loss adjustment expense shall be in addition to the limits of liability set forth herein.

Workers' compensation and other permitted kinds of insurance will be issued only with respect to aviation and aviation related risks. Manager is not authorized to settle claims on workers' compensation insurance.

D. <u>Claim Settlement Authority:</u>

Maximum of Policy Limits up to and including USD $█████ for Aviation Liability in addition to USD $█████ for Aviation Hull business.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Page 3 of 4

PAM-ORINSCO
Schedule A

OR 1700



IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed on the 26th day of February, 2016.

OLD REPUBLIC INSURANCE COMPANY

ATTEST:

By: _____
Name: Karl W. Mueller
Title: Senior Vice President and CFO

OLD REPUBLIC AEROSPACE, INC.

ATTEST:

By: _____
Name: Ralph H. Sohl
Title: President and CEO

PAM-ORINSCO
Schedule A

Page 4 of 4

OR 1701

**PROOF OF SERVICE**
*R Consulting & Sales, Inc. v. Old Republic Insurance Company, et al.*
**Case No. 3:17-cv-00171-LAB-BLM**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 150 S. Los Robles Avenue, Suite 940, Pasadena, California 91101.

On February 1, 2018, I served the within document(s) described as:

**SUPPLEMENTAL DISCLOSURES OF DEFENDANT OLD REPUBLIC INSURANCE COMPANY, PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1) & (e)(1)**

on the interested parties in this action as stated on the attached mailing list.

[X] **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day, with postage thereon fully prepaid at Pasadena, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **BY FAX:** I transmitted a copy of the foregoing document(s) this date via telecopier to the facsimile numbers shown on the attached mailing list.

[ ] **BY OVERNIGHT COURIER:** I caused such envelope to be placed for collection and delivery on this date in accordance with standard Federal Express delivery procedures.

[X] **BY EMAIL:** I caused a copy of the foregoing document to be transmitted electronically by sending it to the email address of the person set forth on the attached service list.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 1, 2018, at Pasadena, California.

_____
Yvonne Allfie
(Type or print name)

_____
(Signature)

# EXHIBIT 53

010 3:39:54 PM



### PHOENIX AVIATION MANAGERS, INC.

1990 VAUGHN ROAD, SUITE 350, KENNESAW GEORGIA 30144
Telephone: (770) 590-4950
FACSIMILE: (770) 590-9438

## ACCOUNT CURRENT AGREEMENT

THIS AGREEMENT, made on the _28th_ of _March_ '05 by and between AVSURANCE CORPORATION located at ANN ARBOR MI  hereinafter designated as "Producer" and Phoenix Aviation Managers, Inc. their affiliates and/or subsidiaries of 1990 Vaughn Road, #350, Kennesaw, Georgia 30144 and elsewhere, hereinafter designated as PAM.

The Producer is an independent contractor who will exercise its independent judgment and discretion with regard to the performance of its business. Producer is not an employee of PAM and is free to represent such other companies as Producer shall consider appropriate. Nothing contained herein shall be construed to establish the Producer as the agent of PAM. Producer is subject to the requirements and prohibitions imposed by law and the terms of this agreement. This agreement shall not be deemed or construed to be an "exclusive" agreement and does not give Producer the exclusive right to represent PAM.

Producer agrees to carry out its activities in connection with this AGREEMENT in such a way as to comply in all respects with all applicable laws of the jurisdictions involved, including all licensing requirements, as well as all other applicable laws governing the conduct of business under this AGREEMENT.

More specifically, Producer shall not, directly or through others appointed or employed by Producer, submit to PAM for consideration business in violation of applicable licensing and other laws and regulations. Producer shall ensure that Producer is responsible for providing PAM with complete licensing information for jurisdictions that require PAM to appoint Producers. Producer shall reimburse PAM the amount of any fees, penalties or fines incurred by or assessed against PAM as a result of Producer's non-compliance with or violation of any licensing or other law or regulation.

IT IS HEREBY AGREED

between Phoenix Aviation Managers, Inc. and Producer as follows:

1.  Producer hereby agrees to be fully responsible for all premiums for insurance, whether original, renewal, installment, audit or other for business placed by the Producer with PAM, and PAM shall not be responsible for premiums advanced by the Producer.

    Whenever a policy or binder is issued by PAM, premium shall be deemed to be earned unless the policy or binder is returned with evidence satisfactory to PAM that such policy or binder did not result in contractual or other liability on the part of PAM.

    Producer shall collect and receipt for all premiums, for PAM. Premiums and other payments collected by Producer as premiums or as payment for other services provided by PAM, shall be the property of PAM and shall be held by Producer "IN TRUST" for the exclusive and sole benefit of PAM until satisfactorily accounted for to PAM.

    Producer shall also be responsible for collecting and remitting to PAM any additional premiums which develop by audit or under reporting form policies. Such items will be

OR 1662

Exhibit 53, page 1

9/8/2010 3:39:55 PM



### PHOENIX AVIATION MANAGERS, INC.

included in the monthly statement prepared by PAM and sent to Producer in written and electronic form. If such additional premium developed by audit from workers' compensation coverage placements is deemed uncollectible by Producer, within sixty days of receipt of audit from PAM, Producer has the right to return the audit and associated invoicing to PAM; thereby foregoing any commissions associated with the audit and associated invoicing, for collection by PAM directly from the applicable insured. Producer will use its best efforts to assist PAM in the collection of such audit premiums.

Producer shall act in a fiduciary capacity with respect to all premiums collected by him/her, or pursuant to the direction of Producer. The privilege of deducting commissions from premium monies received by Producer shall not be construed as an alteration of this fiduciary capacity. The making of payments or rendering of accounts pursuant to this agreement shall not convert the relationship to debtor and creditor as to such sums.

Producer shall retain out of the premiums collected, as full compensation for business placed with PAM commissions, at rates on the attached Schedule of Rates.

The attached Commission Rate Schedule may, from time to time, be modified or amended, or the rates for certain classes of insureds, or an individual insured, may differ from the foregoing rates. PAM shall notify Producer in writing of any such change or modification of commission rates by regular United States Mail to the foregoing address of Producer. Modifications or changes in rates shall be effective from and after the date on said written notice unless a different effective date is agreed upon by both parties in writing. The failure of Producer to make written objection to, such modifications or changes in rates within fifteen (15) days after the date set forth on said written notice will conclusively bind Producer thereto.

"If, however, a premium is due for an audit, which the Producer is unable to collect solely because of unreasonable delay caused by PAM's failure to perform a timely audit, then, upon given written notice by the Producer, within ten (10) days from the Producer's receipt of the audit, PAM will assume the collection responsibility of the audit premiums due from the insured(s) or Policyholder(s)."

2.   It is a condition of this agreement that the Producer shall refund ratably to PAM, on business heretofore or hereafter written, commissions on reductions in premiums at the same rate which such commissions were originally retained.

3.   In the event of termination of this agreement, the Producer, having promptly accounted for and paid over all premiums for which he may be liable, will retain the Producer's records; and, use and control of expirations shall remain the property of the Producer and be left in his undisputed possession, otherwise the records, use and control of expirations shall be vested in and with PAM.

4.   Accounting of and payments of moneys due PAM on business placed by the Producer with PAM are to be made in the manner and at the time and place required by PAM. PAM shall render its statement monthly to Producer showing the amounts of money due PAM, identifying all transactions relating to the insureds of the Producer. The account balance as shown on PAM's statement for all business shall be paid by Producer not later than the due date shown on the account current statement.

If any premium payment is withheld from PAM more than thirty (30) days after the due date, such failure shall be deemed to be a willful withholding of premium payments. It is agreed

OR 1663

Exhibit 53, page 2

9/8/2010 3:39:56 PM



PHOENIX AVIATION MANAGERS, INC.

by **Producer** that there shall be no commission withheld by, owed to, or payable to **Producer** relative to any premium payment willfully withheld from **PAM**. Such waiver of commission by **Producer** shall constitute liquidated damages to indemnify **PAM** for its financial detriment arising from **Producer's** willful failure to pay the said premium obligations and shall not be deemed to be a penalty. **Producer** agrees that undistributed commissions in the hands of **PAM** at any time and for any reason may be applied to and constitute an offset against any monies due **PAM**.

5.    **PAM's** acceptance of accounting of and payments of moneys due in any manner other than that described in Paragraph 4 shall not operate to void this agreement, which, in such event, shall still be binding upon the **Producer**.

6.    **PAM** reserves the right to cancel any policy or other contract of insurance issued by **PAM**, by direct notice to the insured or Obligee.

7.    **Producer** may, while this agreement is in full force and effect, advertise or disclose its business relationship with **PAM**. **Producer** shall not advertise or publicly disclose information or data provided by **PAM** to **Producer**, or publicly advertise and identify **PAM** as being the source of any information or data, without the prior consent of **PAM**. Except as specifically authorized herein, **Producer** shall not broadcast, publish, or distribute any advertisements or other matter referring to **PAM**, or to the **PAM's** contracts of insurance, not originated by **PAM**, without first securing **PAM's** approval.

8.    This agreement shall not be assigned, conveyed, transferred, or sold without the prior written consent of **PAM**. Upon the effective date of the sale, transfer, consolidation, merger, bankruptcy, receivership, or dissolution of **Producer's** business, or the controlling interest therein, this agreement shall forthwith, without notice, terminate. **Producer** shall give at least thirty (30) days advance written notice to **PAM** of any intended sale, transfer, or merger of **Producer's** business, or its consolidation with a successor firm. If **Producer** provides such timely written notice, and requests that **PAM** execute an Account Current Agreement with the buyer, transferee, or other successor in interest, such request may be honored by **PAM**, in **PAM's** sole discretion, if such buyer, transferee, or other successor in interest fully meets **PAM's** requirements for appointment.

This agreement supersedes all previous agreements, whether oral or written, between **PAM** and the **Producer** and constitutes the full agreement between the parties. No amendment to this AGREEMENT shall be valid unless in writing, and signed by the parties except the Exhibits attached hereto. This agreement may be terminated by either party, at any time, by written notice to the other with or without cause; provided, however, that both parties hereto agree to abide by and comply with all state statutory or regulatory notice requirements in conflict herewith.

If any provision of this agreement should be invalid under or in conflict with the laws of any state, such laws shall control, but in all other respects the remainder of this agreement shall not be affected. Failure of **PAM** at any time and for any reason to insist upon strict compliance by the **Producer** with the provisions of this agreement shall not be construed as or constitute a waiver thereof on such any subsequent occasion.

However, until the **Producer** has fully completed all obligations under this agreement with **PAM** the **Producer** shall be bound by the agreement's terms and conditions.

**Producer** further agrees that suspension of acceptance of business by **PAM** shall not operate to void the **Producer's** obligations under this agreement.

Page 3 of 5

Confidential  -  3/01/05

OR 1664

Exhibit 53, page 3

9/8/2010 3:39:56 PM



PHOENIX AVIATION MANAGERS, INC.

The provisions of this AGREEMENT are for the sole benefit of the parties hereto. Nothing in this AGREEMENT is intended to create rights enforceable against any party by any so-called third party beneficiary.

Wherever possible, each provision of this AGREEMENT will be interpreted in such manner and to such an extent as to be effective and valid under applicable law. If any provision is prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition of invalidity.

IN WITNESS WHEREOF PAM and **Producer** have caused their names to be subscribed hereto and they have set their hands and seals on the day and year above written.

Phoenix Aviation Managers, Inc.

BY: _Omer H. Raines, Executive Vice President_

ATTEST: _____

BY: _____   Edmund W. Underwood/President
(NAME & TITLE)

ATTEST: _Vanessa Labertew_

9/8/2010 3:39:57 PM



### PHOENIX AVIATION MANAGERS, INC.

COMMISSION RATE SCHEDULE

| LINE OF BUSNESS | COMMISSION |
|---|---|
| PLEASURE & BUSINESS | |
| COMMERCIAL | |
| AGRICULTURAL | |
| CORPORATE | |
| WORKER'S COMPENSATION | |
|    POLICIES = > $10,000 | |
|    POLICIES LESS THAN $10,000 | |

COMMISSION MAY BE NEGOTIATED WITHIN THE RANGE  BASED ON THE QUALITY OF
THE RISK.

# EXHIBIT 54

9/8/2010 3:39:58 PM



### PHOENIX AVIATION MANAGERS, INC.

1990 VAUGHN ROAD, SUITE 350, KENNESAW GEORGIA 30144
Telephone: (770) 590-4950
FACSIMILE: (770) 590-9438

## PLEASURE & BUSINESS AIRCRAFT PROGRAM

THIS PRODUCER PROGRAM AGREEMENT, made on the 4th _____ day of January 2008 by and between Avsurance Corporation _____ located at 47 West Ellsworth Ann Arbor mi hereinafter designated as "**the PRODUCER**" and **Phoenix Aviation Managers, Inc.** their affiliates and/or subsidiaries at **1990 Vaughn Road, #350, Kennesaw, Georgia 30144** and elsewhere, hereinafter designated as PAM; **ATTACHS TO AND BECOMES A PART OF THE ALREADY INFORCE ACCOUNT CURRENT AGREEMENT.**

PAM has made available at no cost to the **PRODUCER**, an Internet Website Quoting System accessible through portal.phoenixaviationmgrs.com. In consideration of the reciprocal agreements herein, PAM and the **PRODUCER** mutually agree to the following:

### V.  PRODUCER APPOINTMENT AND PROGRAM DEFINITION

   A.  **PAM** hereby appoints the **PRODUCER** as its general agent to perform the duties set forth below and grants the **PRODUCER** authority to accomplish, effect and execute such duties upon the terms and conditions set forth in this AGREEMENT. The authority granted the **PRODUCER** by PAM is limited to the **PROGRAM** which is defined as:

   The Phoenix Aviation Managers, Inc. Internet Website Quoting System for Physical damage (Hull) and Liability insurance coverage for small Pleasure and Business aircraft.

   B.  **PRODUCER** is authorized by this AGREEMENT to underwrite insurance coverage only within the scope of the **PROGRAM.**

   C.  **PAM** appoints the **PRODUCER** as its non-exclusive General Agent for the **PROGRAM. PAM** reserves the right to market, at any time, the class (es) of business and types of coverages written in the **PROGRAM** through other producers.

### VI.  TERM OF AGREEMENT

This AGREEMENT shall be effective commencing Jan. 4 2008 and continue until terminated in accordance with Section III hereunder.

### VII.  PRODUCER'S RELATION TO COMPANY

This AGREEMENT is not a contract of employment and nothing contained herein shall be construed to create the relationship of employer and employee between **PAM** and the **PRODUCER.** The **PRODUCER** is an independent contractor and is intended to exercise its independent judgment and discretion with regard to the performance of its duties and authority hereunder.

### VIII.  GENERAL UNDERWRITING AUTHORITY

   E.  **PAM** hereby grants the **PRODUCER** underwriting authority only through the use of the Phoenix Aviation Managers, Inc.'s **Internet Website Quoting System** (hereinafter designated as **IWQS**). Such underwriting authority does not negate the **PRODUCER's** responsibility to make knowledgeable underwriting decisions. Unique and unusual risks and coverages, as well as those risks that the IWQS program cause to be referred, shall be referred to a PAM

OR 1667

Exhibit 54, page 1

9/8/2010 3:39:58 PM



## PHOENIX AVIATION MANAGERS, INC.

underwriter prior to binding even if some of those risks may fit within the parameters of the **IWQS**.

F. **PRODUCER** does not have the authority to underwrite any class of business, exposure, or coverage, which is outside **PRODUCER's** authority or **PAM's IWQS** program criteria.

G. **PRODUCER's** responsibilities and duties for underwriting are subject to all **PAM** policies and procedures including the **IWQS** program underwriting criteria as outlined in the **IWQS** User Manual as attached in **Addendum No. 1**.

H. **PRODUCER's** underwriting authority and the **IWQS** Underwriting Manual will be reviewed at a minimum, on an annual basis. Adjustments or revisions to the **PRODUCER's** underwriting authority and **IWQS** underwriting criteria will be made as warranted, subject to **PAM** discretion, and will be communicated to the **PRODUCER** in writing.

XI.  **GENERAL RESPONSIBILITIES AND DUTIES OF THE PRODUCER**

Subject to requirements imposed by law, the terms of the PRODUCER AGREEMENT And the specific **IWQS** underwriting procedures and policies that may be provided to the **PRODUCER** by **PAM** from time to time, the **PRODUCER** has the responsibility and duty to:

A.  To use the **IWQS** program to underwrite and accept or reject applications for insurance;

B.  The **PRODUCER** agrees that **PAM** relies on true and accurate inputting of information in to the **IWQS** for the issuance of quotations and policies. **PAM** may at its option, adjust the premium or withdraw the quotation if any information that is presented is incorrect or inaccurate;

C.  The **PRODUCER** understands and agrees that quotations of the **IWQS** are valid for a period of ninety (90) days or until expiration date of the current policy, whichever comes first.

D.  Bind **PAM** on Pleasure and Business aviation insurance policies and endorsements only through the use of the **IWQS.**

E.  Furnish **PAM** the completed and signed Aircraft Insurance Application as required by the **IWQS** underwriting procedures within 30 days of quoting the risk in order to satisfy **PAM** underwriting requirements. If the Aircraft Insurance Application is not received within the 30 day period **PAM** will send notice of cancellation.

F.  **PAM** may at its option, cancel any binder or policy or adjust the premiums of a binder or policy should the information on the completed and signed application be different from the information provided to the **IWQS** program.

G.  Submitting false information for purposes of generating a quotation or manipulating the clearance process will be cause for cancellation of this agreement.

H.  Forward to **PAM** such applications as are beyond the **IWQS's** ability to approve;

I.  Assemble, prepare and deliver the website produced policies including endorsements, make proper arrangements for the countersigning of policies where required, and make certain that such requirements are followed;

Page 2 of 5

OR 1668

9/8/2010 3:39:59 PM



### PHOENIX AVIATION MANAGERS, INC.

J.  Charge, collect, receive and receipt premiums including any additional premiums, and refund return premiums and unearned premiums, if any, on cancelled insurance policies **UNLESS PAM** has chosen to Direct Bill.

K.  For all other matters relating to the collection receiving, processing and handling of premium, return premiums and unearned premiums under the PRODUCER PROGRAM the terms and conditions of the attached **PAM** Account Current Agreement shall apply.

L.  Service all policies of insurance written pursuant to the PRODUCER AGREEMENT;

M.  Furnish **PAM** sufficient information as may be required to satisfy any reporting requirements imposed on **PAM** boards, bureaus, associations and regulatory bodies of competent jurisdiction as respects the policies issued pursuant to the PRODUCER AGREEMENT;

N.  Designate staff members, acceptable to **PAM**, who will be dedicated to use the **IWQS** Program to underwrite on behalf of **PAM**.

O.  The **PRODUCER** agrees that user names and passwords to gain access to the **PAM IWQS** program will not be given to anyone other than the **PRODUCER** and the **PRODUCER's** staff members. **PRODUCER** will take all reasonable action necessary to protect the user names and passwords from use by unauthorized persons.

P.  **PRODUCER** shall not make any representations to any applicant or insured regarding coverage under a policy that is not consistent with the actual terms and conditions of the policy.

### XII. LEGAL COMPLIANCE.

A.  **PRODUCER** agrees to carry out its activities in connection with this AGREEMENT in such a way as to comply in all respects with all applicable laws of the jurisdictions involved, including all licensing requirements, as well as all other applicable laws governing the conduct of business and the **PROGRAM** under this AGREEMENT.

B.  **PRODUCER** shall reimburse **PAM** the amount of any fees, penalties, or fines incurred by or assessed against **PAM** because of **PRODUCER's** non-compliance with or violation of any licensing or other law or regulation. No assistance, if any, given to **PRODUCER** by **PAM** in obtaining or renewing licenses for **PRODUCER** shall constitute a waiver of **PAM's** right to seek indemnification for damages, costs, penalties or assessments incurred by **PAM** through failure of **PRODUCER** to maintain proper licenses

### XIII. PRODUCER TERMINATION AGREEMENT

Cancellation or termination of the PRODUCER AGREEMENT or the Underwriting Authority between the **PRODUCER** and **PAM** shall not affect any insurance coverage bound by the **PRODUCER**, written in compliance with said PRODUCER AGREEMENT or Underwriting Authority and executed by the **PRODUCER** prior to the date of such cancellation or termination. This agreement may be terminated by either party notifying the other in writing.

OR 1669

Exhibit 54, page 3

9/8/2010 3:40:00 PM



### PHOENIX AVIATION MANAGERS, INC.

#### XIV. PROPRIETARY INFORMATION

If and to the extent that the **PRODUCER** shall, in connection with this Underwriting Authority and/or PRODUCER AGREEMENT to which this Underwriting Authority is attached, come into possession of any information, business or technology of **PAM** which is not known to the public, the **PRODUCER** shall treat such information as confidential and agrees not to disclose such information to any person, entity or group not a party to this agreement.

#### XV. ARBITRATION

A. It is understood that this AGREEMENT is made in good faith and should there arise a difference of opinion or interpretation of this AGREEMENT, which cannot be settled amicably between senior representatives of **PAM** and the **PRODUCER** or any dispute arising out of or relating to this Agreement such differences, interpretations or disputes shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire, meeting in the City of Chicago, Illinois, unless otherwise agreed.

B. The members of the board or arbitration are to be active or retired disinterested officials of insurance or reinsurance companies other than the parties or their affiliates. Each party will appoint its arbitrator, and the two arbitrators will choose an umpire before instituting the hearing. If the respondent fails to choose its arbitrators within four weeks after being requested to do so by the claimant, the latter will also appoint the second arbitrator. If the two arbitrators fail to agree upon the appointment of an umpire within four weeks after their nominations, each of them will name three, of whom the other will decline two and the decision shall be made by drawing lots.

C. The claimant will submit its initial statement within 20 days from appointment of the umpire. The respondent will submit its statement, and the claimant may submit a reply statement within 10 days after receipt of the respondent's statement. The respondent's statement shall be subject to the requirements of Section 1213(c) (1) of the New York Insurance Law.

D. The board will make its decision with regard to the custom and usage of the insurance and reinsurance business. The board will issue its decision in writing upon evidence introduced at a hearing or by other means of submitting evidence in which strict rules of evidence need not be followed, but in which cross examination and rebuttal will be allowed if requested. The board will make its decision within 45 days following the termination of the hearings unless the parties consent to an extension. The majority decision of the board will be final and binding upon all parties to the proceedings and will not be subject to the judicial review as to any questions of law. Judgement may be entered upon the award of the board in any court having jurisdiction thereof.

G. Each party will bear the expense of its own arbitrator and will jointly and equally bear with the other party the expense of the umpire. The remaining costs of the arbitration proceedings will be allocated by the board.

H. This SECTION IX, Arbitration, shall survive the termination of this AGREEMENT.

#### XVI. GOVERNING LAW

This Agreement shall be governed as to performance, administration and interpretation by the laws of the Commonwealth of Pennsylvania.

Page 4 of 5

OR 1670

9/8/2010 3:40:01 PM



PHOENIX AVIATION MANAGERS, INC.

The provisions of this AGREEMENT are for the sole benefit of the parties. Nothing in this AGREEMENT is intended to create rights enforceable against any party by any so-called third party beneficiary.

Wherever possible, each provision of this AGREEMENT will be interpreted in such manner and to such an extent as to be effective and valid under applicable law. If any provision is prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition of invalidity.

IN WITNESS WHEREOF **PAM** and **Producer** have caused their names to be subscribed hereto and they have set their hands and seals on the day and year above written.

Phoenix Aviation Managers, Inc.

BY: ROGER M. RIDINGS, EXECUTIVE VICE PRESIDENT

ATTEST:

AVSURANCE CORPORATION

BY:

(NAME & TITLE)
Edmund W Underwood, President

ATTEST:

OR 1671

Exhibit 54, page 5

# EXHIBIT 55



**PHOENIX AVIATION** MANAGERS, INC.

Issued: September 23, 2014

### AIRCRAFT INSURANCE BINDER

| | |
|---|---|
| Named Insured: | *R Consulting And Sales, Inc.* <br> *PO Box 2840* <br> *San Marcos, CA 92079* |
| Policy Dates: | Effective: 9/30/2014 12:01 a.m. <br> Expiration: 9/30/2015 12:01 a.m. |

*Please add Christine and Edy Marson as named PICs (See PHPs) – thanks!*
*JRM 9/29/2014*

| | |
|---|---|
| Policy Number: | CA 00246202 |
| Form: | PAM CA 500 |
| Issuing Company: | Old Republic Insurance Company |
| Commission: | 15.0% |
| Producer: | Kathleen Winkelhaus - Avsurance Corporation <br> POST OFFICE BOX 1387 <br> ANN ARBOR, MI 48108 <br> kwinkelhaus@avfuel.com |
| Underwriter: | Jennifer Melvin |

### COVERAGE SUMMARY

| | |
|---|---|
| Aircraft: | **N234LR - 1980 Gulfstream G-1159A GIII**, with 2 Crew + 12 Passenger Seats |
| Based at: | ELP - El Paso Intl Airport - El Paso, TX |
| Use(s): | **Industrial Aid** |

| | | | |
|---|---|---|---|
| Hull Value: | $1,000,000 | Hull Premium: | $6,100 |
| Deductibles: | Nil N.I.M. / Nil I.M. | | |
| Liability Limit: | $10,000,000 Each Occurrence | Liability Premium: | $4,202 |
| Passenger Voluntary Settlements: $250,000- Including Crew | | | Incl. |
| Medical Payments: $10,000 | | | Incl. |
| | | Total Annual Premium Excluding TRIA and War: | $10,302 |

The following options were selected or DECLINED and the stated Additional Premium charges applied:

| | |
|---|---|
| Hull TRIA: (0.03) (Includes WAR) | $300 |
| Liability TRIA (Includes WAR): | $420 |
| Mexican Policy (Flat and Fully Earned) | $261 |

**FINAL TOTAL ANNUAL PREMIUM (EXCL TAXES):   $11,283**

R Consulting And Sales, Inc.  Page 1 of 3
Phoenix Aviation Managers, Inc.
A Member of the Old Republic Insurance Group

OR 1125

Exhibit 55, page 1

<u>Named Pilots- Two (2) Crew Operations by:</u>

PIC:   Lance Ricotta   Brian Good   Daniel Kizziam
SIC:   Sargon Youhanian *

who is/are properly certified and who has/have successfully completed a PAM Approved Training course for the make & model aircraft operated within the last 12 months.

<u>Open Pilot Warranty:</u>   Two (2) Crew Operations by

As Expiring

### COVERAGE SUMMARY

| | | | |
|---|---|---|---|
| Aircraft: | **N388LR - 1983 Gulfstream G-1159A GIII, with 2 Crew + 12 Passenger Seats** | | |
| Based at: | **ELP - El Paso Intl Airport - El Paso, TX** | | |
| Use(s): | **Industrial Aid** | | |
| Hull Value: | **$1,300,000** | Hull Premium: | **$6,630** |
| Deductibles: | Nil N.I.M. / Nil I.M. | | |
| Liability Limit: | $10,000,000 Each Occurrence | Liability Premium: | $4,202 |
| | Passenger Voluntary Settlements: $250,000- Including Crew | | Incl. |
| | Medical Payments: $10,000 | | Incl. |
| | Total Annual Premium Excluding TRIA and War: | | **$10,832** |

The following options were selected or DECLINED and the stated Additional Premium charges applied:

| | |
|---|---|
| Hull TRIA: (0.03) (Includes WAR) | $390 |
| Liability TRIA (Includes WAR): | $420 |
| Mexican Policy (Flat and Fully Earned) | $261 |

**FINAL TOTAL ANNUAL PREMIUM (EXCL TAXES):   $11,903**

<u>Named Pilots- Two (2) Crew Operations by:</u>

PIC:   Lance Ricotta   Brian Good   Daniel Kizziam
SIC:   Sargon Youhanian*

who is/are properly certified and who has/have successfully completed a PAM Approved Training course for the make & model aircraft operated within the last 12 months.

**\*Training is waived for Sargon Youhanian through 11/25/14. He must be accomanied at all times by a named pilot.**

<u>Open Pilot Warranty:</u>   Two (2) Crew Operations by

As Expiring

OR 1126

Exhibit 55, page 2

**Policy Coverages/Amendments:**

As Expiring

Required Amendments:  CTXGA - TRIA Exclusion, NR38B Nuclear Exclusion, GFMEX – Mexico Warning, CA280 - Industrial Aid Use Amendment CA310

The policy will also contain any State Mandatory Amendments, a Pilot Qualification Amendment, CA382 Lienholder Amendment (as required), War/TRIA coverage Amendments as per coverage selections and any Additional Insured or other coverage extension Amendments as agreed and approved by underwriting.

**Additional Comments:**

This Insurance Binder provides only a general description of coverages offered and neither affirmatively nor negatively amends, extends, nor alters the coverage afforded by the policy numbered on this form.

Best,

*Jennifer Melvin*

Jennifer Melvin

# EXHIBIT 56

**Winkelhaus, Kathleen**

| | |
|---|---|
| **From:** | Winkelhaus, Kathleen |
| **Sent:** | Tuesday, September 23, 2014 3:26 PM |
| **To:** | 'Jennifer Melvin' |
| **Subject:** | RE: R Consulting |
| **Attachments:** | R Consulting ACFT PEF- Good updated.pdf; R Consulting ACFT PEF- CMarsan SIGNED.pdf; R Consulting ACFT PEF- EMarsan SIGNED.pdf; R Consulting ACFT pilot waiver Youhanian.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Jen,

The binder looks good.  This is the latest I have on the pilots. I have requested the rest from R Consulting.

Thank you,
**Kathleen Winkelhaus**
Customer Service Representative
**Avsurance Corporation**
P.O. Box 1387
Ann Arbor, MI 48106-1387
P: 800-472-7090
F: 734-663-8296
www.avfuel.com/avsurance

---

**From:** Jennifer Melvin [mailto:jmelvin@pamav.com]
**Sent:** Tuesday, September 23, 2014 2:49 PM
**To:** Winkelhaus, Kathleen
**Subject:** RE: R Consulting

Hi Kathleen,

On behalf of Phoenix Aviation Managers, Inc. thank you for your business.  Please see the attached binder and review its content.  Please send a confirmation email stating it is either correct or incorrect along with the needed changes.   We also require a current training completion certificate for each named pilot(s).

Should you have any questions regarding the above, please do not hesitate to let me know.  You may also visit our website at www.pamav.com for more information.  Again, thank you for your business.

Best,

Jen Melvin
Phoenix Aviation | Underwriter
Direct 678-264-0547 | Office 630-369-1076

---

**From:** Winkelhaus, Kathleen [mailto:kwinkelhaus@avfuel.com]
**Sent:** Tuesday, September 23, 2014 10:05 AM

2

AVSUR0000085

Exhibit 56, page 1

**EXHIBIT 57**

**Corey Becker**

| | |
|---|---|
| **From:** | Corey Becker |
| **Sent:** | Monday, August 31, 2015 3:15 PM |
| **To:** | 'Underwood, Ed W.' |
| **Cc:** | Winkelhaus, Kathleen; Coleman, Jim D.; Michael Prahl |
| **Subject:** | RE: R Consulting |

Ed,

After reviewing, we're unfortunately just not comfortable with providing coverage for this potential dry-lease, given the nature of the lessee's operations (VIP transportation, Latin America exposure, etc.).

Give me or Mike a call if you have any questions.

Corey P. Becker
Associate Underwriter

Old Republic Aerospace | Old Republic Insurance Group
2300 Cabot Drive | Suite 150 | Lisle, IL 60532
O: 630.369.1076 | D: 678.284.0547 | F: 630.369.1221 | M: 313.908.3151
www.OldRepublicAerospace.com

---

**From:** Underwood, Ed W. [mailto:eunderwood@avfuel.com]
**Sent:** Monday, August 31, 2015 2:32 PM
**To:** Corey Becker
**Cc:** Winkelhaus, Kathleen; Coleman, Jim D.
**Subject:** R Consulting

Corey,

This is the web site link to the parent company of the aircraft lessee. As discussed the home office is in the Dominican Republic. The CEO is Austrian and travels back and forth from Miami and Austria. They formerly leased a GIV from another party.

Web site is www.lifestyleholidaysvc.com

Ed

Edmund W. Underwood Jr. CPCU, CIC
Avsurance Corporation
President
PO Box 1387
Ann Arbor, MI 48106-1387
P: 800-472-7090
F: 734-663-8296
C: 734-604-5331

1

OR 0243

Exhibit 57, page 1



Global Supplier of Aviation Fuel and Services        eunderwood@avfuel.com

The contractor and subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a) and 29 CFR Section Part 471, Appendix A to Subpart A, if applicable. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.

2

OR 0244

Exhibit 57, page 2

**EXHIBIT 58**

**Corey Becker**

| | |
|---|---|
| **From:** | Corey Becker |
| **Sent:** | Monday, September 28, 2015 10:08 AM |
| **To:** | Michael Prahl |
| **Subject:** | FW: R Consulting and Sales |
| **Attachments:** | R Consulting and Sales- N388LR (AC 2) 2015 Worksheet.pdf; R Consulting- 2015 Proposal.pdf |

Mike,

Further to our conversation this morning, here's a brief breakdown of this situation.

CA 00246202. Fleet policy with 3 GIIIs at $10M CSL. No claims in 2 years with ORA.

We quoted renewal on 8/27/15, quote and aircraft worksheet attached.

On the same day, 8/27/15, agent advised insured was entering into a dry-lease agreement for N234LR to do VIP transportation in the Dominican Republic / Latin America. We declined the dry-lease on 8/31/15. Agent advised we would most likely lose the account over this. We held our ground due to the exposure.

I followed-up on the renewal quote on 9/25/15 to note the file, as expiry is 9/30/15. Per agents email below, they requested to bind coverage but advised N388LR (not the aircraft involved in said dry-lease) is currently missing and whereabouts unknown.

Per the below flight aware, this aircraft (N388LR) has only flown once in the past year. It flew from Ontario, CA to Adolfo Lopez Mateos, Mexico on 9/5/14, and has no record since.

http://flightaware.com/live/flight/N388LR

Standing by..

Corey P. Becker
Associate Underwriter

Old Republic Aerospace | Old Republic Insurance Group
2300 Cabot Drive | Suite 150 | Lisle, IL 60532
O: 630.369.1076 | D: 678.284.0547 | F: 630.369.1221 | M: 313.908.3151
www.OldRepublicAerospace.com

---

**From:** Coleman, Jim D. [mailto:jcoleman@avfuel.com]
**Sent:** Friday, September 25, 2015 9:37 PM
**To:** Corey Becker
**Cc:** Winkelhaus, Kathleen; Underwood, Ed W.
**Subject:** Re: R Consulting and Sales

Corey,

1

OR 0247

Exhibit 58, page 1

I was out of the office today at a convention, and am catching up on emails. Did Kathleen provide you with a binding order? I'm assuming she did prior to her leaving the office, but I'm nervous since I wasn't copied In on any email if one was indeed sent.

If she didn't, please bind coverage. With that said, one of the aircraft is apparently missing. N388LR's whereabouts are unknown according the insured. We are waiting on a written statement from the insured.

Jim Coleman
Account Manager
Avsurance Corporation
Office: 800-472-7090
Cell: 734-276-9484



Global Supplier of Aviation Fuel and Services        jcoleman@avfuel.com

**The contractor and subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a) and 29 CFR Section Part 471, Appendix A to Subpart A, if applicable. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.**
On Sep 25, 2015, at 11:16 AM, Corey Becker <cbecker@oraero.com> wrote:

Good morning,

Just doing a quick follow-up so I can note the file. Did R Consulting and Sales end up moving this year?

Thank you!

Corey P. Becker
Associate Underwriter

Old Republic Aerospace | Old Republic Insurance Group
2300 Cabot Drive | Suite 150 | Lisle, IL 60532
O: 630.369.1076 | D: 678.264.0547 | F: 630.369.1221 | M: 313.908.3151
www.OldRepublicAerospace.com

2

OR 0248

Exhibit 58, page 2

# EXHIBIT 59

**Corey Becker**

| | |
|---|---|
| **From:** | Coleman, Jim D. <jcoleman@avfuel.com> |
| **Sent:** | Monday, September 28, 2015 11:46 AM |
| **To:** | Corey Becker |
| **Cc:** | Winkelhaus, Kathleen |
| **Subject:** | RE: R Consulting and Sales |

Corey,

I had the renewal date incorrect, which explains why no order had been given. We do need to bind coverage effective at renewal 9/30/15.

Today has been insanely busy, so I have been able to fill out the online claim form, but I will be doing so this afternoon. Here is what we received from the insured:

**From:** Lance <skywonders@aol.com>
**Date:** September 25, 2015 at 6:10:25 PM EDT
**To:** Ed Insurance <eunderwood@avfuel.com>
**Subject:** N388LR

Hello Ed I have been doing some research and in December it departed Toluca Mexico for Quetero Mexico and asked to divert to Cancun Mexico it never arrived. Has never been seen since. I think it's time to file with insurance company. What's your thought?

Lance


Jim Coleman
Account Manager
Avsurance Corporation
Office: 800-472-7090
Cell: 734-276-9484
Fax: 734-663-8296



 **AVFUEL CORPORATION**
Global Supplier of Aviation Fuel and Services          jcoleman@avfuel.com


The contractor and subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a) and 29 CFR Section Part 471, Appendix A to Subpart A, if applicable. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.
**From:** Coleman, Jim D.
**Sent:** Friday, September 25, 2015 10:37 PM

1

OR 0249

Exhibit 59, page 1

**To:** Corey Becker
**Cc:** Winkelhaus, Kathleen; Underwood, Ed W.
**Subject:** Re: R Consulting and Sales

Corey,

I was out of the office today at a convention, and am catching up on emails. Did Kathleen provide you with a binding order? I'm assuming she did prior to her leaving the office, but I'm nervous since I wasn't copied in on any email if one was indeed sent.

If she didn't, please bind coverage. With that said, one of the aircraft is apparently missing. N388LR's whereabouts are unknown according the insured. We are waiting on a written statement from the insured.

Jim Coleman
Account Manager
Avsurance Corporation
Office: 800-472-7090
Cell: 734-276-9484

On Sep 25, 2015, at 11:16 AM, Corey Becker <cbecker@oraero.com> wrote:

> Good morning,
>
> Just doing a quick follow-up so I can note the file. Did R Consulting and Sales end up moving this year?
>
> Thank you!
>
>
> Corey P. Becker
> Associate Underwriter
>
> Old Republic Aerospace | Old Republic Insurance Group
> 2300 Cabot Drive | Suite 150 | Lisle, IL 60532
> O: 630.369.1078 | D: 678.264.0547 | F: 630.369.1221 | M: 313.908.3151
> www.OldRepublicAerospace.com

2

OR 0250

Exhibit 59, page 2

# EXHIBIT 60

## AIRCRAFT DRY LEASE

**THIS AIRCRAFT DRY LEASE** ("Lease") is made as of July 3rd, 2014 (the "Effective Date") by and between R Consulting and Sales Inc., a Nevada professional corporation ("Lessor") and Info Tech Corporation, a Nevada Corporation and Andy Kim an individual("Lessee") (collectively, the "parties," and individually a "party").

In consideration of the representations, warranties and agreements hereinafter set forth, the parties agree as follows:

1. **Aircraft.** Subject to the terms and conditions of this Lease, Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, a1980 Gulfstream III Aircraft S/N G-1159A-300 and its affixed two engines (SN 11046 & 11037), bearing FAA Registration NumberN234LR, including its engines, avionics, instruments, accessories, and component parts, including replacement parts installed thereon (collectively, the "Aircraft").Lessor represents and warrants to Lessee that it owns, free and clear of any claim, encumbrance, restriction, or lien, all right, title and interest to the Aircraft; that as of the Effective Date, the Aircraft has current hull insurance and liability insurance for the Aircraft issued by insurance in the limit amounts set forth below in Paragraph 10 ("Insurance Policy"); the Aircraft has a valid Federal Aviation Administration ("FAA") registration.

2. **Term.** The term of this Lease shall be for twelve (12) months after the Effective Date subject to earlier termination by either party at any time thirty (30) days after delivery of written notice("Notice of Termination") to the other party to this Lease ("Termination Date"). Lessee shall not schedule use of the Aircraft so that the trip extends beyond the Termination Date without the express prior written agreement of Lessor. If Lessor terminates Lease for any reason other than breach of this Lease, the principal amounts paid to Lessor for reduction in purchase price shall be repaid within fifteen (15) days. Lessor shall bear all costs associated with taking possession of the aircraft in case of premature termination of this Lease.

3. **Security Deposit.** Within 5 business days of execution of this Lease by Lessor and Lessee, Lessee shall deliver to Lessor a non-refundable deposit of Dollars(           ) ("Security Deposit"), which shall be held by Lessor. Lessee shall make the security deposit payable to "R Consulting and Sales Inc." The Security Deposit shall become refundable in case Lessor terminates without cause and/or breaches this Lease in any way.

4. **Rent.** Lessee will pay Lessor as rental for the Aircraft ("Rent",           ) per month of Lessee's use of the Aircraft, including for "Deadhead" legs.

4.1 **Reduced Initial Rent.** For the first three (3) months of the Lease, the Rent for the Aircraft shall be a reduced amount of           ) per month, and the Principal Contribution amount shall also be reduced to           per month for three (3) months.

4.2 **First and Last Month.** Lessee shall pay within 5 business days the first month's Rent of           ) upon execution of this Lease as a good faith early payment which shall

Gulfstream III SN300                                          1

OR 1278

apply towards the first month's Rent. Upon delivery of the Aircraft and upon approved inspection by Lessee that all work required is completed, Lessee shall pre-pay to Lessor the last month's rent in the amount of $

    4.3    **Lease Commencement Date.** Lease shall start on the day the Aircraft is delivered to Lessee.

    4.4    **Rent Payments.** The Rent payment due date shall be determined by the acceptance and delivery date of the Aircraft. For example, if the Aircraft was delivered on August 5, 2014, all subsequent rental payments shall be due monthly within 5 business days from 5th day of every month.

    4.5    **Principal Contribution from Rent.** For every rental payment received by Lessor from Lessee, Lessor shall apply $      a principal contribution ("Principal Contribution") towards the purchase of the Aircraft. (For example, after six (6) months of Lease payments a total of $     ' principal contribution amount would be credited towards the purchase price of the Aircraft which will make the new purchase price .

    5.    **Right to Purchase Aircraft.** At any time, during the term of this Lease or within 15 days of the expiration of its term, Lessee shall have the right to purchase the Aircraft. The agreed upon purchase amount prior to any Principal Contribution amounts being applied shall be                  s (U.S.           ') (the "Purchase Price"). When Lessee exercises its right to purchase the Aircraft the following shall take place: 1) within fifteen (15) days, Lessor shall provide a full accounting of all applied Principal Contribution amounts against the Purchase Price of the Aircraft and the net amount owed by Lessee for the purchase; 2) Lessor and Lessee shall enter into escrow to complete the transfer of the Aircraft with an authorized, mutually agreeable title and escrow company in Oklahoma City, Oklahoma, with Lessor paying the costs of the title insurance and Lessor and Lessee equally sharing the cost of escrow; 3) Lessee and Lessor shall execute a bill of sale outlining the sale of the Aircraft from Lessor to Lessee;4) Lessee shall deposit the remaining Purchase Price amount into escrow within fifteen (15) days of the opening of escrow; and 5) Lessor shall fully cooperate, execute any and all documents, and take any and all other necessary actions to effect the transfer of all title and ownership interestin the Aircraft to Lessee.

    6.    **Base Maintenance.** The Aircraft will be maintained by R Consulting & Sales, Inc.,a Nevada corporation("Manager"), whose principal place of business is to be located in Carson City, Nevada, or such other location as the parties may agree to in writing ("Base"). Lessor and Manager will enter into a management agreement(the "Management Agreement"),which Lessor warrants and represents to Lessee shall be in effect as of the Effective Date this Lease. Pursuant to the Management Agreement, Manager agrees to maintain the Aircraft at Lessor's approved maintenance facility. Lessor further warrants and represents to Lessee that it shall maintain the Aircraft at Lessor's sole cost throughout the term of the Lease, and if Lessor decides to replace the Manager of the Aircraft during the term of the Lease, Lessor shall promptly notify Lessee of such fact within five (5) business days.

    7.    **Return.** Upon expiration or termination of the Lease, Lessee will return the Aircraft to the base at San Diego Brown Field.  Lessee will return the Aircraft to Lessor in the

Gulfstream III SN390

2

OR 1279

same condition as received, normal wear and tear excepted. In case Lessor prematurely terminates the Lease, Lessor shall be responsible to bear all costs associated with the return of the Aircraft.

8.    **Operation.** The Aircraft is to be operated under this Lease in accordance with guidelines as set forth in the FAA FAR Part 91. When the Aircraft is operated under this Lease, Lessee will, at all times, be in operational control of the Aircraft and will not, except with Lessor's prior written consent, assign this Lease, and Lessee will be solely responsible for its possession and use. Lessee will not use or operate the Aircraft in violation of any law, regulation or order of any governmental authority, or in violation of the Aircraft's airworthiness certificate, license or registration, or in breach of any term or condition of any insurance policy required under this Lease, or use the Aircraft in any area excluded from coverage by the terms of any insurance policy required under this Lease. When the Aircraft is operated under this Lease, Lessee will, at all times, employ or contract (through Manager or independently)for pilots to operate the Aircraft who are duly qualified, current, and rated on the Aircraft and whose licenses are in good standing, and who meet the standards established by the Federal Aviation Administration ("FAA") and by any insurance policy required under this Lease. Lessee will bear the cost of any fees, charges or penalties arising out of Lessee's operation of the Aircraft. Lessor will bear all capital improvement costs for the Aircraft at lessors approved facility.

8.1    **Sublease Operation.** Lessor grants Lessee permission to sublease the Aircraft to any third party, at Lessee's discretion, subject to the condition that Lessee maintains operational control of the Aircraft.

9.    **Maintenance.** Lessor will, at all times and at Lessor's own expense, either through Manager or otherwise, cause the Aircraft to be maintained, repaired and in an airworthy conditioning accordance with an Aircraft inspection program and in conformity with rules set forth under FAA FAR PART 91.Lessee shall not make alterations, modifications, additions or improvements to the Aircraft without the prior written consent of Lessor. All alterations, modifications, additions and improvements which are made become the property of Lessor and are subject to the terms of this Lease.

9.1    **Maintenance Reserves.** All maintenance and repair costs and/or reserves shall be at the expense of Lessor and shall be considered included as part of the Rent paid by Lessee. Lessor shall not hold Lessee liable or responsible for expenses or costs incurred by Lessor related maintenance or repairs, unless the aircraft was found to have been intentionally abused by the Lessee.

9.2    **Engine Use and Reserves.** Lessee shall be allowed up to thirty (30) hours of engine usage for the first three(3) months. After the first three (3) months Lessee will be allowed up to forty (40) hours of usage per month until the expiration of this Lease. Calculations of hourly usage per month hall be averaged over a period of three (3) months, and any unused hours of usage shall accrue and rollover from month-to-month. Lessee's failure to use all of the allotted hours of usage in any given month shall not be deemed a waiver of those hours of usage. Where Lessee's engine usage exceeds the allotted hours in a given month, Lessor will first apply any accrued unused hours of usage, and once the accrued hours of usage has been exhausted, Lessee agrees to pay Lessor a rate of $          for each hour over the allotted usage amount. Payment of any such overages shall be paid on the 15th day of the 4th month covering usage from

the previous 3 months prior. In case the 15th day is a non-working day or holiday, payment shall be due the following business day.

9.3     **Engine Condition Disclosure.** Lessor and Lessee both mutually understand that the calendar life engines on the Aircraft are due to expire on December 2014 for both engines and that at expiration it would no longer be considered airworthy on a FAA FAR PART 135 certificate and that it is the intent of the Lessor, Manager, Maintenance provider and Lessee that they will operate this Aircraft under FAA FAR PART 91 and the compliance with the calendar date requirement is not required per the US DOT FAA ORDER# 8620.2A ("Exhibit A"). Lessee acknowledges and trusts that Lessor and Manger of the aircraft will comply with all FAA FAR PART 91 requirements and keep the engines as well as the Aircraft in an airworthy condition at all times for Lessee.

9.4     **Engine Times.** Lessor warrants that at least 1900 hours of engine time remain on each engine with Serial #11046 for the Left Engine and Serial #11037 for the Right Engine.

10.     **Delivery of Plane.** Lessor agrees to deliver the plane to Lessee in airworthy condition and in conformity with FAA FAR PART 91 regulations. All outstanding maintenance items currently due or due for the immediate three (3) months preceding the effective date of the Lease(within FAA FAR PART 91 requirements), shall be completed at Lessor's expense prior to delivery. In case Lessor is unable to deliver the Aircraft by August 15, 2014, Lessee shall have the right to cancel the Lease at its discretion and shall receive a refund of 100% of any amounts paid to Lessor within five (5) business days.

10.1     **Lessor Repairs Prior to Delivery.** Lessor agrees to repair/fix, at its expense, the following items prior to delivery of the Aircraft to Lessee: 1) remediation of all mold/mildew conditions throughout the Aircraft (including, but not limited to, the window lining);2) re-covering any window panels needing re-covering, 3) repairing all cabin lighting; and 4) cleaning all carpeting. Lessor also agrees to repair/fix the following items prior to delivery, with Lessor and Lessee agreeing to equally share in the expenses: 1) refurbishing the cabinets that have clear coat damage.

10.2     **Additional Work Items.** At Lessee's request, Lessor shall also re-dye each seat and reupholster the couch with leather, with Lessee being responsible to bear all related expenses. A quotation shall be provided to Lessee and approval shall be provided to Lessor prior to any work commencing.

11.     **Delivery of Aircraft.** Lessor shall deliver the Aircraft to Lessee at Ontario Airport.

12.     **Records.** Lessor will maintain, or cause to be maintained, all Aircraft logs and records, including maintenance and repair records, related to Aircraft and Lessee's use under this Lease within conformity to meet or exceed any requirements as set forth under the FAA FAR PART 91 regulations. In the event Lessee exercises its option to purchase the Aircraft and upon Lessee's request, Lessor shall provide Lessee all such records.

13.     **Insurance.** Lessor will, at all times and at Lessor's own expense, cause to be maintained a policy or policies of insurance with premiums thereon fully paid in advance, issued by and binding upon a solvent insurance company, identifying Lessor as the named insured and sole loss payee under the aircraft hull, engine and property damage casualty insurance policy and

Gulfstream III SN300                                    4

naming, among others, Lessee (and its affiliates, shareholders, directors, officers, employees, and agents)and Managers additional insured under the general liability portion of such policy, insuring against personal injury, death, hull damage or other property damage or loss arising out of or in any manner occasioned by the act, omission or negligence of Lessor, Lessee, or Manager, or their respective affiliates, owners, shareholders, directors, officers, employees, and agents or invitees with respect to the custody, maintenance, use or operation of the Aircraft. Lessor represents and warrants to Lessee that such Insurance Policy shall afford (a) adequate aircraft hull, engine and other property casualty insurance to satisfy Lessor in the event of the destruction of the Aircraft;(b) include a breach of warranty endorsement and a waiver of subrogation; and (c) include aircraft liability insurance with a minimum combined single legal liability limit in the amount of not less than                            ). Lessor shall cause such Insurance Policy expressly to refer to, and shall provide coverage with respect to, Lessee's indemnity undertaking as set forth in Section 15 below. Such Insurance Policy shall provide for at least thirty (30) days' notice in writing to Lessee and Lessor before any cancellation of such Insurance Policy, and an original endorsement complying with the foregoing provisions shall be delivered by Lessor to Lessee promptly after this Lease is executed as a condition of this Lease.

    13.1   **Additional Insured.** Lessor agrees to add Lessee as an additional insured on its current insurance policy.

    14.   **Loss or Damage.** This Lease may be terminated by either party by reason of any damage to or loss of the Aircraft and no Rent shall be due for any period after the occurrence of a casualty loss of the Aircraft.

    14.1   **Maintenance Repair Time / Concession.** In the case where Aircraft is unusable due to maintenance related items whether scheduled over 10 days per 3 month period or unscheduled over 2 days per month, Lessor shall provide a replacement aircraft for use by Lessee of equivalent or better value for the time being the Aircraft is unable to be used. In case Lessor is unable to provide a replacement aircraft to Lessee for its use. Lessor agrees to discount the following months lease rate accordingly for the days the aircraft is unusable and pro-rate the allowed hours for the remainder of the month as well as reduce the principal contribution amount pro-rata. For example, if the lease rate is            per month with            being applied towards the principal contribution amount and with 40 hours of flying time included, a credit of            shall be issued per day against the lease rate and a reduction of            flight hours per day shall apply for each day a credit is issued, this shall also reduce the principal contribution amount by            per day. So if the plane is unusable for 10 days, a total of            flight hours will be deducted from the current months allowable hours of flying time and a total of            credit will be provided against the following months lease rate, and            will be reduced from the principal contribution amount..

    15.   **Indemnification.** To the extent that Lessee's indemnity undertaking herein is covered by the Insurance Policy, Lessee agrees to indemnify, hold harmless and defend Lessor and its members, together with the members, managers, officers, employees, agents, successors and assigns of Lessor and of each such member of Lessor (each, an "Indemnities"), from and against any and all liabilities, losses, (including Lessee's own loss of use), damages, penalties, sanctions, fines, causes of action, suits, claims (including, without limitation, claims involving strict or absolute liability in tort, damage, injury, death, liability and third party claims),

Gulfstream III SN300        5

OR 1282

demands, costs and expenses of every nature (collectively, "Claims"), arising directly or indirectly from or in connection with Lessee's use or operation of the Aircraft, or any default in the performance of Lessee's other obligations under this Lease, or any failure by Lessee to comply with applicable law, or any unlawful or negligent act or omission by Lessee, except to the extent any such Claims arise out of, result from or relate to the negligence, breach of contract or failure to comply with any applicable law on the part of such Indemnities. Lessee's obligations under this paragraph will survive termination of this Lease and will remain in effect until all indemnity payments required hereunder have been made by Lessee.

16.    **Taxes.** Lessor shall be responsible for any State sales, use or other tax and shall pay such taxes to the appropriate taxing authority related to this Lease. Lessor shall also be responsible for filing personal tax owed on or for the Aircraft; provided, however, that Lessee shall pay all taxes and other charges associated with Lessee's use of the Aircraft under this Lease, including, without limitation, landing fees, fuel taxes and any other charges or fees that may be assessed against a specific flight by Lessee. In case any report or return is required to be made by Lessee with respect to any taxes, Lessee will either (after notice to Lessor) make such report or return in such manner as will show the ownership of the Aircraft in Lessor and send a copy of such report or return to Lessor, or will notify Lessor of such requirement and make such report or return in such manner as will be satisfactory to Lessor. Lessor and Lessee agree to cooperate fully with each other in the preparation of any such report or return.

17.    **Liens.** Lessee will not directly or indirectly create, incur, assume or permit the existence of any liens on the Aircraft related to Lessee's use or operation of the Aircraft and Lessee will promptly, at Lessee's own expense, take such action as may be duly necessary to discharge any such lien.

17.1    **Lessor Liens.** Lessor warrants and represents that the Aircraft is currently free and clear of any liens or encumbrances at the time of execution of this Lease. Lessor further agrees not to directly or indirectly create, incur, assume, obligate or permit the existence of any liens or encumbrance con the Aircraft. Lessor will promptly, at Lessor's own expense, take whatever actions are necessary to discharge any such liens or encumbrances and maintain free and clear title of the Aircraft to allow Lessee to exercise its option to purchase the Aircraft under the terms of this Lease. In the event that Lessee is unable to exercise its option to purchase the Aircraft due to any breach or default on the part of Lessor, Lessor shall be responsible to repay any and all Principal Contributions back to Lessee.

18.    **Inspection.** Lessor or its designee has the right, but not the duty, to inspect the Aircraft at any reasonable time and upon reasonable notice, wherever the Aircraft may then be located. Upon Lessor's request, Lessee will advise Lessor of the Aircraft's location and will furnish Lessor with all logs and records in Lessee's possession regarding the Aircraft and its use, maintenance or condition.

19.    **Lessee's Default.** Each of the following events shall constitute an "Event of Default" hereunder:

(a)    Lessee fails to make payment of Rent within five (5) days after the same becomes due; or

(b)     Lessee fails to perform or observe any covenant, condition or agreement to be performed or observed by Lessee under this Lease; or

(c)     Lessee becomes insolvent.

20.     **Lessor's Remedies.** Upon the occurrence of any Event of Default, Lessor may, in its sole discretion, elect:

(a)     By notice in writing, to terminate this Lease, whereupon Lessee will, without further demand, forthwith return the Aircraft to Lessor as required under Section 6, and pay all accrued and unpaid amounts due under this Lease; or

(b)     To perform or cause to be performed any obligation, covenant or agreement under this Lease. Lessee agrees to pay all costs and expenses incurred for such performance and acknowledges that such performance shall not be deemed to cure said Event of Default; or

(c)     To initiate proceedings against Lessee for any other remedy available to Lessor whether at law or in equity.

Lessee will be liable for all costs, charges and expenses, incurred by Lessor by reason of the occurrence of any Event of Default or the exercise of Lessor's remedies hereunder.

No remedy is intended to be exclusive, but each will be cumulative and in addition to any other remedy referred to above or otherwise available at law or in equity. The failure or delay of Lessor in exercising any rights granted under this Lease upon any occurrence of any of the contingencies set forth above shall not constitute a waiver of any such right.

21.     **Counterparts, Electronic Notices, and Signatures.** This Lease may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one instrument. Electronic signatures shall be binding and effective as an original. This Lease shall be effective as of the date specified on the first page hereof, notwithstanding the actual date of execution of any of the counterparts hereof. Any one of such counterparts, or any true, complete and correct copy thereof, shall be sufficient for the purpose of proving the existence and terms of this Lease, and no party shall be required to produce an original or all of such counterparts in making such proof. Notices to be given under the terms of this Lease shall be delivered in writing and may be delivered by (1) electronic communication, provided electronic mail is confirmed as received by the recipient; (2) personally; (3) by overnight courier; or (4) by certified mail, return receipt requested, postage prepaid, addressed as provided on the signature page or to such replacement address as may subsequently be provided in writing by one party to the other, and shall be deemed to have been delivered in the case of an email, on the next business day if delivered after 5 PM to the location to which it is sent or the email is received, respectively; in the case of

Gulfstream III SN300                                7

mailing, two (2) business days after being mailed; and in the case of personal delivery, upon actual delivery or the intended recipient's refusal to accept delivery.

22.    **Entire Agreement.**  The terms and conditions of this Lease constitute the entire agreement between the parties with respect to the subject-matter of this Lease and supersede all prior written and oral negotiations, representations and agreements, if any, between the parties with respect to such subject-matter, and will be binding upon them, their successors, assigns and legal representatives.

23.    **Modification of Agreement.**  No change or modification or waiver of any term or condition of this Lease will be effective unless the change or modification is in writing and signed by the party to be charged.

24.    **Governing Law.**  The parties acknowledge that this Lease and the enforcement thereof will be governed by and construed and enforced in all respects in accordance with the laws of the County of San Diego, State of California, without reference to its conflicts of law rules. Loosing party pays attorney's fees.

25.    **Right to Pay Expenses.**  Lessor will have the right, but not the obligation, to pay any costs or expenses that Lessee is obligated to pay under any provision of this Agreement, and Lessee shall, promptly upon its receipt of a request therefore from Lessor, reimburse Lessor for all amounts so paid by Lessor.

26.    **Truth-In-Leasing.**

(a)    LESSOR HAS REVIEWED THE AIRCRAFT'S PRECEDING EXECUTION OF THIS LEASE.

(b)    LESSEE CERTIFIES THAT LESSEE, AND NOT LESSOR, IS RESPONSIBLE FOR OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THIS LEASE. LESSEE'S ADDRESS APPEARS ON THE SIGNATURE PAGE HEREOF. LESSEE FURTHER CERTIFIES THAT LESSEE UNDERSTANDS LESSEE'S RESPONSIBILITY FOR COMPLIANCE WITH APPLICABLE FEDERAL AVIATION REGULATIONS.

(c)    LESSOR AND LESSEE CERTIFY THAT THE AIRCRAFT WILL BE MAINTAINEDAND INSPECTED AS PROVIDED HEREIN UNDER PART 91 OF THE FEDERAL AVIATION REGULATIONSAND, AT THE MINIMUM, IN ACCORDANCE WITH THE MANUFACTURER'S RECOMMENDED INSPECTION MAINTENANCE PROGRAM FOR THE AIRCRAFT WHEN OPERATED UNDER THIS LEASE. LESSEE FURTHER CERTIFIES THAT LESSEE UNDERSTANDS LESSEE'SRESPONSIBILITY FOR COMPLIANCE WITH PART 91 AND OTHER APPLICABLE PROVISIONS OF THE FEDERAL AVIATION REGULATIONS.

(d)    LESSEE UNDERSTANDS THAT AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE.

Gulfstream III SN300                               8

OR 1285

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

   (e)  THE PARTIES HEREBY CERTIFY THAT A COPY OF THIS LEASE WILL BE CARRIED ON THE AIRCRAFT AT ALL TIMES, AND WILL BE MADE AVAILABLE FOR INSPECTION ON REQUEST BY AN APPROPRIATELY CONSTITUTED AND IDENTIFIED REPRESENTATIVE OF THE FAA.

   IN WITNESS WHEREOF, the parties hereto have each caused this Lease to be duly executed effective as of the Effective Date.

**LESSOR:**

**R Consulting and Sales, Inc.,**
a Nevada professional corporation

By _Raquel Michel_
Name: _RAquel Michel_
Title: _President_

Mailing Address:
R Consulting and Sales, Inc.
318 N Carson St STE 208
Carson City, NV 89701

Email: skywonders@aol.com

**LESSEE:**

Info Tech Corporation.,
a Nevada Corporation

By _[signature]_
Name: _Chun Kim_
Title: _CEO_

Mailing Address:
Info Tech Corporation/Care of Legal
Department and Andy Kim an Individual
848 N. Rainbow Blvd#3422.
Las Vegas, Nevada 89107

Email: andy@itsourcecorp.net

Gulfstream III SN369       9

OR 1286

LESSEE:

Andy Kim,
an Individual

By _____

Name: __Andy Kim_____
Title: __an Individual_____

Mailing Address:
Andy Kim
848 N. Rainbow Blvd#3422.
Las Vegas, Nevada 89107

_____

Email: andy@itsourcecorp.net

Gulfstream III SN300                    10

OR 1287

Exhibit 60, page 10

# EXHIBIT 61

**From:** Gary Czajkowski <gczajkowski@oraero.com>
**Date:** October 5, 2015 at 2:56:42 PM MDT
**To:** Lance <skywonders@aol.com>
**Cc:** Doug Bland <dbland@oraero.com>, Raquel <1raquel@msn.com>
**Subject:** Re: R Consulting & Sales, Inc.  N388LR

1

OR 0012

Exhibit 61, page 1

My apologies for missing the "s" on Mrs.

Thank you for the clarifications

We'll be in touch very soon.

Regards

Gary Czajkowski
Old Republic Aerospace
Vice President | Western Regional Claims Manager
O: 303.989.7902 | F: 720.247.4884

On Oct 5, 2015, at 2:53 PM, Lance <skywonders@aol.com> wrote:

> Since Mrs Michael is President she has made the claim. We feel the plane has been
> stolen.
>
> On Oct 5, 2015, at 1:16 PM, Gary Czajkowski <gczajkowski@oraero.com> wrote:
>
>> Mr. Ricotta
>>
>> Thank you for clarifying your position. Are you and/or Mr. Michael
>> making a claim and if so, what is the claim for?
>>
>> Gary Czajkowski
>> Old Republic Aerospace
>> Vice President | Western Regional Claims Manager
>> O: 303.989.7902 | F: 720.247.4884
>>
>> On Oct 5, 2015, at 12:17 PM, Lance <skywonders@aol.com> wrote:
>>
>>> Raquel Michael is President of R Consulting and Sales. I
>>> am head of sales and management of aircraft.
>>>
>>> Lance
>>>
>>> On Oct 1, 2015, at 2:47 PM, Gary Czajkowski
>>> <gczajkowski@oraero.com> wrote:
>>>
>>>> Dear Mr. Ricotta,
>>>>
>>>> Doug has shared your outline of the
>>>> events with N388LR. We appreciate
>>>> what you have provided thus far. We
>>>> have a couple of questions regarding
>>>> your statement we would like to ask
>>>> clarification on.

2

OR 0013

Exhibit 61, page 2

You state, "He turned in a claim because we can not recover our aircraft and feel something bad has happened to it." Who is "He"? Can you please clarify what claim is being presented to us and by whom?

And lastly, can you please confirm your position with R Consulting & Sales, Inc.?

Thank you for your cooperation.

Regards,

Gary Czajkowski
Vice President | Western Regional Claims Manager
Old Republic Aerospace | Old Republic Insurance Group
11178 Huron Street | Suite 203 | Northglenn, CO 80234
O: 303.989.7902 | C: 303.807.7130 | F: 720.247.4884
www.OldRepublicAerospace.com
www.aircraftsalvageonline.com

**From:** Lance [mailto:skywonders@aol.com]
**Sent:** Wednesday, September 30, 2015 5:31 AM
**To:** Doug Bland

3

OR 0014

Exhibit 61, page 3

**Subject:** Re: R Consulting & Sales, Inc. N388LR

Hello Doug in July 2014 we had a trip to Toluca where the crew met Pablo and he called asking about a dry Lease. We discussed for a couple of months about leasing the aircraft to his company. He said he was doing work for the Mexican Military and working on selling the Army some C-130 aircraft. He would be using for his travel and his clients travel. He use to be the president of Azteca Airlines and had owned many aircraft over the years. I looked up his company and everything checked out. We sent him a sample lease and he made some changes and we agreed to the lease. He had a Universal Fuel Account and had the aircraft fueled and he wired us money for the Lease initiation. He hired a pilot Luis Hernandez that I knew. The initial wire was short because of some bank error he said, but was making payments to make up so we allowed it to continue. He then said one of his clients wanted to purchase the aircraft in December so we said we sell we had been looking at a G4 and we're going to use the money from the sale to purchase the G4. Pablo said he was going to operate the aircraft for his client and would handle the sale and wire us the funds. I told him the Lease would stay in affect until we were paid in full. In January he said he was paid by the client and would be wiring money. He came up with excuse after excuse with banking issues and trying to get exchange rates. He promised to send us payments told us he would send us a couple cars we agreed to as partial trade made more excuses why he couldn't send money. He made a $200,000 payment in April after we told him we wanted the aircraft returned. We have been trying to find the aircraft ever since which I made calls to people trying to locate the aircraft. We started getting concerned about where the aircraft was at I called FAA Legal and explained the situation they said we didn't need to report anything. After a

4

couple more months of not being paid we filed a lawsuit hopping to get Pablo to return the aircraft. He then put me in contact with Jose Luis Sanchez the person Pablo said he sold the aircraft to. I pressed on where the aircraft was located and have been trying to find the aircraft and get paid. We are concerned the aircraft was stolen or seized somewhere or damaged beyond repair and Pablo doesn't want to tell us. We had a call from someone at the FAA in December asking about the aircraft and when we pressed the FAA official from Atlanta Office what was going on he never called back. We could never verify that this person was actually from the FAA or not. We properly filed the Lease with the FAA and told the agent he could contact the Leasor and that was the last we had heard from him.

It has been every week we were supposed to be paid and more and more stories. He turned in a claim because we can not recover our aircraft and feel something bad has happened to it. We have not been able to confirm, but we're told there was a flight in Mid December where the aircraft departed Toluca Mexico and was enroute to Quetero Mexico and the aircraft asked to change destination to Cancun Mexico. We were told it never arrived in Cancun. We are still trying to confirm this and the dates.

We did hear that Pablo is operating a Hawker 800 N801JM which is registered to a US trust.

Lance

On Sep 29, 2015, at 1:44 PM, Doug Bland <dbland@oraero.com> wrote:

> Lance, I discussed our conversation with my supervisor. He asked me to request an outline from you as to what

5

OR 0016

Exhibit 61, page 5

You can recall
happened between
yourself and
Pablo. Additionally,
please indicate to us in
writing what you are
claiming regarding
N388LR.
If you have any
questions please let me
know.

Best Regards,

*Doug Bland*
California Claims
Manager

Old Republic Aerospace
| Old Republic
Insurance Group
2800 Camino Dos Rios,
Suite 101C I Newbury
Park, CA 91320
D: 805-496-7181 | F:
877 223-3830
www.OldRepublicAeros
pace.com
www.aircraftsalvageonl
ine.com

6

OR 0017

Exhibit 61, page 6

# EXHIBIT 62

| From: | Raquel Michel <1raquel@msn.com> |
|---|---|
| Sent: | Wednesday, December 16, 2015 10:55 AM |
| To: | Les Sychak |
| Cc: | Raquel Michel |
| Subject: | N388LR  R Consulting v. Ulloa--Complaint |
| Attachments: | Complaint.pdf |

Hello Les,

Here is the Complaint filed that states the purchase agreement was foisted upon R Consulting by Pablo Gonzalez Ulloa before we had any information that the Aircraft was missing and/or stolen and certainly before we learned of its possible disposition through the Department of Homeland Security. The Complaint is a matter of public record and could be easily obtained if you need further information. Once you read the complaint you will understand why it was filed. I am also still waiting on the police report as soon as I receive it I will forward it to you. I do have a Case # 15163194 filed with the San Diego County police department Who phone number is 760-510-5200 Deputy Buswell took the report.
Please let me know if you have any questions.
Sincerely,

Raquel Michel
R Consulting & Sales Inc.
P.O. Box 2840
San Marcos Ca 92079
Phone 760-809-4566
Fax 760-510-8321

From: mmason@metschlaw.com
To: 1raquel@msn.com
CC: skywonders@aol.com
Subject: R Consulting v. Ulloa--Complaint
Date: Tue, 8 Dec 2015 17:18:30 +0000

Raquel,
Here is the copy of the complaint against Ulloa, per your request.
Best,
Mike
Michael J. Mason
Metsch & Mason, LLP
Emerald Plaza
402 W. Broadway, Suite 2700
San Diego, CA 92101
Direct: 619-230-0897
Cell: 858-336-5886
Fax: 619-230-1839

1

OR 0084

Exhibit 62, page 1

E: mmason@metschlaw.com
Web: www.metschmason.com

2



1   PAUL S. METSCH [SBN 121912]
    pmetsch@metschlaw.com
2   MICHAEL J. MASON [SBN 222602]
    mmason@metschlaw.com
3   METSCH & MASON, LLP
    Emerald Plaza
4   402 W. Broadway, Suite 2700
    San Diego, CA 92101
5   Direct: 619-230-1642
    Fax: 619-230-1839
6
    Attorneys for Plaintiff
7   R CONSULTING & SALES, INC.

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**06/26/2015** at 12:43:10 PM
Clerk of the Superior Court
By Adam Beason,Deputy Clerk

8            SUPERIOR COURT OF CALIFORNIA

9         COUNTY OF SAN DIEGO, CENTRAL DIVISION

10

11

12  R CONSULTING & SALES, INC., a Nevada
    corporation,

13              Plaintiff,

14  v.

15  PABLO GONZALEZ ULLOA, an individual;
    AVIARRENDAMIENTOS S.A. DE C.V., an
16  entity of unknown form and origin; and DOES
    1 through 10,
17
                Defendants.
18

19

20

Case No. 37-2015-00021516-CU-BC-CTL

**COMPLAINT FOR:**

1) **BREACH OF AGENCY
   AGREEMENT;**
2) **BREACH OF LEASE;**
3) **CONVERSION;**
4) **INTENTIONAL
   MISREPRESENTATION (FRAUD);
   AND**
5) **NEGLIGENCE**

**[IMAGED FILE]**

21

22

23

24

25

26

27

28

55431-006

                        COMPLAINT

                                        OR 0086

                Exhibit 62, page 3

1    Plaintiff R CONSULTING & SALES, INC. ("R Consulting") alleges as follows:

2                                    **PARTIES**

3         1.      R Consulting is, and at all relevant times was, a Nevada corporation authorized to

4    do business in the County of San Diego, California.  R Consulting is, and at all relevant times was,

5    the owner of the aircraft identified as a 1983 Gulfstream III Aircraft S/N G-1159A-388 and its

6    affixed two engines, bearing FAA Registration Number N388LR (the "Aircraft").

7         2.      R Consulting alleges on information and belief that Defendant Aviarrendamientos

8    S.A. de C.V ("Aviarrendamientos") is, and at all relevant times was, an entity of unknown form

9    and origin doing business in the County of San Diego, California.

10        3.      R Consulting alleges on information and belief that Defendant Pablo Gonzalez

11   Ulloa ("Ulloa," and together with Aviarrendamientos, the "Defendants") is, and at all relevant

12   times was, an individual residing in Mexico City, Mexico and doing business in the County of San

13   Diego.

14        4.      R Consulting is the lessor of the Aircraft under a September 4, 2014 Aircraft Dry

15   Lease between R Consulting, on the one hand, and Aviarrendamientos and Ulloa as lessees, on the

16   other hand (the "Lease").  A true copy of the Lease is attached hereto as **Exhibit "1"** and

17   incorporated by this reference.

18        5.      R Consulting is presently unaware of the true names or capacities of the defendants

19   sued as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names.

20   R Consulting will seek leave to amend this Complaint to allege the true names and capacities of

21   Does 1 through 10 when it learns them.

22        6.      R Consulting alleges on information and belief that Does 1 through 10 are in some

23   way responsible for the events and damages, along with the other defendants, alleged in this

24   Complaint.  R Consulting further alleges on information and belief that, at all relevant times, each

25   defendant, including Does 1 through 10, was the agent, employee, partner, member, officer,

26   parent, subsidiary, alter ego, fiduciary or co-conspirator of the remaining defendants, and in acting

27   or failing to act as alleged, each defendant acted within the course and scope of its agency,

28   employment, partnership, membership or conspiracy, and with the knowledge and consent and

55431-006                              -1-
                                     COMPLAINT

1  under the direction and control of one or more of the remaining defendants. Unless specifically

2  indicated otherwise, each reference to any named defendant or to "Defendants" or "defendants"

3  includes by reference all Doe defendants.

### VENUE AND JURISDICTION

5      7.    Venue is proper in this Court because the obligations and claims sued upon in this

6  Complaint were made and entered into, and were to be performed and were performed, in San

7  Diego County, California.

### COMMON ALLEGATIONS

9      8.    During the term of the Lease, Sanchez purchased the Aircraft from R Consulting

10  under a December 1, 2014 Aircraft Purchase Agreement ("Purchase Agreement").  A true copy of

11  the Purchase Agreement is attached hereto as **Exhibit "2"** and incorporated by this reference.  The

12  Purchase Agreement provided for a purchase price of $1,000,000 (the "Purchase Price").

13      9.    Because Defendants were in possession of the Aircraft, Defendants orally agreed

14  within the last two years to act as R Consulting's agent in connection with the sale and delivery of

15  the Aircraft to third-party, Jose Luis Sanchez ("Sanchez") (the "Agency Agreement").  As R

16  Consulting's agents under the Agency Agreement, Defendants agreed to receive the Purchase

17  Price from Sanchez and deliver the Purchase Price to R Consulting upon their receipt of the

18  Purchase Price, which Defendants received in-full from Sanchez in December, 2014.  As

19  consideration for the Agency Agreement, R Consulting agreed to terminate the Lease upon

20  completion of both of the following:  (1) Defendants' delivery to Sanchez of the Aircraft; and (2)

21  Defendants' delivery to R Consulting of the Purchase Price.

22      10.    Although Defendants delivered the Aircraft to Sanchez and have repeatedly

23  acknowledged in writing receiving the Purchase Price in December of 2014 and owing the

24  Purchase Price to R Consulting, Defendants have failed and refused to deliver the Purchase Price

25  to R Consulting, despite R Consulting's repeated demands.

26      11.    As a result of Defendants' failure to deliver the Purchase Price to R Consulting, the

27  Lease remains in full force and effect.  Defendants have failed to make the required Rent

28  payments due to R Consulting under the Lease since January 1, 2015, with Rent accruing at the

55431-006

-2-

COMMPLAINT

1   rate of $73,000 per month, exclusive of the 10% late charges.

2       12.     To date, in addition to the Purchase Price, Defendants owe R Consulting the

3   principal sum of $438,000 for their breaches of the Lease.  Thus, as a result of Defendants' actions

4   and omissions, R Consulting has sustained damages in the principal sum of $1,438,000, exclusive

5   of late charges due under the Lease, pre-judgment interest, costs and punitive damages.

**FIRST CAUSE OF ACTION**

**(Breach of Agency Agreement—against all Defendants)**

8       13.     R Consulting incorporates by reference paragraphs 1 through 12 above as though

9   fully set forth herein.

10      14.     R Consulting has fully and timely performed all of its legal obligations under the

11  Agency Agreement, except for those legally excused.

12      15.     R Consulting alleges on information and belief that Defendants materially breached

13  the Agency Agreement by failing to deliver the $1,000,000 Purchase Price to R Consulting upon

14  their receipt of the Purchase Price from Sanchez. To date, Defendants owe R Consulting the sum

15  of at least $1,000,000, exclusive of pre-judgment interest and costs, according to proof at trial.

16      16.     As a direct and proximate result of Defendants' breaches, R Consulting has been

17  damaged in the sum of at least $1,000,000, exclusive of pre-judgment interest and costs, according

18  to proof at trial.

**SECOND CAUSE OF ACTION**

**(Breach of Lease—against all Defendants)**

21      17.     R Consulting incorporates by reference paragraphs 1 through 12 above as though

22  fully set forth herein.

23      18.     R Consulting has fully and timely performed all of its legal obligations under the

24  Lease, except for those legally excused.

25      19.     R Consulting alleges on information and belief that Defendants materially breached

26  the Lease by failing to make the required payments under the Lease when due.  To date,

27  Defendants owe R Consulting the sum of at least $438,000, exclusive of 10% late charges due

28  under the Lease, pre-judgment interest and costs, according to proof at trial.

55431-006                      -3-
                            COMPLAINT

20.     As a direct and proximate result of Defendants' breaches, R Consulting has been damaged in the sum of at least $438,000, exclusive of 10% late charges due under the Lease, pre-judgment interest and costs, according to proof at trial.

### THIRD CAUSE OF ACTION

#### (Conversion—against all Defendants)

21.     R Consulting incorporates by reference paragraphs 1 through 12 above as though fully set forth herein.

22.     R Consulting is informed and believes that Defendants intentionally and wrongfully converted the Purchase Price to their own personal use and benefit.

23.     R Consulting is informed and believes that Defendants have exercised wrongful dominion or control over the Purchase Price, and R Consulting did not consent to Defendants use, interference or conversion.

24.     As a direct and proximate result of Defendants' acts of conversion, R Consulting has been damaged in the sum of at least $1,000,000, exclusive of pre-judgment interest and costs, according to proof at trial.

25.     R Consulting is entitled to the imposition of a constructive trust over Defendants' assets in an amount equal to the Purchase Price, which amount is at least $1,000,000, exclusive of pre-judgment interest and costs, according to proof at trial.

26.     Defendants' conduct was intended to cause injury to R Consulting, and was oppressive, fraudulent, and malicious, as defined by Civil Code section 3294, entitling R Consulting to punitive damages, according to proof.

### FOURTH CAUSE OF ACTION

#### (Intentional Misrepresentation (Fraud)—against all Defendants)

27.     R Consulting incorporates by reference paragraphs 1 through 12 above as though fully set forth herein.

28.     In or around December of 2014, Ulloa, acting individually and on behalf of Aviarrendamientos, represented to Lance Ricotta of R Consulting that Ulloa would deliver the Aircraft to Sanchez; take delivery of the Purchase Price from Sanchez; and deliver the Purchase

55431-006

-4-

COMPLAINT

1  Price to R Consulting upon receipt of the Purchase Price, as required under the Purchase

2  Agreement (the "Representations").  Ulloa, acting individually and on behalf of

3  Aviarrendamientos, made the Representations with the intent to defraud and deceive R

4  Consulting.

5      29.    The Representations were false, and Defendants knew that the Representations

6  were false when they made them.

7      30.    Defendants made the Representations with an intent to defraud and to deceive R

8  Consulting, that is, for the purpose of inducing R Consulting to rely upon the Representations and

9  to act or to refrain from acting in reliance on the Representations.  Specifically, Defendants made

10  the Representations to induce R Consulting to enter into the Agency Agreement and allow

11  Defendants to take delivery of the Purchase Price from Sanchez.

12      31.    Defendants knew that R Consulting did not know and could not reasonably

13  discover the true facts.

14      32.    At all times Defendants were making the Representations, R Consulting was

15  unaware of the falsity of the Representations and believed them to be true.

16      33.    R Consulting reasonably and justifiably relied on the Representations of material

17  fact and was induced to, and in reliance on and as a result of the Representations did, enter into the

18  Agency Agreement and allow Defendants to take delivery of the Purchase Price from Sanchez.

19      34.    Had R Consulting known the true facts, it would never have entered into the

20  Agency Agreement.

21      35.    As a direct and proximate result of Defendants' fraud and intentional

22  misrepresentations, R Consulting has been damaged in the sum of at least $1,000,000, exclusive of

23  pre-judgment interest and costs, according to proof at trial.

24      36.    Defendants' conduct was intended to cause injury to R Consulting, and was

25  oppressive, fraudulent and malicious conduct as defined in Civil Code section 3294, entitling R

26  Consulting to exemplary and punitive damages, according to proof at trial.

27  ///

28  ///

55431-006

-5-

COMPLAINT

**FIFTH CAUSE OF ACTION**

**(Negligence—against all defendants)**

37.   R Consulting re-alleges and incorporates by reference paragraphs 1 through 12 above as though fully set forth herein.

38.   At all relevant times, Defendants owed R Consulting a duty of care to disclose material facts in connection with the Agency Agreement.

39.   Defendants breached their duty of care owed to R Consulting by failing to disclose that Defendants had negligently misrepresented and/or concealed the true facts from R Consulting in connection with R Consulting entering into the Agency Agreement.

40.   As a direct and proximate result of Defendants' negligent misrepresentations and/or failure to disclose the true facts to R Consulting, R Consulting has been damaged in the sum of at least $1,000,000, exclusive of pre-judgment interest and costs, according to proof at trial.

**PRAYER**

WHEREFORE, R Consulting prays for judgment against Defendants, and each of them, as follows:

**ON THE FIRST AND FIFTH CAUSES OF ACTION:**

1.   For compensatory damages in at least the sum of $1,000,000, to be proven at trial.

**ON THE SECOND CAUSE OF ACTION:**

1.   For compensatory damages in at least the sum of $438,000, exclusive of 10% late charges due under the Lease, to be proven at trial.

**ON THE THIRD AND FOURTH CAUSE OF ACTION:**

1.   For compensatory damages in at least the sum of $1,000,000 to be proven at trial; and

2.   For punitive and exemplary damages according to proof.

///
///
///
///

55431-006

-6-

COMPLAINT

1   <u>ON ALL CAUSES OF ACTION:</u>

2       1.    For costs of suit incurred in this action;

3       2.    For pre-judgment interest at the maximum allowable legal rate; and

4       3.    For such other and further relief as the Court deems just and proper.

5

6   DATED:  June 26, 2015           METSCH & MASON, LLP

7

8                  By:

9                  PAUL S. METSCH

10                 MICHAEL J. MASON
                   Attorneys for Plaintiff R CONSULTING &

11                 SALES, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

55431-006

-7-
COMPLAINT

OR 0093

Exhibit 62, page 10

# EXHIBIT 1

OR 0094

## AIRCRAFT DRY LEASE

**THIS AIRCRAFT DRY LEASE** ("Lease") is made as of September 4, 2014 (the "Effective Date") by and between R Consulting and Sales Inc., a Nevada professional corporation ("Lessor") and Aviarrendamientos S.A. de C.V. and Pablo Gonzalez Ulloa ("Lessee") (collectively, the "parties," and individually a "party").

In consideration of the representations, warranties and agreements hereinafter set forth, the parties agree as follows:

1.      **Aircraft.** Subject to the terms and conditions of this Lease, Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, a 1983 Gulfstream III Aircraft S/N G-1159A-388 and its affixed two engines, bearing FAA Registration Number N388LR, including its engines, avionics, instruments, accessories, and component parts, including replacement parts installed thereon (collectively, the "Aircraft"). Lessor represents and warrants to Lessee that it owns, free and clear of any claim, encumbrance, restriction, or lien, all right, title and interest to the Aircraft; that as of the Effective Date, the Aircraft has current hull insurance and liability insurance for the Aircraft issued by insurance in the limit amounts set forth below in Paragraph 10 ("Insurance Policy"); the Aircraft has a valid Federal Aviation Administration ("FAA") registration.

2.      **Term.** The term of this Lease shall be for (3) months after the Effective Date subject to earlier termination by either party at any time thirty (30) days after delivery of written notice ("Notice of Termination") Payments must be current to terminate Lease to the other party to this Lease ("Termination Date"). Lessee shall not schedule use of the Aircraft so that the trip extends beyond the Termination Date without the express prior written agreement of Lessor.

3.      **Security Deposit.** Upon the execution of this Lease by Lessor and Lessee, Lessee shall deliver to Lessor a non-refundable first and last month security deposit and one month security deposit of Two Hundred Nineteen Thousand Dollars (U.S. $219,000) ("Security Deposit"), which shall be held by Lessor as provided in this Lease. Lessee may pay the Security Deposit by a wire as instructed in writing by Lessor or by check payable to Lessor.

4.      **Rent.** Lessee will pay Lessor as rental for the Aircraft ("Rent") Seventy Three Thousand Dollars ($ 73,000) per month of Lessee's use of the Aircraft, including for "Deadhead" legs. Lessee will pay Rent within five (5) days of the fourth of every month. Late rent will be charged at 10% of Lease Payment.

5.      **Base Maintenance.** The Aircraft will be Maintained by R Consulting & Sales, Inc., a California corporation ("Manager"), whose principal place of Ontario, California, or such other location as the parties may agree in writing ("Base"). Lessor and Manager have entered into a management agreement that Lessor represents and warrants to Lessee is in effect as of the Effective Date (the "Management Agreement") pursuant to which Manager has agreed to maintain the Aircraft at Lessor's approved maintenance facility; Lessor represents and warrants

**Scanned by CamScanner**

OR 0095

to Lessee that it shall maintain the Aircraft at its sole cost during the Term and if it replaces the manager of the Aircraft during the Term, it shall promptly notify Lessee of such fact.

6.   **Return.** Upon expiration or termination of the Term, Lessee will return the Aircraft to the Base at San Diego Brown Field. Lessee will return the Aircraft to Lessor in the same condition as received, normal wear and tear excepted.

7.   **Operation.** The Aircraft is to be operated under this Lease in accordance with Part 91. When the Aircraft is operated under this Lease, Lessee will at all times be in operational control of the Aircraft and will not, except with Lessor's prior written consent, assign this Lease or sublease the Aircraft, and Lessee will be solely responsible for its possession and use. Lessee will not use or operate the Aircraft in violation of any law, regulation or order of any governmental authority, or in violation of the Aircraft's airworthiness certificate, license or registration, or in breach of any term or condition of any insurance policy required under this Lease, or use the Aircraft in any area excluded from coverage by the terms of any insurance policy required under this Lease. When the Aircraft is operated under this Lease, Lessee will, at all times, employ or contract (through Manager or independently) for pilots to operate the Aircraft who are duly qualified, current, and rated on the Aircraft and whose licenses are in good standing, and who meet the standards established by the Federal Aviation Administration ("FAA") and by any insurance policy required under this Lease. Lessee will bear the cost of any fees, charges or penalties arising out of Lessee's operation of the Aircraft. Lessor will bear all capital improvement costs for the Aircraft at lessors approved facility.

8.   **Maintenance.** Lessor will at all times, at Lessor's own expense, either through Manager or otherwise, cause the Aircraft to be kept in a fully operational. Lessee is responsible for consumables such as oils, hydraulic fluids, oxygen, nitrogen, ect while aircraft is in there possession. Lessee shall not make alterations, modifications, additions or improvements to the Aircraft without the prior written consent of Lessor. All alterations, modifications, additions and improvements which are made become the property of Lessor and are subject to the terms of this Lease.

9.   **Records.** Lessee will maintain, or cause to be maintained, all Aircraft logs and records related to Lessee's use of the Aircraft under this Lease

10.   **Insurance.** Lessor will at all times, at Lessor's own expense, cause to be maintained a policy or policies of insurance with premiums thereon fully paid in advance, issued by and binding upon a solvent insurance company, identifying Lessor as the named insured and sole loss payee under the aircraft hull, engine and property damage casualty insurance policy and naming, among others, Lessee (and its affiliates, shareholders, directors, officers, employees, and agents) and Manager as additional insureds under the general liability portion of such policy, insuring against personal injury, death, hull damage or other property damage or loss arising out of or in any manner occasioned by the act, omission or negligence of Lessor, Lessee, or Manager, or their respective affiliates, owners, shareholders, directors, officers, employees, and agents or invitees with respect to the custody, maintenance, use or operation of the Aircraft. Lessor represents and warrants to Lessee that such Insurance Policy shall afford (a) adequate

dry_lease_Gulfstream_388 2014.doc

2 **Scanned by CamScanner**

aircraft hull, engine and other property casualty insurance to satisfy Lessor in the event of the destruction of the Aircraft; (b) include a breach of warranty endorsement and a waiver of subrogation; and (c) include aircraft liability insurance with a minimum combined single legal liability limit in the amount of not less than Five Million Dollars ($5,000,000.00). Lessor shall cause such Insurance Policy expressly to refer to, and shall provide coverage with respect to, Lessee's indemnity undertaking as set forth in Section 12 below. Such Insurance Policy shall provide for at least thirty (30) days' notice in writing to Lessee and Lessor before any cancellation of such Insurance Policy, and an original endorsement complying with the foregoing provisions shall be delivered by Lessor to Lessee promptly after this Lease is executed as a condition of this Lease.

11.   **Loss or Damage.** This Lease may be terminated by either party by reason of any damage to or loss of the Aircraft and no Rent shall be due for any period after the occurrence of a casualty loss of the Aircraft.

12.   **Indemnification.** To the extent that Lessee's indemnity undertaking herein is covered by the Insurance Policy, Lessee agrees to indemnify, hold harmless and defend Lessor and its members, together with the members, managers, officers, employees, agents, successors and assigns of Lessor and of each such member of Lessor (each, an "Indemnitee"), from and against any and all liabilities, losses, (including Lessee's own loss of use), damages, penalties, sanctions, fines, causes of action, suits, claims (including, without limitation, claims involving strict or absolute liability in tort, damage, injury, death, liability and third party claims), demands, costs and expenses of every nature (collectively, "Claims"), arising directly or indirectly from or in connection with Lessee's use or operation of the Aircraft, or any default in the performance of Lessee's other obligations under this Lease, or any failure by Lessee to comply with applicable law, or any unlawful or negligent act or omission by Lessee, except to the extent any such Claims arise out of, result from or relate to the negligence, breach of contract or failure to comply with any applicable law on the part of such Indemnitee. Lessee's obligations under this paragraph will survive termination of this Lease and will remain in effect until all indemnity payments required hereunder have been made by Lessee.

13.   **Taxes.** Lessor shall be responsible for any State sales, use or other tax and shall pay such taxes to the appropriate taxing authority related to this Lease. Lessor shall also be responsible for filing personal tax owed on or for the Aircraft; provided, however, that Lessee shall pay all taxes and other charges associated with Lessee's use of the Aircraft under this Lease, including, without limitation, landing fees, fuel taxes and any other charges or fees that may be assessed against a specific flight by Lessee. In case any report or return is required to be made by Lessee with respect to any taxes, Lessee will either (after notice to Lessor) make such report or return in such manner as will show the ownership of the Aircraft in Lessor and send a copy of such report or return to Lessor, or will notify Lessor of such requirement and make such report or return in such manner as will be satisfactory to Lessor. Lessor and Lessee agree to cooperate fully with each other in the preparation of any such report or return.

14.   **Liens.** Lessee will not directly or indirectly create, incur, assume or permit the existence of any liens on the Aircraft related to Lessee's use or operation of the Aircraft and

dry_lease_Oldfieldroom_FE8 2014.doc                  3

**Scanned by CamScanner**

Lessee will promptly, at Lessee's own expense, take such action as may be necessary duly to discharge any such lien.

15.    **Inspection.** Lessor or its designee has the right, but not the duty, to inspect the Aircraft at any reasonable time and upon reasonable notice, in flight, or wherever the Aircraft may then be located. Upon Lessor's request, Lessee will advise Lessor of the Aircraft's location and will furnish Lessor with all logs and records in Lessee's possession regarding the Aircraft and its use, maintenance or condition.

16.    **Lessee's Default.** Each of the following events shall constitute an "Event of Default" hereunder:

(a)    Lessee fails to make payment of Rent within five (5) days after the same becomes due; or

(b)    Lessee fails to perform or observe any covenant, condition or agreement to be performed or observed by Lessee under this Lease; or

(c)    Lessee becomes insolvent; or

(d)    Lessor believes, in good faith, that the prospect of payment or Lessee's performance under this Lease is uncertain or impaired.

17.    **Lessor's Remedies.** Upon the occurrence of any Event of Default, Lessor may, in its sole discretion, elect:

(a)    By notice in writing, to terminate this Lease, whereupon Lessee will, without further demand, forthwith return the Aircraft to Lessor as required under Section 6, and pay all accrued and unpaid amounts due under this Lease; or

(b)    To perform or cause to be performed any obligation, covenant or agreement under this Lease. Lessee agrees to pay all costs and expenses incurred for such performance and acknowledges that such performance shall not be deemed to cure said Event of Default; or

(c)    To initiate proceedings against Lessee for any other remedy available to Lessor whether at law or in equity.

Lessee will be liable for all costs, charges and expenses, incurred by Lessor by reason of the occurrence of any Event of Default or the exercise of Lessor's remedies hereunder.

No remedy is intended to be exclusive, but each will be cumulative and in addition to any other remedy referred to above or otherwise available at law or in equity. The failure or delay of Lessor in exercising any rights granted under this Lease upon any occurrence of any of the contingencies set forth above shall not constitute a waiver of any such right.

dry_lease_Gulfstream_188 2014.doc                    4 Scanned by CamScanner

18.   **Counterparts, Electronic Notices, and Signatures.** This Lease may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one instrument. Electronic signatures shall be binding and effective as an original.  This Lease shall be effective as of the date specified on the first page hereof, notwithstanding the actual date of execution of any of the counterparts hereof.  Any one of such counterparts, or any true, complete and correct copy thereof, shall be sufficient for the purpose of proving the existence and terms of this Lease, and no party shall be required to produce an original or all of such counterparts in making such proof.  Notices to be given under the terms of this Lease shall be delivered in writing and may be delivered by (1) electronic communication, provided electronic mail is confirmed as received by the recipient; (2) personally; (3) by overnight courier; or (4) by certified mail, return receipt requested, postage prepaid, addressed as provided on the signature page or to such replacement address as may subsequently be provided in writing by one party to the other, and shall be deemed to have been delivered in the case of an email, on the next business day if delivered after 5 PM to the location to which it is sent or the email is received, respectively; in the case of mailing, two (2) business days after being mailed; and in the case of personal delivery, upon actual delivery or the intended recipient's refusal to accept delivery.

19.   **Entire Agreement.** The terms and conditions of this Lease constitute the entire agreement between the parties with respect to the subject-matter of this Lease and supersede all prior written and oral negotiations, representations and agreements, if any, between the parties with respect to such subject-matter, and will be binding upon them, their successors, assigns and legal representatives.

20.   **Modification of Agreement.** No change or modification or waiver of any term or condition of this Lease will be effective unless the change or modification is in writing and signed by the party to be charged.

21.   **Governing Law.** The parties acknowledge that this Lease and the enforcement thereof will be governed by and construed and enforced in all respects in accordance with the laws of the County of San Diego, State of California, without reference to its conflicts of law rules.

22.   **Right to Pay Expenses.** Lessor will have the right, but not the obligation, to pay any costs or expenses that Lessee is obligated to pay under any provision of this Agreement, and Lessee shall, promptly upon its receipt of a request therefor from Lessor, reimburse Lessor for all amounts so paid by Lessor.

23.   **Truth-In-Leasing.**

(a)   LESSOR HAS REVIEWED THE AIRCRAFT'S PRECEDING EXECUTION OF THIS LEASE.

(b)   LESSEE CERTIFIES THAT LESSEE, AND NOT LESSOR, IS RESPONSIBLE FOR OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THIS LEASE.  LESSEE'S ADDRESS APPEARS ON THE SIGNATURE PAGE HEREOF.  LESSEE

dry_lease_Outfitstream_388 2014.doc

5

**Scanned by CamScanner**

FURTHER CERTIFIES THAT LESSEE UNDERSTANDS LESSEE'S RESPONSIBILITY FOR COMPLIANCE WITH APPLICABLE FEDERAL AVIATION REGULATIONS.

(c)     LESSOR AND LESSEE CERTIFY THAT THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED AS PROVIDED HEREIN UNDER PART 91 OF THE FEDERAL AVIATION REGULATIONS AND, AT THE MINIMUM, IN ACCORDANCE WITH THE MANUFACTURER'S RECOMMENDED INSPECTION MAINTENANCE PROGRAM FOR THE AIRCRAFT WHEN OPERATED UNDER THIS LEASE.  LESSEE FURTHER CERTIFIES THAT LESSEE UNDERSTANDS LESSEE'S RESPONSIBILITY FOR COMPLIANCE WITH PART 91 AND OTHER APPLICABLE PROVISIONS OF THE FEDERAL AVIATION REGULATIONS.

(d)     LESSEE UNDERSTANDS THAT AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

dry_lease_Out/streem_388 2014.doc

6

Scanned by CamScanner

OR 0100

(e)   THE PARTIES HEREBY CERTIFY THAT A COPY OF THIS LEASE WILL BE CARRIED ON THE AIRCRAFT AT ALL TIMES, AND WILL BE MADE AVAILABLE FOR INSPECTION ON REQUEST BY AN APPROPRIATELY CONSTITUTED AND IDENTIFIED REPRESENTATIVE OF THE FAA.

IN WITNESS WHEREOF, the parties hereto have each caused this Lease to be duly executed effective as of the Effective Date.

| LESSOR: | LESSEE: |
|---|---|
| **R Consulting and Sales, Inc.,**<br>a Nevada professional corporation | Aviarrendamientos S.A. de C.V..,<br>Pablo Gonzalez Ulloa<br>An individual |
| By _____ | By _____ |
| Name: _____ | Name: PABLO GONZALEZ-ULLOA |
| Title: _____ | Title: PRESIDENT |
| Mailing Address:<br>R Consulting and Sales, Inc.<br>318 N Carson st STE 208<br>Carson City, NV 89701 | Mailing Address:<br>Pablo Gonzalez Ulloa.<br>Address<br>Indiana 141 Napoles<br>Mexico, DF. 03810 |
| Email: skywonders@aol.com | Email: pgu@arm.aero |

**Scanned by CamScanner**

OR 0101

# EXHIBIT 2

OR 0102

## AIRCRAFT PURCHASE AGREEMENT

THIS AIRCRAFT PURCHASE AGREEMENT (THIS "AGREEMENT") IS MADE THIS 1st DAY OF DECEMBER, 2014 BY AND BETWEEN R CONSULTING & SALES, INC, 318 N CARSON St , SUITE 208, CARSON CITY, NV 89701, E-MAIL: skywonders@aol.com, PHONE: (760) 809-45-88 ("SELLER") AND  JOSE LUIS SANCHEZ                       , E-MAIL: joseluissanchez188@yahoo.com , PHONE: (__) _____ ("PURCHASER") AND WITNESSETH:

WHEREAS, SELLER AND PURCHASER PREVIOUSLY EXECUTED A LETTER OF INTENT (THE "LETTER OF INTENT TO PURCHASE") THE GULFSTREAM III AIRCRAFT DESCRIBED BELOW (THE "AIRCRAFT") EXECUTED DECEMBER 1, 2014 PROVIDING FOR, AMONG OTHER THINGS, A PRE-PURCHASE INSPECTION OF THE AIRCRAFT AND RECORDS;

WHEREAS, PURSUANT TO THE OFFER TO PURCHASE, THE AIRCRAFT HAS BEEN DELIVERED BY SELLER TO A FACILITY DESIGNATED BY PURCHASER FOR ACCOMPLISHMENT OF THE PRE-PURCHASE INSPECTION; AND

WHEREAS, THE LETTER OF INTENT CONTEMPLATES THE EXECUTION OF AN AIRCRAFT PURCHASE AGREEMENT AND THE PARTIES INTEND THIS AGREEMENT TO FULFILL THAT CONTEMPLATION.

NOW THEREFORE, SELLER AND PURCHASER HEREBY AGREE AS FOLLOWS:

1.  **Agreement to Purchase**:  Seller agrees to sell and purchaser agrees to purchase the aircraft specified below subject to the terms and conditions set forth below and attached herein (and by this reference made a part hereof).

| YEAR | MODEL | FAA NUMBER | AIRCRAFT SERIAL NUMBER | ENGINES |
|------|-------|------------|------------------------|---------|
| 1983 | Gulfstream III | N388LR | 388 | Rolls Royce Spey Mk 511SR |

Specifications:
Seller represents that the Aircraft has the specifications set forth in Appendix 1 hereto.

| | | |
|---|---|---|
| TOTAL SELLING PRICE | $1,000,000 | 00 |
| TOTAL SALE | $1,000,000 | 00 |

| | | |
|---|---|---|
| TOTAL CREDIT TO SALE | | 00 |
| CASH DUE | $1,000,000 | 00 |

2.  **Payment**:  The Aircraft will be sold for cash, payable on the date of Closing (as hereinafter defined) and by delivery of lawful money of the United States of America by wire transfer to  R Consulting & Sales  Inc.

3.  **Pre-Purchase Inspection** Buyer has executed and is satisfied with his own pre-purchase inspection.

4.  **Failure to Close or Accept Delivery**: Purchaser accepts and takes delivery of aircraft upon execution of this purchase agreement.

5.  **Force Majeure**:  Seller shall not be liable for labor difficulties, machinery breakdowns, inability to obtain shipping space or transportation, delays of carriers or suppliers, fires, floods, acts of God, or other outbreak of hostilities, mobilization, civil commotion, riots, embargoes, and domestic or foreign governmental regulations or orders (each a "Force Majeure Event") or should the Aircraft be destroyed or damaged beyond repair before or after Closing.

6.  **Closing**.  The closing (the "Closing") on the Aircraft will take place on or before three (3) business days after the Airworthiness Discrepancies are completed.

| Seller's Initials ____   Date _____ | Purchaser's Initials _JL_ Date 1 12-14 |
|---|---|

OR 0103

7.  **Closing, Title and Delivery:** On or prior to the Closing Date, Purchaser shall (i) wire the remaining portion of the Purchase Price to the Escrow Agent, together with amounts sufficient to pay all taxes pursuant to Paragraph 10 hereof, the filing fees to file for the Registration (as hereinafter defined) and the FAA Bill of Sale (as hereinafter defined) with the FAA, and the Delivery Costs (as hereinafter defined), (ii) deliver to the Escrow Agent an original completed and executed application for registration of the Aircraft with the FAA (the "Registration"), and (iii) deliver to Escrow Agent an executed escrow agreement authorizing the release of the Purchase Price and filing of the Registration and FAA Bill of Sale upon satisfaction of the terms of this Paragraph 9.  On or prior to the Closing Date, Seller shall (i) deliver to the Escrow Agent two (2) original executed Federal Aviation Administration Bill of Sale Form 8050-2 in the form attached hereto as Appendix 3 (the "FAA Bill of Sale"), (ii) deliver to Escrow Agent an original executed Warranty Bill of Sale to the Aircraft in the form attached hereto as Appendix 4, and (iii) deliver to Escrow Agent an executed escrow agreement authorizing the release of the Purchase Price and filing of the Registration and the FAA Bill of Sale upon satisfaction of the terms of this Paragraph 9.  The Aircraft shall be delivered for closing in or at Purchaser's expense to some other mutually agreeable location within the continental United States (the "Delivery Location"), which shall not give rise to adverse tax consequences for the parties. Purchaser shall pay Seller's reasonable out-of-pocket cost for fuel, pilot travel and the pilot's daily rate if other than Seller's own pilots (not to exceed $500.00 per pilot) to ferry the Aircraft from  to the Delivery Location (collectively, the "Delivery Costs"). On the date of Closing, the parties shall close on this transaction once it has been verified by the Escrow Agent that (i) Escrow Agent has received all deliveries required by the Purchaser, (ii) Escrow Agent has received all deliveries required by the Seller, (iii) the Aircraft is in position at the Delivery Location, and (iv) Purchaser has accepted delivery of the Aircraft by executing and delivering to Seller the Delivery Receipt in a form substantially the same as Appendix 2 attached hereto and incorporated herein.  At the time of Closing the Escrow Agent shall simultaneously: i) release to Seller the Purchase Price less any broker commissions to be paid by Seller, any loan payoff and the escrow fees due to Escrow Agent; ii) release the Delivery Costs to Seller; iii) file the Registration and the FAA Bill of Sale with the FAA, and (iv) release the Warranty Bill of Sale to Purchaser.

Title to the Aircraft free and clear of all liens and encumbrances and risk to the Aircraft shall pass to Purchaser on the date of Closing.  Seller will maintain full insurance coverage on the Aircraft until the risk of loss passes to Purchaser at Closing.

8.  **Taxes:** Purchaser agrees to pay and to indemnify Seller for all sales and use taxes or assessments which may be imposed by any governmental authority upon this sales transaction or the use of the Aircraft by Purchaser, and any such taxes or assessments which Seller will be obligated under law to collect from Purchaser. Except as provided herein, Seller agrees to pay and to indemnify Purchaser for all taxes, fees or duties and expenses, as well as any penalties, interest and attorney's fees, imposed by any jurisdiction or governmental authority as a result of the ownership, location or usage of the Aircraft prior to the Closing Date/Delivery Time and all taxes on profits, gross receipts or income of Seller applicable to or arising out of the transactions contemplated by this Agreement.  Prior to the payment of any assessment for which Purchaser or Seller desires to seek indemnification from the other party hereunder, the party desiring indemnification shall provide the other party with five (5) business days prior written notice of the same.  The indemnified party shall allow the indemnifying party to dispute any such assessment and shall cooperate reasonably in regard thereto.

9.  **DISCLAIMER:** BUYER UNDERSTANDS THAT THE AIRCRAFT IS BEING PURCHASED IN AN "AS IS, WHERE IS" CONDITION EXCEPT AS PROVIDED ABOVE TO THE CONTRARY. UNLESS OTHERWISE PROHIBITED BY LAW AND THIS AGREEMENT, BUYER AGREES THAT THE WARRANTIES OF SELLER SET FORTH IN THE FOLLOWING PARAGRAPH ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OF SELLER, WHETHER WRITTEN, ORAL OR IMPLIED, OTHER THAN THE EXPRESS WARRANTIES OF TITLE SET FORTH IN THE WARRANTY BILL OF SALE. BUYER ACKNOWLEDGES AND AGREES THAT SELLER SHALL NOT, BY VIRTUE OF HAVING OWNED AND SOLD THE AIRCRAFT OR OTHERWISE, BE DEEMED TO HAVE MADE ANY REPRESENTATIONS OR WARRANTY AS TO THE MERCHANTABILITY, FITNESS, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN, THE AIRCRAFT, OR TO HAVE MADE ANY OTHER REPRESENTATIONS OR WARRANTIES.   SELLER DISCLAIMS AND BUYER WAIVES ALL WARRANTIES AND LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE (INCLUDING STRICT LIABILITY IN TORT), WITH RESPECT TO THE MERCHANTABILITY, FITNESS, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN, THE AIRCRAFT.

10. **WARRANTY:** Seller warrants that all representations and warranties in this Agreement are true and correct in all material respects as of the contract acceptance date on the front page of this Agreement and will be true and correct as of the date of Closing.  Seller warrants that, at closing, it will have good, marketable title and possession

Seller's Initials _____   Date _____          Purchaser's Initials _J_J_   Date: 1-12-14

OR 0104

Exhibit 62, page 21

of the Aircraft, including the engines, free and clear of all liens, claims, demands and encumbrances, which title Seller will convey to Purchaser. Purchaser and Seller warrant that each has the authority to enter into this transaction under its articles of incorporation and the applicable law of the state of its incorporation.

11.   **Assignments of Programs and Warranties:** Seller hereby assigns to Purchaser (to the extent assignable), as of the date of Closing, all of the rights, warranties, representations, covenants, and indemnities made to Seller by or which Seller is entitled to enforce against any predecessor in title to the Aircraft or from the Aircraft manufacturer, if any. Seller agrees to assist Purchaser, at Purchaser's sole cost and expense, in enforcing or arranging for the enforcement by appropriate parties for Purchaser's benefit, at Purchaser's sole cost and expense, all such rights, warranties, representations, covenants and indemnities, including transfer to Purchaser at Closing of any other third party service or maintenance agreements. However, Purchaser shall pay any costs related to the transfer of such warranties and programs.

12.   **Acceptance Flight:** Shall not exceed two (2) hours with Sellers Pilot in Command as captain during the flight and the Purchaser may provide a qualified co-pilot for such Acceptance Flight. The Acceptance Flight may be combined with the ferry flight to transport the Aircraft to the location of the final Delivery.

13.   **Applicable Law:** This Agreement shall be construed and interpreted under the laws of the State of California in the County encompassing the City of San Diego.

14.   **Enforceability:** In the event any provision of this Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without affecting the remaining provisions of this Agreement which shall continue in full force and effect.

15.   **Survival:** The covenants, agreements, representations and warranties by Seller shall survive the Closing of this transaction.

16.   **Cooperation:** Each party shall execute and deliver all such documents as may reasonably be requested in order to implement the intent and purposes of this Agreement, and shall cooperate reasonably in carrying out the Closing.

17.   **Broker's Commissions:** Seller shall be responsible for payment of a commission due to its broker, if any. Purchaser has not engaged any broker. Seller does hereby agree to indemnify and defend Purchaser and hold Purchaser harmless from any and all commissions, claims to such commissions or similar fees, including attorneys' fees incurred in any lawsuit regarding such commission or fees to Broker, or any other broker to the extent such claims or liabilities are by any broker claiming by, through or under Seller and are based upon the actions of Seller. Purchaser does hereby agree to indemnify Seller and hold Seller harmless from any and all commissions, claims to such commissions or similar fees, including attorneys' fees incurred in any lawsuit regarding such commission or fees, to the extent such claims or liabilities are by any broker claiming by, through or under Purchaser and are based upon the actions of Purchaser.

18.   **Non-Disclosure:** The material terms and conditions set forth in this Agreement may not be disclosed in any fashion, either in whole or in part, to any third party (excluding governmental authorities and the disclosing party's legal counsel, financial institution, accountants and other relevant personnel with a need to know) unless in connection with enforcement of the terms hereof or unless the party desiring to make such disclosure first obtains the express written approval of the other party.

19.   **Litigation Expenses:** If litigation is instituted to enforce this Agreement, the prevailing party shall be awarded its reasonable attorney's fees incurred and all reasonable litigation costs, including depositions, expert witness fees, photographic expense, witness travel and lodging expense and all court costs.

20.   **Agreement Assignment:** Neither party may assign its rights, interests or obligations under this Agreement without the prior written consent of the other party.

21.   **International Registry:** Purchaser and Seller agree to timely register, and to cause their lenders and/or lessees, if any, to timely register, as users of the International Registry established pursuant to the Cape Town Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (collectively the "Cape Town Treaty") and to make, or cause to be made all filings and consents to filings required to perfect Purchaser's ownership interest, and the lien hold interest of Purchaser's lender, in the Aircraft pursuant to the Cape Town Treaty, concurrent with the Closing.

| Seller's Initials _____ Date _____ | Purchaser's Initials _11_ Date _1-12-1_ |

21.   International Registry:  Purchaser and Seller agree to timely register, and to cause their lenders and/or lessees, if any, to timely register, as users of the International Registry established pursuant to the Cape Town Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (collectively the "Cape Town Treaty") and to make, or cause to be made all filings and consents to filings required to perfect Purchaser's ownership interest, and the lien hold interest of Purchaser's lender, in the Aircraft pursuant to the Cape Town Treaty, concurrent with the Closing. Purchaser shall pay for all costs associated with registering Purchaser's and Purchaser's lender's International Interests, including but not limited to registering Purchaser and Purchaser's lender as a Transacting User Entity, filing fees for filing Purchaser's and Purchaser's lenders International Interests in the airframe and engines, and fees associated with searching the International Registry prior to, and after registration of Purchaser's and Purchaser's lender's International Interests.  Seller shall be required to pay its own costs related to registering Seller as a Transacting User Entity on the International Registry.

23.   Counterparts:  This Agreement may be executed in counterparts, each when read together constituting a binding agreement on the parties.  E-mailed signatures will have the full force and effect of original signatures.

24.   Entire Agreement:  This Agreement constitutes the entire agreement of the parties hereto with respect to the purchase and sale of the Aircraft; all prior representations and understandings having been merged herein.  This Agreement may not be modified or terminated orally.  No claimed modification, termination or waiver or any of the provisions of this Agreement shall be valid unless in writing signed by the party to be bound thereby.  The terms and conditions hereof supersede and cancel any terms contained in any other documents.  This Agreement becomes a binding contract when it is signed by both parties hereto.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed by their authorized officers as of the date and year first above mentioned.

SELLER: R Consulting & Sales, Inc.                     PURCHASER

By:_____                             By:_____
Name: Raquel Michel       Title: President             Name: Jose Luis Sanchez       Title: Individual
Address:   318 N Carson St, Suite 208                  Address: 1150 Lee Wagener Blvd, Suite 203
City/State/Zip:  Carson City, Nevada 89701             City/State/  Fort Lauderdale, Florida 33315
Phone:  (760) 809 4566                                 Phone: _____

| Seller's Initials _____  Date _____ | | Purchaser's Initials _JJ_  Date 1-17-14 |

OR 0106

Exhibit 62, page 23

| APPENDIX 1 |
|---|

### SPECIFICATIONS

_____ Landings, _____ since mid-life,  No Damage, Good P&I, Factory Maintenance Program, CMP

Max Ramp: 70,200 Lbs
Max Take-off: 69,700 Lbs

**Engine Specs:**
ROLLS ROYCE SPEY MKC 511-8

APU-Allied Signal GTCP 36-100 G-APU
s/n 440C

**Avionics/Radios:**
Sperry SPZ 800 Auto-Pilot
HNYWL Primus 880 Radar
Dual Collins FD-109 F.D.
Allied Signal TCS II W/CH7
Dual Collins VHF 220 Comms
Universal UNSIK FMS
Dual Collins VIR 30 NAVS
Universal UNS 1K GPS
Dual Collins ADF-60 ADF
Dual Litton 92 INS
Dual Collins DME-42 DME
Collins ALT 55B Radar ALT W/VTA
Dual HNYWL RCZ852 XPNDR
Universal Class A EGPWS
Dual Collins 671 URN/SEL H.F.

**Additional Equipment:**
AFT Lavatorie
AFT Galley
Convection Oven
Microwave Oven
Three Cabin Monitors
Panasonic DVD Player
Sony VCR
10 Disc CD Player

OTHER OPTIONS:

Fairchild A-100 CVR
RVSM Approved

| Seller's Initials _____   Date _____ | Purchaser's Initials ⁊⅂· Date 1·12·14 |
|---|---|

---

**Provisions for FDR '**
8.33 Spacing
FM Immunity
Gulfstream Camp

---

**Exterior:**
Overall White w/ Black Main Stripes

---

**Interior:**
12 Passenger Ten Individual Chairs, Three Place Divan, Chairs Beige Leather, Divan Beige and Tan Fabrics, Carpet Brown Sculptured. Headliner in Sand Ultra, Cabinetry and Wood Trim in Dark Burl.

---

**Inspection Status:**
On Factory Recommended Maintenance, Camp Maintenance Records.

Fresh 12, 24, & 72 Mo. and 5000 Cycle Inspections and Fresh Landing Gear O.H.

---

Seller's Initials _____ Date _____

Purchaser's Initials _____ Date 12-14

OR 0108

Exhibit 62, page 25

| APPENDIX 2 |
|---|

### DELIVERY RECEIPT

Pursuant to the Aircraft Purchase Agreement ("Agreement") dated the 1st of   December   , 2014 between R Consulting & Sales, Inc. (hereinafter "Seller") and Jose Luis Sanchez (hereinafter "Purchaser"), Purchaser hereby acknowledges

delivery on this FIRST day of December , 2014, of the following Aircraft:

        Year/Model:        1983 Gulfstream III
        Serial Number:        388
        Registration #:        N388LR

        Aircraft Total Time:_____

        Total Engine Hours-Left: _____

        Total Engine Hours-Right: _____

Delivery of the Gulfstream III has been made to Purchaser at:

(Facility), _____

_____

(City and State) _____
complete with all logbooks and equipment (as outlined on the Schedule A to the Agreement), as well as all spare or loose equipment associated with the Aircraft.

Purchaser has visually examined the Aircraft and completed a Pre-purchase Inspection as defined in the Terms and Conditions to the Aircraft Purchase Agreement, and hereby accepts delivery of the Aircraft under terms and conditions of the above referenced Agreement. As of this date, Purchaser further accepts the Aircraft "As Is, Where Is," with all faults.

<u>Agreed and Accepted By Purchaser:</u>

                Signed By:_____
                Name: _____
                Title: _____

| Seller's Initials _____   Date _____ | | Purchaser's Initials /U/  Date 1·77·14 |
|---|---|---|

OR 0109

Exhibit 62, page 26

**B FORM APPROVED**
OMB NO. 2120-0042

APPENDIX 3

## UNITED STATES OF AMERICA

**U. S. DEPARTMENT OF TRANSPORTATION FEDERAL AVIATION ADMINISTRATION**

*AIRCRAFT BILL OF SALE*

FOR AND IN CONSIDERATION OF $ 1.00 + o.v.c. THE UNDERSIGNED OWNER(S) OF THE FULL LEGAL AND BENEFICIAL TITLE OF THE AIRCRAFT DESCRIBED AS FOLLOWS:

UNITED STATES
REGISTRATION NUMBER   N388LR

AIRCRAFT MANUFACTURER & MODEL
Gulfstream III

AIRCRAFT SERIAL No.
388

DOES THIS ____ DAY OF __DECEMBER 2014____, HEREBY SELL, GRANT, TRANSFER AND DELIVER ALL RIGHTS, TITLE, AND INTERESTS IN AND TO SUCH AIRCRAFT UNTO:

Do Not Write In This Block
FOR FAA USE ONLY

| PUR CHA SER | NAME AND ADDRESS (IF INDIVIDUAL (S), GIVE LAST NAME, FIRST NAME, AND MIDDLE INITIAL.) |
| | Sanchez, Jose L |
| | DEALER CERTIFICATE NUMBER |

AND TO _____ EXECUTORS, ADMINISTRATORS, AND ASSIGNS TO HAVE AND TO HOLD SINGULARLY THE SAID AIRCRAFT FOREVER, AND WARRANTS THE TITLE THEREOF.

IN TESTIMONY WHEREOF ___ HAVE SET _____ HAND AND SEAL THIS ____ DAY OF _____, 2014.

| | NAME (S) OF SELLER (TYPED OR PRINTED) | SIGNATURE (S) (IN INK) (IF EXECUTED FOR CO-OWNERSHIP, ALL MUST SIGN.) | TITLE (TYPED OR PRINTED) |
|---|---|---|---|
| SEL LER | R Consulting & Sales, Inc. | | |
| | | | |
| | | | |

ACKNOWLEDGEMENT (NOT REQUIRED FOR PURPOSES OF FAA RECORDING: HOWEVER, MAY BE REQUIRED BY LOCAL LAW FOR VALIDITY OF THE INSTRUMENT.)

**ORIGINAL TO FAA**

AC Form 8050-2 (9/92) (NSN 0052-00-629-0003) Supersedes Previous Edition

Seller's Initials _____ Date _____

Purchaser's Initials _J_ Date 1-12-14

OR 0110

Exhibit 62, page 27

# WARRANTY BILL OF SALE

**APPENDIX 4**

(hereinafter "Seller"), in consideration of the sum of one dollar ($1.00) plus other good and valuable consideration paid by (hereinafter "Purchaser"), receipt of which is hereby acknowledged, pursuant and subject to an Aircraft Purchase Agreement between Seller and Purchaser, dated December 1st, 2014, (the "Agreement"), hereby sells, grants, assigns, transfers and delivers to Purchaser, its successors and assigns, all right, title and interest in and to the Aircraft described as: 1) 1983 Gulfstream III, bearing FAA Registration N388LR and manufacturer's serial number 388; 2) two (2) engines, respectively bearing manufacturer's serial numbers 3) all Aircraft records; and 4) other equipment of whatever nature installed on the Aircraft as set forth in the Agreement and as may be more fully set forth in Appendix 1 thereof, those items set forth or as provided in 1), 2) and 3) above being hereinafter collectively referred to as "Aircraft."

Seller hereby represents and warrants to, and agrees with, Purchaser, its successors and assigns, that (1) Seller is the lawful owner of the Aircraft and, Seller is hereby transferring and conveying to Purchaser full legal and beneficial title to the Aircraft and that Purchaser will acquire by the terms of this Warranty Bill of Sale and the FAA Bill of Sale (Form 8050-2) good and valid title to the Aircraft and that the Aircraft is free and clear of all mortgages, leases, security interests, claims, charges, liens and encumbrances of any kind whatsoever; (2) Seller has the right to sell the Aircraft as aforesaid; and (3) Seller shall warrant and defend title to the Aircraft against the claims of any person, party, firm, corporation or entity of any kind whatsoever which may have accrued, existed or attached thereto or arisen prior to transfer of title by Seller to Purchaser.

DISCLAIMER: BUYER UNDERSTANDS THAT THE AIRCRAFT IS BEING PURCHASED IN AN "AS IS, WHERE IS" CONDITION EXCEPT AS PROVIDED ABOVE TO THE CONTRARY. UNLESS OTHERWISE PROHIBITED BY LAW AND THIS AGREEMENT, BUYER AGREES THAT THE WARRANTIES OF SELLER SET FORTH IN THE FOLLOWING PARAGRAPH ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OF SELLER, WHETHER WRITTEN, ORAL OR IMPLIED, OTHER THAN THE EXPRESS WARRANTIES OF TITLE SET FORTH IN THE WARRANTY BILL OF SALE. BUYER ACKNOWLEDGES AND AGREES THAT SELLER SHALL NOT, BY VIRTUE OF HAVING OWNED AND SOLD THE AIRCRAFT OR OTHERWISE, BE DEEMED TO HAVE MADE ANY REPRESENTATIONS OR WARRANTY AS TO THE MERCHANTABILITY, FITNESS, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN, THE AIRCRAFT, OR TO HAVE MADE ANY OTHER REPRESENTATIONS OR WARRANTIES. SELLER DISCLAIMS AND BUYER WAIVES ALL WARRANTIES AND LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE (INCLUDING STRICT LIABILITY IN TORT), WITH RESPECT TO THE MERCHANTABILITY, FITNESS, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP IN, THE AIRCRAFT.

Seller's other warranties and representations, including disclaimers and limitations, with respect to the Aircraft are as set forth in the Agreement.

Seller agrees and acknowledges that the terms and conditions of this Warranty Bill of Sale, including without limitation, all representations, warranties and agreements for the benefit of Purchaser, shall survive the delivery of the Aircraft and the delivery, execution and recording of the FAA Bill of Sale.

In witness whereof, Seller has caused this Warranty Bill of Sale to be signed by its duly authorized officer this First day of December 2014.

Seller:

By:_____
Name:
Title:

| | |
|---|---|
| Seller's Initials _____ Date _____ | Purchaser's Initials ___ Date _____ |

OR 0111

**APPENDIX 5**

## AIRWORTHINESS DISCREPANCIES

| Seller's Initials _____   Date _____ |
| --- |

| Purchaser's Initials _44_ Date _1·12_ M |
| --- |

OR 0112

# EXHIBIT 63

5/6/2016 2:42:12 PM - Les Sychak (lsychak)
Claims - H15I47985

TCW Scott Weigman, DHS (C# 313-530-1931) He has been in contact with Lance Ricotta. Lance mentioned that we denied coverage and that it was based on us not believing him. He said that Lance also said that we apparently did not believe him (Scott). I advised Scott that we based our coverage position on facts and information from our investigation and input from the insured, i.e. R Consulting and Lance. Further, I never made a comment that I did not believe Scott and advised Scott that I consider such a statement by Lance to be slanderous. Scott backed off his statement somewhat and said that it wasn't quite like that, or words to that effect. Scott said he is just trying to help Lance out with his situation (I think he wants to do what he can to get Lance a settlement. He mentioned the $1M aircraft value and asked if the denial means that Lance just walks away from $1M because we don't have photos or location of the aircraft. I told him that it is much more complicated than that. Our coverage position is based on various provisions of the policy, to which I can't get into as that may be considered a private and confidential transaction between us and our insured.)

In an attempt to help Lance, he spoke with the DHS chief counsel to see what, if anything, DHS can share, possibly redacting portions of the reports. If so, he would send to Lance and let Lance send copies to us. However, the chief counsel said they can't provide copies of any reports per the Code of Federal Regulations. There are about 10 exceptions and this situation does not fall within any of them.

He'll let me know if that, or any other status, changes. Meanwhile, there is still no location of the aircraft and no photos.

Scott is very calm, cordial and even smooth with his conversation, but clearly looking for info. While I hoped to get info from him, it begs the question: What info could we possibly have that would help him? The most we really know from him is that he is aware of this aircraft. He "might' be involved in some type of investigation concerning the aircraft, but can provide no details, though he did go up the ladder in an attempt to do so. Regardless, that leaves us in the dark as to the current status of the aircraft, where it is, how it got there and its current condition.

OR 0164

Exhibit 63, page 1

# EXHIBIT 64

## Les Sychak

| | |
|---|---|
| **From:** | Les Sychak |
| **Sent:** | Tuesday, April 19, 2016 2:42 PM |
| **To:** | 'Weigman, Scott' |
| **Subject:** | RE: Gulfstream GIII, N388LR; R Consulting and Sales; Our File No.: H15i47985 |

Scott,

Thanks for your inquiry.  If you can provide the location of the aircraft and access to a report that would give details about what happened, pilots, purpose of the flight, etc., that would be helpful.

Best Regards,

Les Sychak
Vice President | Claims Special Projects Manager

Old Republic Aerospace | Old Republic Insurance Group
1990 Vaughn Road | Suite 350 | Kennesaw, GA 30144
O: 770.590.4950 | D: 678.569.2240 | F: 770.590.0599
www.OldRepublicAerospace.com
www.aircraftsalvageonline.com

**From:** Weigman, Scott [mailto:Michael.S.Weigman@ice.dhs.gov]
**Sent:** Friday, April 15, 2016 12:15 PM
**To:** Les Sychak <lsychak@oraero.com>
**Subject:** RE: Gulfstream GIII, N388LR; R Consulting and Sales; Our File No.: H15i47985

Hello Les,

Is there anything else I can assist with on this?

Thanks for the document you sent.

**Scott Weigman**
**Special Agent**

313-226-0781 Office
313-530-1931 Cellular

**From:** Les Sychak [mailto:lsychak@oraero.com]
**Sent:** Thursday, March 17, 2016 12:00 PM
**To:** Weigman, Scott
**Subject:** RE: Gulfstream GIII, N388LR; R Consulting and Sales; Our File No.: H15i47985

Scott,

Pursuant to our telephone conversation, here is my contact info, below.  As discussed, we have an insurance policy for R Consulting and Sales (R Consulting) which lists the GIII, N388LR as an insured aircraft.  We would appreciate any information you can provide on this aircraft.  As requested, attached is a copy of the Aircraft Purchase Agreement that was provided to us by R Consulting.  It shows a sale to Jose Luis Sanchez.

Best Regards,

1

OR 1360

Exhibit 64, page 1

# EXHIBIT 65

**Winkelhaus, Kathleen**

| | |
|---|---|
| **From:** | Coleman, Jim D. |
| **Sent:** | Tuesday, September 22, 2015 8:17 PM |
| **To:** | Winkelhaus, Kathleen |
| **Subject:** | R Consulting |

Kathy,

The renewal has gotten a little dicey. Lance believes one of his aircraft has been destroyed. He hasn't known of it's whereabouts since last December.

Jim Coleman
Account Manager
Avsurance Corporation
Office: 800-472-7090
Cell: 734-276-9484

2

AVSUR0000542

Exhibit 65, page 1

# EXHIBIT 66

**Coleman, Jim D.**

| | |
|---|---|
| **From:** | Coleman, Jim D. |
| **Sent:** | Monday, September 28, 2015 5:08 PM |
| **To:** | skywonders@aol.com |
| **Cc:** | Underwood, Ed W.; Winkelhaus, Kathleen |
| **Subject:** | RE: N388LR |

Lance,

Do you have any additional information you can provide? Name of the lessee, pilots, etc? Old Republic/Phoenix has pulled their renewal quote and started the non-renewal/cancellation process. Both USAIG and W. Brown have also retracted their quotes after getting wind of this situation. I believe had this been reported sooner, Phoenix may have had a different reaction, but because it took nearly 10 months to report, they no longer want anything to do with this placement.

I am still going to turn in your statement below and start the claim process, but I am now scrambling to find a market to insure the rest of the fleet.

Jim Coleman
Account Manager
Avsurance Corporation
Office: 800-472-7090
Cell: 734-276-9484
Fax: 734-663-8296

Begin forwarded message:

> **From:** Lance <skywonders@aol.com>
> **Date:** September 25, 2015 at 6:10:25 PM EDT
> **To:** Ed Insurance <eunderwood@avfuel.com>
> **Subject: N388LR**
>
> Hello Ed I have been doing some research and in December it departed Toluca Mexico for Quetero Mexico and asked to divert to Cancun Mexico it never arrived. Has never been seen since. I think it's time to file with insurance company. What's your thought?
>
> Lance

1

AVSUR0000843

# EXHIBIT 67

**Michael Mason**

| | |
|---|---|
| **From:** | Doug Bland <dbland@oraero.com> |
| **Sent:** | Thursday, December 03, 2015 9:38 AM |
| **To:** | Michael Mason |
| **Cc:** | Lance Ricotta; Paul Metsch |
| **Subject:** | RE: N388LR--the Aircraft  R Consulting  H15i47921 |

Dear Mr. Mason, I forwarded your email to my supervisor yesterday. He indicated that he would have Les Sychak, the adjuster on the coverage side, re-send the ROR and his letter requesting information. As soon as he gets that out I will review everything and make sure you have as complete a list as possible.

Best Regards,

*Doug Bland*
California Claims Manager

Old Republic Aerospace | Old Republic Insurance Group
2800 Camino Dos Rios, Suite 101C | Newbury Park, CA 91320
D: 805-496-7181 | F: 877 223-3830
www.OldRepublicAerospace.com
www.aircraftsalvageonline.com

---

**From:** Michael Mason [mailto:mmason@metschlaw.com]
**Sent:** Wednesday, December 02, 2015 1:26 PM
**To:** Doug Bland
**Cc:** Lance Ricotta; Paul Metsch
**Subject:** N388LR--the Aircraft

Dear Mr. Bland:

As you know, we represent R Consulting & Sales, Inc. ("R Consulting"), the insured under the policy of insurance with Old Republic relating to the Aircraft.  It was a pleasure speaking with you just now.

Per our discussion, please send me, in writing, a list of the items Old Republic requires so that it can process R Consulting's claim relating to the Aircraft as soon as possible.

In addition, in one of your December 1 emails, you requested a police report regarding the Aircraft.  Mr. Ricotta has reported the aircraft missing to the Department of Homeland Security ("DHX"), and, based on our information, the DHS has not generated any report.  Please advise how and to what agency you would like R Consulting to report the plane as missing/stolen.  To date, local law enforcement agencies have been unwilling to take a report regarding the Aircraft.

I look forward to hearing from you.

Sincerely,

Mike Mason

1

RCONS0599

Exhibit 67, page 1

Michael J. Mason
Metsch & Mason, LLP
Emerald Plaza
402 W. Broadway, Suite 2700
San Diego, CA  92101

Direct:  619-230-0897
Cell:     858-336-5886
Fax:      619-230-1839
E:         mmason@metschlaw.com
Web:    www.metschmason.com

RCONS0600

Exhibit 67, page 2